# EXHIBIT D
pages: 708-810



*1st Box to SEC-OWB*
*Feb, 2014*
*\* mortgage fraud*
*filed to Bill?*
*gas fraud*

English    Customer Service    USPS Mobile    Register   Sign In

**USPS.COM**

Sign up for My Tracking Find

# USPS Tracking™

Have questions? We're here to help.

Tracking Number: **9502800021854053000181**

Monday, February 24, 2014

Product & Tracking Information                              Available Actions

| Postal Product: | Features: | | |
| Priority Mail 2-Day™ | $50 insurance included | Certified Mail | |

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| **February 25, 2014** | **Depart USPS Sort Facility** | **WASHINGTON, DC 20018** |
| February 25, 2014 , 6:10 am | Processed through USPS Sort Facility | WASHINGTON, DC 20018 |
| February 22, 2014 , 2:49 pm | Acceptance (SSK) | FORT COLLINS, CO 80521 |

**Confirmation**

9502800021854053000181

Your request for all activity to-date will be processed within four hours. Any future activity will be processed whenever there is new delivery related event activity.

Your confirmation will be sent to the following:

meghan.belaski@gmail.com

Track Another Package

**What's your tracking (or receipt) number?**

*"1st part"*

**708**



## Acknowledgment Letter

**OWB Correspondence** <owbcorrespondence@sec.gov>                    Tue, Apr 1, 2014 at 9:11 AM
To: "Meghan.belaski@gmail.com" <Meghan.belaski@gmail.com>, ▬▬▬▬▬▬▬▬▬▬▬

Good Morning,

Attached is an acknowledgment letter as it pertains to your recent TCR submission. Please let me know if you have difficulty viewing this document. Should you have any additional information to provide, please mail or fax it to: SEC Office of the Whistleblower, 100 F Street NE, Mailstop 5971, Washington, DC 20549, 703-813-9322 (fax).  Thank you.

D. ▬▬▬

 **Belaski RMBS Ack  Letter - 01092014.docx**
   25K

Office of the Whistleblower
100 F Street, NE
Washington, DC 20549
Fax: (703) 813-9322
Hotline: (202) 551-4790

Ms. Meghan Belaski


Dear Ms. Belaski and ▇▇▇▇▇▇▇

The information you recently submitted to the SEC Office of the Whistleblower has been received.

Thank you for taking the opportunity to submit your information to us. Efforts by persons such as yourself are critical to the success of this program.

If you have any questions or concerns, please do not hesitate to contact the Office of the Whistleblower.



# LEI
## LAND ENERGY, INC.

**1615 California Street, Suite 702, Denver, Colorado 80202**
T: 303-825-5263   |   F: 303-825-6629   |   lane@landenergyinc.com

October 15, 2013



503 Mallard Drive
Severance, CO 80550

Re:     Oil and Gas Lease covering lands in:
        <u>Township 6 North, Range 67 West, 6th P.M.</u>
        Section 2:        Lot 58, Lakeview Addition First Filing, according to the Plat recorded December 23,
                          1980 at Reception No. 1845021
                          County of Weld, State of Colorado

        Net Acres:      0.069000
        Gross Acres:    0.138000

Dear ▇▇▇▇▇▇

Land Energy, Inc. (LEI) is working to develop mineral rights under the Lakeview Addition of Section 2. According to title, you own a partial mineral interest in the above described Lot. This correspondence has been sent in effort to determine if you, as a mineral owner, are interested in participating in the development of your oil and gas mineral rights.

An Oil and Gas Lease is the standard instrument used by the Oil and Gas industry to grant access to minerals underlying properties. In consideration for execution of an Oil and Gas Lease, a mineral owner receives an initial payment referred to as a bonus. Bonus payments are calculated on the basis of net mineral acres or can be paid as a flat bonus. The lease itself is bound by a lease term. In the event that wells are successfully completed in the specified time frame and minerals are extracted from lands underlying the lease, a share of the proceeds, referred to as royalty, is paid to the mineral owner. Royalty payments are based on a percentage of the net proceeds gained from production, proportionate to the mineral interest held by the mineral owner in a unitized area.

In residential areas, such as yours, drilling operations are limited to lands lying outside of developed neighborhoods and leases are written to exclude surface occupancy of any residential property. The acquisition of leases in residential areas is conducted to allow the pooling of adjoining properties to form a drilling unit. Drilling units, established through the Colorado State Oil and Gas Commission, are formed to define the area from which oil and or gas are to be extracted, and to establish the lands where the mineral owners are to receive royalty payments from the production of a well.

Land Energy, Inc. hereby offers to lease your mineral interest based on a flat bonus payment of $750.00 in consideration for execution of an Oil and Gas Lease with a primary term of three (3) years and an option to extend for an additional two (2) years, and royalty interest of nineteen percent (19%).

Enclosed you will find an Oil and Gas Lease package containing the following: Two (2) original Paid-Up Oil and Gas Leases, a forty-five (45) banking day sight draft, *(this sight draft is subject to title approval of actual mineral ownership, should the mineral ownership be different than the amount LEI is currently drafting, LEI shall re-draft for the correct amount)*, copies of each for your records, and a W-9 Form.

After reviewing the enclosed documents, should you find everything acceptable, please execute the two original Oil and Gas Leases by signing where indicated **in the presence of a Notary Public**. Please sign your name **exactly** as it appears on the lease.  The documents stamped "COPY" are for your records.

The draft will need to be endorsed and deposited with the *Collections Department* of your bank within fourteen (14) days of the date thereon, and will be paid forty-five (45) banking days after receipt by our bank. Again, this draft should be presented to the *Collections Department*, and not to the personal banking teller. Preferably, and in an effort to avoid any potential fees associated with the collection process, you can endorse the draft and send it back with the lease to our office. Upon receipt, we will deposit it for collection and our bank will send you notice of when the draft is due. The cashier's check will be sent directly to your address, subject to the terms of the draft.

Next, please fill out the W-9 form by inserting a Social Security or Tax ID number where provided and by signing and dating where indicated. We require this information for tax purposes only and will keep this information completely confidential.

After executing, please return the two (2) signed and notarized Oil and Gas Leases and the completed W-9 form at your earliest convenience in the stamped, self-addressed envelope provided. If you choose not to deposit the draft with your bank, please return the endorsed draft to us as well.

If you have any questions at all, please do not hesitate to call Land Energy, Inc. toll free at (800) 873-3054 or locally at (303) 825-5263. Thank you for your time and consideration in this matter.


Sincerely,
LAND ENERGY, INC.


*Alicia Beal*

Alicia Beal
Land Assistant
2006/sk

PRODUCERS 88-PAID UP
Rev. 5-60 No. 2
NE 94 OG

LEI-2000-3 

# OIL AND GAS LEASE

AGREEMENT, Made and entered into the 15th day of **October, 2013**, by and between ████████████ whose address is 503 Mallard Drive, Severance, CO 80550, (hereinafter called Lessor, whether one or more) and **Land Energy, Inc.** whose address is 1615 California St. Suite 702, Denver, CO 80202, (hereinafter called Lessee).

WITNESSETH, That the Lessor, for and in consideration of Ten and More ($10.00) DOLLARS cash in hand paid, the receipt of which is hereby acknowledged, and the covenants and agreements hereinafter contained, has granted, demised, leased and let, and by these presents does grant, demise, lease and let exclusively unto the said Lessee, the land hereinafter described, with the exclusive right for the purpose of drilling, mining, exploring by geophysical and other methods, and operating for and producing therefrom oil and all gas, to include coalbed methane gas, of whatsoever nature or kind, together with the right to construct and maintain pipelines, telephone and electric lines, tanks, ponds, roadways, plants, equipment, and structures thereon to produce, save and take care of said oil and gas (which right shall include specifically a right-of-way and easement for ingress to and egress from said lands by Lessee, or its assignees, agents or permittees, necessary to or associated with the construction and maintenance of such pipelines, telephone and electric lines, tanks, ponds, roadways, plants, equipment, and structures on said lands to produce, save and take care of the oil and gas), and the exclusive right to inject air, gas, water, brine and other fluids from any source into the subsurface strata, and any and all other rights and privileges necessary, incident to, or convenient for the economical operation of said land, alone or conjointly with neighboring land, for the production, saving and taking care of oil and gas (including dewatering of coalbed gas wells), and the injection of air, gas, water, brine, and other fluids into the subsurface strata, said lands being situated in the County

of _____Weld_____, State of _____Colorado_____, described as follows, to-wit:

Township 6 North, Range 67 West, 6th P.M.
Section 2:        Lot 58, Lakeview Addition First Filing, according to the Plat recorded December 23, 1980 at Reception No. 1845021
                      County of Weld, State of Colorado

**\*Notwithstanding anything to the contrary in this Oil and Gas Lease, any and all reference, in paragraph 3, regarding royalty interest, is hereby and by this reference hereto, amended to read nineteen percent (19%) royalty.**

Notwithstanding anything herein contained, this Lease is a "No Surface Occupancy" Oil and Gas Lease. It is agreed and understood that Lessee, its successors or assigns shall not conduct any operations or locate any facilities on the surface of the leased lands. It is understood that the Lessee, its successors or assigns shall not be allowed any access to the surface of the leased lands without the prior written consent of Lessor. Lessee is granted the right to drill and operate directional or horizontal wells through, across and under said lands, irrespective of the bottom hole location of said wells. To this end, Lessor herein grants to Lessee a subsurface easement for all purposes associated with such horizontal or directional well or wells regardless of whether or not Lessor benefits directly or indirectly from said well or wells. **In consideration of the foregoing Lessor further grants a waiver to any setbacks and by this lease does hereby waive any setbacks that may be required by the Colorado Oil and Gas Conservation Commission and/or any municipality having or purporting to have jurisdiction over the right to propose such setbacks except the 500 foot Excepting Zone Setback adopted by the Colorado Oil and Gas Conservation Commission in 2013.**

In addition to the lands described above, Lessor hereby grants, leases and lets exclusively unto Lessee, to the same extent as if specifically described, lands which are owned or claimed by Lessor by one of the following reasons: (1) all lands and rights acquired or retained by avulsion, accretion, reliction or otherwise as the result of a change in the boundaries or centerline of any river or stream traversing or adjoining the lands described above; (2) all riparian lands and rights which are or may be incident, appurtenant, related or attributed to Lessor in any lake, stream or river traversing or adjoining the lands described above by virtue of Lessor's ownership of the lands described above; (3) all lands included in any road, easement or right-of-way traversing or adjoining the lands described above which are or may be incident, appurtenant, related or attributed to Lessor by virtue of Lessor's ownership of the lands described above; and (4) all strips or tracts of land adjacent or contiguous to the lands described above owned or acquired by Lessor through adverse possession or other similar statutes of the state in which the lands are located.

For purposes of payment of rentals and royalties, Lessor and Lessee agree that the lease shall be treated as covering  0.14  acres, whatever more or less.
1. It is agreed that this lease shall remain in force for a term of three (3) years from this date and as long thereafter as oil or gas of whatsoever nature or kind is produced from said leased premises or on acreage pooled therewith, or drilling operations are continued as hereinafter provided. If, at the expiration of the primary term of this lease, oil or gas is not being produced on the leased premises or on acreage pooled therewith but Lessee is then engaged in drilling, re-working or dewatering operations thereon, then this lease shall continue in force so long as operations are being continuously prosecuted on the leased premises or on acreage pooled therewith; and operations shall be considered to be continuously prosecuted if not more than one hundred eighty (180) days shall elapse between the completion or abandonment of one well and the beginning of operations for the drilling of a subsequent well. If after discovery of oil or gas on said land or on acreage pooled therewith, the production thereof should cease from any cause after the primary term, this lease shall not terminate if Lessee commences additional drilling or re-working operations within ninety (90) days from date of cessation of production or from date of completion of dry hole. If oil or gas shall be discovered and produced as a result of such operations at or after the expiration of the primary term of this lease, this lease shall continue in force so long as oil or gas is produced from the leased premises or on acreage pooled therewith.

Additionally, Lessor hereby agrees and conveys to Lessee an exclusive option to renew and extend the primary term of this lease for an additional two (2) years from the original expiration date. Should Lessee elect to renew and/or extend this lease or any part thereof, Lessee shall pay a bonus consideration equal to the net mineral acre bonus paid herein. The notice to extend this lease and payment shall be postmarked by midnight the day prior to the expiration of the original primary term of this lease.
2. This is a PAID-UP LEASE. In consideration of the down cash payment, Lessor agrees that Lessee shall not be obligated, except as otherwise provided herein, to commence or continue any operations during the primary term. Lessee may at any time or times during or after the primary term surrender this lease as to all or any portion of said land and as to any strata or stratum by delivering to Lessor by filing for record a release or releases, and be relieved of all obligation thereafter accruing as to the acreage surrendered.
3. In consideration of the premises the said Lessee covenants and agrees:
1st. To deliver to the credit of Lessor, free of cost, in the pipeline to which Lessee may connect wells on said land, the equal one-eighth (1/8th) part of all oil produced and saved from the leased premises.
2nd. The Lessee shall pay Lessor, as royalty, on gas, including casinghead gas or other gaseous substances, produced from the leased premises and sold or used off the premises or used in the manufacture of gasoline or other products, the market value at the well of one-eighth of the gas sold or used, provided that on gas sold the royalty shall be one-eighth (1/8th) of the amount realized from such sale. The amount realized from the sale of gas shall be the price established by the gas sales contract entered into in good faith by Lessee and a gas purchaser for such term and under such conditions as are customary in the industry at the location where the well is located. "Price" shall mean the net amount received by Lessee after giving effect to applicable regulatory orders and after application of any applicable price adjustments specified in such contract or regulatory orders. Lessor and Lessee agree that costs that are customary in the area which are incurred by Lessee in gathering, compressing, dehydrating, and transporting gas to a pipeline or processing plant may be deducted from the royalty paid to Lessor.
3rd. To pay Lessor for gas produced from any oil well and used off the premises or in the manufacture of gasoline or any other product a royalty of one-eighth (1/8th) of the proceeds, at the mouth of the well, payable at the prevailing market rate.
4. If, at the expiration of the primary term or at any time or times thereafter there is any well on the leased premises either capable of producing oil or gas or subject to dewatering operations, then this lease shall not terminate so long as such well is shut in or such dewatering operations continue. For such well, Lessee shall pay or tender to Lessor or Lessor's successor or assigns One Dollar per year per net mineral acre retained hereunder, such payment or tender to be made on or before the anniversary date of this lease next ensuing after the expiration of 90 days from the date such well is shut in or dewatering commences and thereafter on or before the anniversary date of this lease during the period such well is shut in or is in a dewatering phase. Lessee's failure to pay or tender, or properly pay or tender, any such sum shall render Lessee liable for the amount due but it shall not operate to terminate this lease.
5. If said Lessor owns a lesser interest in the above described land than the entire and undivided fee simple estate therein, then the royalties (including any amount due as described in paragraph # 4 above) herein provided for shall be paid the Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.
6. Lessee shall have the right to use, free of cost, gas, oil and water produced on said land for Lessee's operation thereon, except water from the wells of Lessor.

713

Township 6 North, Range 67 West, 6th P.M.
Section 2:     Lot 58, Lakeview Addition First Filing, according to the Plat recorded December 23, 1980 at Reception No. 1845021
County of Weld, State of Colorado

**\*Notwithstanding anything to the contrary in this Oil and Gas Lease, any and all reference, in paragraph 3, regarding royalty interest, is hereby and by this reference hereto, amended to read nineteen percent (19%) royalty.**

Notwithstanding anything herein contained, this Lease is a **"No Surface Occupancy"** Oil and Gas Lease. It is agreed and understood that Lessee, its successors or assigns shall not conduct any operations or locate any facilities on the surface of the leased lands. It is understood that the Lessee, its successors or assigns shall not be allowed any access to the surface of the leased lands without the prior written consent of Lessor. Lessee is granted the right to drill and operate directional or horizontal wells through, across and under said lands, irrespective of the bottom hole location of said wells. To this end, Lessor herein grants to Lessee a subsurface easement for all purposes associated with such horizontal or directional well or wells regardless of whether or not Lessor benefits directly or indirectly from said well or wells. **In consideration of the foregoing Lessor further grants a waiver to any setbacks and by this lease does hereby waive any setbacks that may be required by the Colorado Oil and Gas Conservation Commission and/or any municipality having or purporting to have jurisdiction over the right to propose such setbacks except for the 500 foot Excepting Zone Setback adopted by the Colorado Oil and Gas Conservation Commission in 2013.**

In addition to the lands described above, Lessor hereby grants, leases and lets exclusively unto Lessee, to the same extent as if specifically described, lands which are owned or claimed by Lessor by one of the following reasons: (1) all lands and rights acquired or retained by avulsion, accretion, reliction or otherwise as the result of a change in the boundaries or centerline of any river or stream traversing or adjoining the lands described above; (2) all riparian lands and rights which are or may be incident, appurtenant, related or attributed to Lessor in any lake, stream or river traversing or adjoining the lands described above by virtue of Lessor's ownership of the lands described above; (3) all lands included in any road, easement or right-of-way traversing or adjoining the lands described above which are or may be incident, appurtenant, related or attributed to Lessor by virtue of Lessor's ownership of the lands described above; and (4) all strips or tracts of land adjacent or contiguous to the lands described above owned or acquired by Lessor through adverse possession or other similar statutes of the state in which the lands are located.

For purposes of payment of rentals and royalties, Lessor and Lessee agree that the lease shall be treated as covering __0.14__ acres, whatever more or less.

1. It is agreed that this lease shall remain in force for a term of three (3) years from this date and as long thereafter as oil or gas of whatsoever nature or kind is produced from said leased premises or on acreage pooled therewith, or drilling operations are continued as hereinafter provided. If, at the expiration of the primary term of this lease, oil or gas is not being produced on the leased premises or on acreage pooled therewith but Lessee is then engaged in drilling, re-working or dewatering operations thereon, then this lease shall continue in force so long as operations are being continuously prosecuted on the leased premises or on acreage pooled therewith; and operations shall be considered to be continuously prosecuted if not more than one hundred eighty (180) days shall elapse between the completion or abandonment of one well and the beginning of operations for the drilling of a subsequent well. If after discovery of oil or gas on said land or on acreage pooled therewith, the production thereof should cease from any cause after the primary term, this lease shall not terminate if Lessee commences additional drilling or re-working operations within ninety (90) days from date of cessation of production or from date of completion of dry hole. If oil or gas shall be discovered and produced as a result of such operations at or after the expiration of the primary term of this lease, this lease shall continue in force so long as oil or gas is produced from the leased premises or on acreage pooled therewith.

Additionally, Lessor hereby agrees and conveys to Lessee an exclusive option to renew and extend the primary term of this lease for an additional two (2) years from the original expiration date. Should Lessee elect to renew and/or extend this lease or any part thereof, Lessee shall pay a bonus consideration equal to the net mineral acre bonus paid herein. The notice to extend this lease and payment shall be postmarked by midnight the day prior to the expiration of the original primary term of this lease.

2. This is a **PAID-UP LEASE**. In consideration of the down cash payment, Lessor agrees that Lessee shall not be obligated, except as otherwise provided herein, to commence or continue any operations during the primary term. Lessee may at any time or times during or after the primary term surrender this lease as to all or any portion of said land and as to any strata or stratum by delivering to Lessor by filing for record a release or releases, and be relieved of all obligation thereafter accruing as to the acreage surrendered.

3. In consideration of the premises the said Lessee covenants and agrees:

1st. To deliver to the credit of Lessor, free of cost, in the pipeline to which Lessee may connect wells on said land, the equal one-eighth (1/8th) part of all oil produced and saved from the leased premises.

2nd. The Lessee shall pay Lessor, as royalty, on gas, including casinghead gas or other gaseous substances, produced from the leased premises and sold or used off the premises or used in the manufacture of gasoline or other products, the market value at the well of one-eighth (1/8th) of the gas sold or used, provided that on gas sold the royalty shall be one-eighth (1/8th) of the amount realized from such sale. The amount realized from the sale of gas shall be the price established by the gas sales contract entered into in good faith by Lessee and a gas purchaser for such term and under such conditions as are customary in the industry at the location where the well is located. "Price" shall mean the net amount received by Lessee after giving effect to applicable regulatory orders and after application of any applicable price adjustments specified in such contract or regulatory orders. Lessor and Lessee agree that costs that are customary in the area which are incurred by Lessee in gathering, compressing, dehydrating, and transporting gas to a pipeline or processing plant may be deducted from the royalty paid to Lessor.

3rd. To pay Lessor for gas produced from any oil well and used off the premises or in the manufacture of gasoline or any other product a royalty of one-eighth (1/8th) of the proceeds, at the mouth of the well, payable at the prevailing market rate.

4. If, at the expiration of the primary term or at any time or times thereafter there is any well on the leased premises either capable of producing oil or gas or subject to dewatering operations, then this lease shall not terminate so long as such well is shut in or such dewatering operations continue. For each such well, Lessee shall pay or tender to Lessor or Lessor's successor or assigns One Dollar per year per net mineral acre retained hereunder, such payment or tender to be made on or before the anniversary date of this lease next ensuing after the expiration of 90 days from the date such well is shut in or dewatering commences and thereafter on or before the anniversary date of this lease during the period such well is shut in or is in a dewatering phase. Lessee's failure to pay or tender, or properly pay or tender, any such sum shall render Lessee liable for the amount due but shall not operate to terminate the lease.

5. If said Lessor owns a lesser interest in the above described land than the entire and undivided fee simple estate therein, then the royalties (including any amount due as described in paragraph # 4 above) herein provided for shall be paid the Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

6. Lessee shall have the right to use, free of cost, gas, oil and water produced on said land for Lessee's operation thereon, except water from the wells of Lessor.

7. When requested by Lessor, Lessee shall bury Lessee's pipeline below plow depth.

8. No well shall be drilled nearer than 200 feet to the house or barn now on said premises without written consent of Lessor.

9. Lessee shall pay for damages caused by Lessee's operations to growing crops on said land.

10. Lessee shall have the right at any time to remove all machinery and fixtures placed on said premises, including the right to draw and remove casing.

11. The rights of the Lessor and Lessee hereunder may be assigned in whole or in part. No change of ownership of Lessor's interest (by assignment or otherwise) shall be binding on Lessee until Lessee has been furnished with notice, consisting of certified copies of all recorded instruments or documents and other information necessary to establish a complete chain of record title from Lessor, and then only with respect to payments thereafter made. No other kind of notice, whether actual or constructive, shall be binding on Lessee. No present or future division of Lessor's ownership as to different portions or parcels of said land shall operate to enlarge the obligations or diminish the rights of Lessee, and all Lessee's operations may be conducted without regard to any such division. If all or any part of this lease is assigned, no leasehold owner shall be liable for any act or omission of any other leasehold owner.

12. Lessee, at its option, is hereby given the right and power at any time and from time to time as a recurring right, either before or after production, as to all or any part of the land described herein and as to any one or more of the formations hereunder, to pool or unitize the leasehold estate and the mineral estate covered by this lease with any other land, lease or leases in the immediate vicinity for the production of oil and gas, or separately for the production of either, when in Lessee's judgment it is necessary or advisable to do so, and irrespective of whether authority similar to this exists with respect to such other land, lease or leases. Likewise, units previously formed to include formations not producing oil or gas, may be reformed to exclude such non-producing formations. The forming or reforming of any unit shall be accomplished by Lessee executing and filing of record a declaration of such unitization or reformation, which declaration shall describe the unit. Any unit may include land upon which a well has theretofore been completed or upon which operations for drilling have theretofore been commenced. Production, drilling or reworking operations or a well shut in for want of a market anywhere on a unit which includes all or a part of this lease shall be treated as if it were production, drilling or reworking operations or a well shut in for want of a market under this lease. In lieu of the royalties elsewhere herein specified, including shut-in royalties, Lessor shall receive on production from the unit so pooled royalties only on the portion of such production allocated to this lease; such allocation shall be that proportion of the unit production that the total number of surface acres covered by this lease and included in the unit bears to the total number of surface acres

714

in such unit and shall be subject to paragraph # 5 above.  In addition to the foregoing, Lessee shall have the right to unitize, pool or combine all or any part of the above described lands as to one or more of the formations thereunder with other lands in the same general area by entering into a cooperative or unit plan of development or operation approved by any governmental agency having authority to do so and, from time to time, with like approval, to modify, change or terminate any such plan or agreement and, in such event, the terms, conditions and provisions of this lease shall be deemed modified to conform to the terms, conditions, and provisions of such approved cooperative or unit plan of development or operation and, particularly, all drilling and development requirement of this lease, express or implied, shall be satisfied by compliance with the drilling and development requirements of such plan or agreement, and this lease shall not terminate or expire during the life of such plan or agreement.  In the event that said above described lands or any part thereof, shall hereafter be operated under any such cooperative or unit plan of development or operation whereby the production therefrom is allocated to different portions of the land covered by said plan, then the production allocated to any particular tract of land shall, for the purpose of computing the royalty payments to be made hereunder to Lessor shall be based upon production only as so allocated.  Lessor shall formally express Lessor's consent to any cooperative or unit plan of development or operation adopted by Lessee and approved by any governmental agency by executing the same upon request of Lessee.

13.  All express or implied covenants of this lease shall be subject to all Federal and State Laws, Executive Orders, Rules or Regulations, and this lease shall not be terminated, in whole or in part, nor Lessee held liable in damages, for failure to comply therewith, if compliance is prevented by, or if such failure is the result of, any such Law, Order, Rule or Regulation.

14.  Lessor hereby warrants and agrees to defend the title to the lands herein described, and agrees that the Lessee shall have the right at any time to redeem for Lessor, by payment, any mortgages, taxes or other liens on the above described lands, in the event of default of payment by Lessor and be subrogated to the rights of the holder thereof, and the undersigned Lessors, for themselves and their heirs, successors and assigns, hereby surrender and release all right of dower and homestead in the premises described herein, insofar as said right of dower and homestead may in any way affect the purposes for which this lease is made, as recited herein.

15.  When drilling, production or other operations are delayed, interrupted or stopped by lack of water, labor, material, inability to obtain access to leased premises, fire, flood, war, rebellion, insurrection, riot, strike, differences with workmen, failure of carriers to transport or furnish facilities for transportation of any product produced hereunder, lack of available or satisfactory market, in Lessee's opinion, for the oil or gas produced, or as a result of an order, or failure to issue permits, or the approval of any governmental agency, (including but not limited to orders restricting production) or as a result of any cause beyond the control of Lessee, the time of such delay, interruption or stoppage shall not be counted against the Lessee under any provision of this lease, and this lease shall not terminate by reason of any such delay, interruption or stoppage, and period of such delay, interruption or stoppage shall be added to the term of this lease.

16.  Should any one or more of the parties hereinabove named as Lessor fail to execute this lease, it shall nevertheless be binding upon all such parties who do execute it as Lessor.  The word "Lessor," as used in this lease, shall mean any one or more or all of the parties who execute this lease as Lessor.  All the provisions of this lease shall be binding on the heirs, successors and assigns of Lessor and Lessee.

17.  In the event Lessor considers that Lessee has not complied with all its obligations hereunder, either express or implied, Lessor shall notify Lessee in writing, setting out specifically in what respects Lessee has breached this lease.  Lessee shall then have sixty (60) days after receipt of said notice within which to meet or commence to meet all or any part of the breaches alleged by Lessor.  The service of said notice shall be precedent to the bringing of any action by Lessor on said lease for any cause, and no such action shall be brought until the lapse of sixty (60) days after service of such notice on Lessee.  Neither the service of said notice nor the doing of any acts by Lessor aimed to meet all or any of the alleged breaches shall be deemed an admission or presumption that Lessee has failed to perform all its obligations hereunder.  This lease shall never be forfeited or cancelled for failure to perform in whole or in part any of its implied covenants, conditions, or stipulations until a judicial determination is made that such failure exists and Lessee fails within a reasonable time to satisfy any such covenants, conditions, or stipulations.

18.  If, during the primary term of this lease, Lessor receives, from a third party, in an arms-length transaction, a bona fide offer, which Lessor is willing to accept, to purchase a lease on all or any part of the lease premises with that lease becoming effective on the expiration of this lease, Lessor agrees to immediately notify Lessee, in writing, of the offer, including in the notice the name and address of the offeror, the price offered and all of the pertinent terms of the offer.  Lessee shall have 15 days from the date of receipt of Lessor's written notice within which to elect to purchase a new lease on any part of the lands that are subject to this lease at the same price and on the same terms and conditions as specified in the third party offer.  All offers made at times up to and including the last day of the primary term of this lease shall be subject to the terms and conditions of this provision.  In the event Lessee elects to purchase the new lease it shall notify Lessor in writing prior to the expiration of the 15 day period.  Lessee shall promptly furnish Lessor the new lease for execution by Lessor, together with Lessee's payment of the bonus, as specified in the offer, as consideration for the new lease.  Upon receipt, Lessor shall promptly execute the new lease and return it to Lessee.  Lessee's failure to respond to Lessor's written notice within the 15 day period shall be deemed an election by Lessee not to purchase the new lease.  At that time, Lessor shall be free to execute the new lease in favor of the third party offeror.

IN WITNESS WHEREOF, this instrument is executed as of the date first above written.

Lessor:

By_____

---

## ACKNOWLEDGMENT-INDIVIDUAL

STATE OF_____}

COUNTY OF _____}SS

BEFORE ME, the undersigned, a Notary Public, in and for said County and State, on this _____ day of _____, 2013, personally appeared_____ to me known to be the identical person(s) described in and who executed the within and foregoing instrument of writing and acknowledged to me that____ duly executed the same as____free and voluntary act and deed for the uses and purposes therein set forth.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal the day and year last above written.

My Commission Expires:_____

Notary Public
Address:

715



THE COMMON LAW IS THE WILL OF *Mankind* ISSUING FROM THE *Life* OF THE *People*

SEARCH THE SITE



Due to the lapse in government funding, information on this website will not be routinely updated, the transactions submitted via the website may not be processed, and the department may not be able to respond to inquiries until funding has been restored.

## JUSTICE NEWS



**Message from the Attorney General and the President to Employees**
Tuesday, October 1, 2013
The following message from the Attorney General was emailed to Justice Department employees on October 1, 2013.



**Remarks as Prepared for Delivery by Attorney General Eric Holder on the Lawsuit Against the State of North Carolina**
Monday, September 30, 2013
We are here to announce that the Justice Department will file suit today against the State of North Carolina to challenge portions of the State's highly restrictive new voting law.

**Justice Department Reaches Fair Lending Settlement with Chevy Chase Bank Resulting in $2.85 Million in Relief for Homeowners**
Monday, September 30, 2013
The Justice Department filed a settlement agreement and order today that resolved allegations that Chevy Chase Bank F.S.B. engaged in a pattern or practice of discrimination against qualified African-American and Hispanic borrowers in its home mortgage lending from 2006 through 2009.



**North Carolina Businessman Sentenced for Tax Fraud**
Monday, September 30, 2013
William Robert Hupman Jr., of Mebane, N.C., was sentenced to serve 17 months in prison followed by one year of supervised release for tax fraud today, the Justice Department and the Internal Revenue Service (IRS)

## THE JUSTICE BLOG

September 27th, 2013
The Third Annual Summit on Preventing Youth Violence

September 25th, 2013
September 11th Victim Compensation Fund (VCF) Registration Deadline is October 3, 2013

September 19th, 2013
Attorney General Eric Holder Visits the FBI Washington Field Office (WFO) to Thank Investigators

September 9th, 2013
The Fight to Put an End to Wildlife Trafficking

## FEATURED RESOURCES

Questions & Answers Highlighting Ethics Issues that May Arise in the Event of a Lapse in Appropriations

Contingency Plan for Agency Operations in the Absence of Appropriations, 2014

Crime in the United States, 2012

Smart on Crime: Reforming the Criminal Justice System for the 21st Century

IC3 2012 Internet Crime Report

Firearm Violence, 1993-2011

Budget and Performance

JUSTICE.GOV *in* ESPAÑOL

DEPARTMENT *of* JUSTICE
ACTION CENTER

UNITED STATES ATTORNEYS



3119017 10/21/2003   12:06P   Weld County, CO
1 of 1 R 6.00  D 0.00  Steve Moreno Clerk & Recorder

RECORDER'S MEMORANDUM
THIS DOCUMENT WAS FOUND
TO F      DIATE FOR
         PURPOSES.

State of Colorado                Special Warranty Deed          FHA Case No. 052 199815

**017**

This Deed, Made this   October 17, 2003 , between the Secretary of Housing and Urban Development, of Washington, D.C., party of the first part, and ▮▮▮▮▮▮and Meghan B. Nutt parties of the second part, WHOSE LEGAL ADDRESS IS: 2812 Stanford Road, Ft Collins, CO 80525

Witnesseth: That the said party of the first part, for and in consideration of the sum of ($ 134,000.00) One Hundred Thirty Four Thousand and 00/100, and other good and valuable considerations, to the said party of the first part in hand paid by the said parties of the second part, the receipt whereof is hereby confessed and acknowledged, has granted, bargained, sold and conveyed and by these presents does grant, bargain, sell, convey and confirm unto the said parties of the second part, their heirs and assigns, forever, not in tenancy in common but in joint tenancy, the following described lot, piece or parcel of land situated in the County of WELD, State of Colorado, to wit:

LOT 56, LAKEVIEW ADDITION FIRST FILING, TOWN OF SEVERENCE, COUNTY OF WELD, STATE OF COLORADO

also known by street and number as: 503 Mallard Drive, Severence, CO 80550

Being the same property acquired by the party of the first part pursuant to the provisions of the National Housing Act, as amended (12 U.S.C. § 1701 et. seq.) and the Department of Housing and Urban Development Act (42 U.S.C. § 3531).

Together with all and singular the hereditaments and appurtenances thereunto belonging, or in any wise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof; and all the estate, right, title, interest, claim and demand whatsoever, of the said party of the first part, either in law or equity, of, in and to the above bargained premises, with the hereditaments and appurtenances;

To Have and To Hold the said premises above bargained and described with the appurtenances unto the said parties of the second part, their heirs and assigns forever.

Subject to All covenants, restrictions, reservations, easements, conditions and rights appearing of record; and Subject to any state of facts an accurate survey would show.

And the said party of the first part, for himself and his successors, covenants and agrees to and with the said parties of the second part, their heirs and assigns, the above bargained premises in the quiet and peaceable possession of the said parties of the second part, their heirs and assigns, against all and every person or persons lawfully claiming or to claim the whole or any part thereof, by, through or under the said party of the first part, to Warrant and forever Defend.

In Witness Whereof the undersigned has set his/her hand and seal as Attorney-in-Fact for and on behalf of the said Secretary of Housing and Urban Development.

Witnesses:                                    Secretary of Housing and Urban Development
                                              Prime Contract A.C-OPC-21326 U S Dept of HUD
_____     By:
                                              By _____ , Attorney-in-Fact
_____        (Print or Type Name)

State of  Texas        )
County of  Dallas      ) ss

The foregoing instrument was acknowledged before me this  14 day of  October 2003
by  Michael Kampschneider                        , who executed said instrument as Attorney-
In-Fact for and on behalf of the Secretary of Housing and Urban Development.

Witness my hand and official seal.

ALLISON STELLA
Notary Public, State of Texas
My Commission Expires
February 11, 2006

My Commission Expires

This instrument was drafted by HUD's Office of General, Rocky Mountains, 633 17th Street, Denver, Colorado, 80202.

3119018  10/21/2003   12:05P  Weld County, CO
1 of  22  R 111.00  D 0.00  Steve Moreno Clerk & Recorder

018

Return To:

HOME TOWN MORTGAGE, INC.

8939 COLUMBINE ROAD
EDEN PRAIRIE, MN  55347

Prepared By:

HOME TOWN MORTGAGE, INC.
8939 COLUMBINE ROAD
EDEN PRAIRIE, MN 55347
(952) 908-8300

——————————————————[Space Above This Line For Recording Data]——————————————————

# DEED OF TRUST

LOAN NO.:  31238

MIN   10017770000312389
MERS Phone: 1-888-679-6377

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated   OCTOBER 17, 2003
together with all Riders to this document.
(B) "Borrower" is

██████████ AND MEGHAN B. NUTT, HUSBAND AND WIFE


Borrower is the trustor under this Security Instrument.
(C) "Lender" is
HOME TOWN MORTGAGE, INC.

Lender is a  CORPORATION
organized and existing under the laws of   MINNESOTA

Initials:_____

COLORADO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS      Form 3006  1/01
VMP-6A(CO) (0005)                    Page 1 of 15        LENDER SPPORT SYSTEMS, INC. MERS6ACO.NEW (06/03)


MBN

718

3119018  10/21/2003   12:05P  Weld County, CO
2 of 22  R 111.00   D 0.00   Steve Moreno Clerk & Recorder

Lender's address is

8939 COLUMBINE ROAD, EDEN PRAIRIE, MN  55347

**(D) "Trustee"** is the Public Trustee of             WELD             County, Colorado.

**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F) "Note"** means the promissory note signed by Borrower and dated        OCTOBER 17, 2003
The Note states that Borrower owes Lender

ONE HUNDRED TWENTY SEVEN THOUSAND THREE HUNDRED AND NO/100 X X X X X X X X X X X X X X

Dollars

(U.S. $ 127,300.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than        NOVEMBER 01, 2033

**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:



[XX] Adjustable Rate Rider    [ ] Condominium Rider    [ ] 1-4 Family Rider
[ ] Graduated Payment Rider    [XX] *Planned Unit Development Rider*    [ ] Biweekly Payment Rider
[ ] Balloon Rider    [ ] Rate Improvement Rider    [ ] Second Home Rider
[ ] Other(s) [specify]

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments, and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M) "Escrow Items"** means those items that are described in Section 3.

**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

VMP-6A(CO) (0005)          Page 2 of 15          Initials: ____
                                                        Form 3006  1/01



MBN

719



3119018  10/21/2003  12:05P  Weld County, CO
16 of 22 R 111.00  D 0.00  Steve Moreno Clerk & Recorder

MIN    10017770000312389
MERS Phone: 1-888-679-6377

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this          17th          day of
OCTOBER, 2003          , and is incorporated into and shall be
deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security
Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to
HOME TOWN MORTGAGE, INC.

(the
"Lender") of the same date and covering the Property described in the Security Instrument and located at:

503 MALLARD DRIVE, SEVERANCE, CO  80546

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other
such parcels and certain common areas and facilities, as described in

COVENANTS, CONDITIONS AND RESTRICTIONS.

(the "Declaration"). The Property is a part of a planned unit development known as

LAKEVIEW

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent
entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the
uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument,
Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's
Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of
incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii)
any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when
due, all dues and assessments imposed pursuant to the Constituent Documents.

Initials: _____

MULTISTATE PUD RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3150 1/01
VMP-7R (0008)                                        Page 1 of 3          LENDER SUPPORT SYSTEMS INC. 7R.NEW (03/03)





MBN

720



3119018  10/21/2003   12:05P   Weld County, CO
17 of 22  R 111.00  D 0.00  Steve Moreno Clerk & Recorder

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Initials:_____

VMP-7R (0008)                    Page 2 of 3                    Form 3150 1/01



721

3119016  10/21/2003  12:06P  Weld County, CO
16 of 22 R 111.00  D 0.00  Steve Moreno Clerk & Recorder

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.

_____ 10/17/03 (Seal)          Meghan B. Nutt _____ (Seal)
                              -Borrower          MEGHAN B. NUTT              -Borrower

_____ (Seal)                   _____ (Seal)
                        -Borrower                                         -Borrower

_____ (Seal)                   _____ (Seal)
                        -Borrower                                         -Borrower

_____ (Seal)                   _____ (Seal)
                        -Borrower                                         -Borrower

VMP-7R (0008)                    Page 3 of 3                    Form 3150 1/01

722

3119018  10/21/2003  12:05P  Weld County, CO
15 of 22  R 111.00  D 0.00  Steve Moreno Clerk & Recorder

STATE OF   COLORADO

*Weld* County ss:

The foregoing instrument was acknowledged before me this *17* day of *October*

by ▮▮▮▮▮▮▮ AND MEGHAN B. NUTT, HUSBAND AND WIFE

Witness my hand and official seal.

My Commission Expires:

GREGORY C. PARHAM
NOTARY PUBLIC
STATE OF COLORADO
My Commission Expires 4/19/2006

_____
Notary Public

VMP-6A(CO) (0005)          Page 15 of 15          Initials: _____

Form 3006  1/01

723

MONDAY, FEBRUARY 16, 2015



Connect with HUD

Busque Información en Español

Site Map    Text  A-Z Index    Text  A  A  A

Search

# planned unit developments (PUDs)

Per Mortgagee Letter 2003-02 issued on January 22, 2003, HUD no longer approves PUD Projects.

Due to this Mortgagee Letter change, the PUD Approval List has been removed.

724

Form RD 3550-11
(Rev. 8-00)

Form Approved
OMB No. 0575-0172

**United States Department of Agriculture**
**Rural Housing Service**

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this _____ day of _____,_____
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security
Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to

(the "Lender")

of the same date and covering the Property described in the Security Instrument and located at:

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain
common areas and facilities, as described in

(the "Declaration"). The Property is a part of a planned unit development known as

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrowers interest in the homeowners association or equivalent entity owning or managing
the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

    **PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender
further covenant and agree as follows:
    **A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The
"Constituent Documents" are the: (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document
which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall
promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.
    **B. Hazard Insurance.** So long as the Owners Association maintains, with generally accepted insurance carrier, a "master"
or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts, for
the periods, and against the hazards Lender requires, including fire and hazards included within the term "extended coverage," then:

        (i) Lender waives the provision in Uniform Covenant 2 for the monthly payment to Lender of the yearly premium
        installments for hazard insurance on the Property; and
        (ii) Borrower's obligation under Uniform Covenant 5 to maintain hazard insurance coverage on the Property is deemed
        satisfied to the extent that the required coverage is provided by the Owners Association policy.

    Borrower shall give Lender prompt notice of any lapse in required hazard insurance coverage provided by the master or
blanket policy.
    In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to the Property,
or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender.
Lender shall apply the proceeds to the sums secured by the Security Instruments, with any excess paid to Borrower.
    **C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Associa-
tion maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.
    **D. Condemnation.** The proceeds of any award of claim for damages, direct or consequential, payable to Borrower in
connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD,
or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by
Lender to the sums secured by the Security Instrument as provided in Uniform Covenant 10.

*According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0575-01 72. The time required to complete this information collection is estimated to average 5 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.*

725

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to:

(i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain;

(ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender;

(iii) termination of professional management and assumption of self-management of the Owners Association; or

(iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.

_____(Seal)          _____(Seal)
                    -Borrower                                      -Borrower

_____(Seal)          _____(Seal)
                    -Borrower                                      -Borrower

_____(Seal)          _____(Seal)
                    -Borrower                                      -Borrower

726

Harried Appraisal Services

ORDER #2093698

# UNIFORM RESIDENTIAL APPRAISAL REPORT

File No. 408LASKNUT503

Summary Appraisal Report

| Property Description | | | | |
|---|---|---|---|---|
| Property Address | 603 MALLARD DR. | City SEVERANCE | State CO | Zip Code 80546 |
| Legal Description | SEV 1LV-58 LOT 68, LAKEVIEW ADDN 1ST FILING | | County WELD | |
| | | Tax Year 2003 | R.E. Taxes $ 1,023.28 | Special Assessments $ 0 |
| Assessor's Parcel No. 080702101058 | | Current Owner NUTT | Occupant ☒ Owner ☐ Tenant ☐ Vacant | |
| Borrower NUTT | ☒ Fee Simple ☐ Leasehold | Project Type ☒ PUD ☐ Condominium (HUD/VA only) | HOA $ 0 /Mo. | |
| Property rights appraised | | Map Reference 223-KH37 | | |
| Neighborhood or Project Name LAKEVIEW | | | Census Tract 0922.01 | |
| Sale Price $ | Date of Sale | Description & $ amount of loan charges/concessions to be paid by seller N/A-REFINANCE | | |
| Lender/Client Countrywide Home Loans | Address 6400 LEGACY DR., PTX-137, PLANO, TX 76024 | | | |
| Appraiser JASON S. SLATER/Certified Residential Appraiser | Address P.O. BOX 272288, FORT COLLINS, CO 80527 | | | |

| Location | ☐ Urban | ☒ Suburban | ☐ Rural | Predominant occupancy | Single family housing | | Present land use % | Land use change |
|---|---|---|---|---|---|---|---|---|
| | | | | | PRICE $(000) | AGE (yrs) | One family 98 | ☒ Not likely ☐ Likely |
| Built up | ☒ Over 75% | ☐ 25-75% | ☐ Under 25% | ☒ Owner 95 | | | 2-4 family | ☐ In process |
| Growth rate | ☐ Rapid | ☒ Stable | ☐ Slow | ☐ Tenant 5 | 130 Low NEW | | Multi-family | To: N/A |
| Property values | ☒ Increasing | ☐ Stable | ☐ Declining | ☒ Vacant (0-5%) | 850 High 100+ | | Commercial 2 | |
| Demand/supply | ☐ Shortage | ☒ In balance | ☐ Over supply | ☐ Vacant (over 5%) | Predominant | | | |
| Marketing time | ☒ Under 3 mos. | ☐ 3-6 mos. | ☐ Over 6 mos. | | 260 10 | | | |

Note: Race and the racial composition of the neighborhood are not appraisal factors.

Neighborhood boundaries and characteristics: THE SUBJECT IS LOCATED IN THE CENTRAL PART OF THE NEIGHBORHOOD OF THE SMALL TOWN OF SEVERANCE, WITH THE TOWN CONSIDERED THE MARKETING BOUNDARIES. REASONABLE ACCESS TO LOCAL CONVENIENCES.

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.): THERE IS REASONABLE ACCESS TO LOCAL CONVENIENCES IN SEVERANCE, IN ADDITION TO SHOPPING IN SEVERANCE, WINDSOR, FORT COLLINS, LOVELAND, AND GREELEY. THE NEARBY CITIES HAVE ALL SCHOOL LEVELS HEALTH FACILITIES, SHOPPING, AND FREEWAY ACCESS, AS WELL AS PUBLIC PARKS AND OTHER AMENITIES. PROXIMITY TO EMPLOYMENT AND OTHER AMENITIES IS TYPICAL OF SUBURBAN LOCATIONS IN NORTHERN COLORADO, WITH NO DETRIMENTAL INFLUENCES NOTED. EMPLOYMENT STABILITY IS OVERALL GOOD, WITH LOW UNEMPLOYMENT RATES FOR THE NORTHERN COLORADO AREA.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time -- such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.): CURRENT GENERAL MARKET CONDITIONS WITHIN THE SUBJECT'S AREA ARE TYPICAL OF THE WELD COUNTY AREA, WITH INTEREST RATES RANGING FROM 6.50% TO 8.50%. CURRENT RATES APPEAR TO BE STABLE, WITH NO UNUSUAL SELLER PARTICIPATION REGARDING LOAN DISCOUNTS, INTEREST BUY DOWNS, OR CONCESSIONS. TYPICAL MARKETING TIMES AND EXPOSURE TIMES RANGE FROM 0 TO 90 DAYS. PROPERTY VALUES ARE PRESENTLY STABLE TO SLOWLY TRENDING UPWARD. NO DETRIMENTAL MARKET CONDITIONS ARE NOTED.

| Project Information for PUDs (if applicable) - - Is the developer/builder in control of the Home Owners' Association (HOA)? | ☐ Yes ☐ No |
|---|---|
| Approximate total number of units in the subject project N/A | Approximate total number of units for sale in the subject project - not available as to 2003 Deed |

Describe common elements and recreational facilities: THE SUBJECT IS NOT LOCATED IN A PLANNED UNIT DEVELOPMENT.

| Dimensions SITE PERIMETER DIMENSIONS NOT AVAILABLE, SITE AREA PER COUNTY RECORDS. | | Topography LEVEL AT STREET GRADE |
|---|---|---|
| Site area 6,011 SF (PER COUNTY) | Corner Lot ☐ Yes ☒ No | Size 6,011 SF/TYPICAL FOR AREA |
| Specific zoning classification and description R- RESIDENTIAL | | Shape MOSTLY RECTANGULAR |
| Zoning compliance ☒ Legal ☐ Legal nonconforming (Grandfathered use) ☐ Illegal ☐ No zoning | | Drainage ADEQUATE/AWAY FROM HOUSE |
| Highest & best use as improved: ☒ Present use ☐ Other use (explain) | | View AVERAGE/RESIDENTIAL |
| | | Landscaping AVERAGE/TYPICAL |
| Utilities Public Other | Off-site improvements Type Public Private | Driveway Surface CONCRETE |
| Electricity ☒ | Street ASPHALT ☒ | Apparent easements TYPICAL UTILITY |
| Gas ☒ | Curb/gutter CONCRETE ☒ | FEMA Special Flood Hazard Area ☐ Yes ☒ No |
| Water ☒ | Sidewalk CONCRETE ☒ | FEMA Zone C | Map Date 9/22/1999 |
| Sanitary sewer ☒ | Street lights LAMP POST ☒ | FEMA Map No. 080260 0485 D |
| Storm sewer ☒ | Alley NONE | NO TITLE SEARCH OR |

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning use, etc.): SURVEY WAS MADE AVAILABLE TO THE APPRAISER. THEREFORE, ANY ADVERSE EASEMENTS COULD NOT BE DETERMINED. THE SITE IS FAIRLY TYPICAL FOR THE SUBJECT AREA. THE SUBJECT IS SURROUNDED ON ALL SIDES BY SIMILAR SINGLE FAMILY HOMES, WITH NO DETRIMENTAL VIEW OR EXTERNAL FACTORS NOTED.

| GENERAL DESCRIPTION | EXTERIOR DESCRIPTION | FOUNDATION | BASEMENT | INSULATION |
|---|---|---|---|---|
| No. of Units 1 | Foundation CONCRETE | Slab NONE | Area Sq. Ft. NO BASEMENT | Roof CONCLD ☒ |
| No. of Stories 1 | Exterior Walls FRAME | Crawl Space 100% | % Finished N/A | Ceiling CONCLD ☒ |
| Type (Det./Att.) DET | Roof Surface COMP. SHINGLE | Basement NONE | Ceiling N/A | Walls CONCLD ☒ |
| Design (Style) 1 STORY | Gutters & Dwnspts. STEEL | Sump Pump NONE NOTED | Walls N/A | Floor ☐ |
| Existing/Proposed EXISTING | Window Type SLIDING | Dampness NONE NOTED | Floor N/A | None ☐ |
| Age (Yrs.) 1986 | Storm/Screens THERMAL | Settlement NONE NOTED | Outside Entry N/A | Unknown ☐ |
| Effective Age (Yrs.) 5 | Manufactured House NO | Infestation NONE NOTED | | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | | | | | | NO BASEMENT |
| Level 1 | X | 1 | 1 | 1 | | | | 3 | 1.0 | X | | 1,056 |
| Level 2 | | | | | | | | | | | | |

Finished area above grade contains: 6 Rooms; 3 Bedroom(s); 1.0 Bath(s); 1,056 Square Feet of Gross Living Area

| INTERIOR Materials/Condition | HEATING | KITCHEN EQUIP. | ATTIC | AMENITIES | CAR STORAGE: 2 ATTACHED |
|---|---|---|---|---|---|
| Floors CARPET/WOOD | Type Forced Air | Refrigerator ☒ | None ☐ | Fireplace(s) # NONE | None ☐ |
| Walls DRYWALL | Fuel GAS | Range/Oven ☒ | Stairs ☐ | Patio OPEN ☒ | Garage # of cars |
| Trim/Finish STAINED WOOD | Condition WORKING | Disposal ☒ | Drop Stair ☐ | Deck NONE ☐ | Attached 2 (20 X 20) |
| Bath Floor VINYL TILE | COOLING | Dishwasher ☒ | Scuttle ☒ | Porch COVERED ☒ | Detached N/A |
| Bath Wainscot FIBERGLASS | Central NONE | Fan/Hood ☒ | Floor ☐ | Fence STOCKADE ☒ | Built-in N/A |
| Doors HOLLOW CORE | Other N/A | Microwave ☒ | Heated ☐ | Pool NONE ☐ | Carport N/A |
| | Condition N/A | Washer/Dryer ☒ | Finished ☐ | | Driveway OPEN PARK |

Above Condition AVERAGE TO GOOD

Additional features (special energy efficient items, etc.): THE SUBJECT IS IN OVERALL AVERAGE TO GOOD CONDITION, COVERED FRONT PORCH, OPEN REAR PATIO WITH ADDITIONAL CONCRETE PAD, VAULTED CEILINGS, NEW WOOD FLOORING AND INTERIOR PAINT, **REFER TO ADDENDUM**

Condition of the improvements, depreciation (physical, functional, and external), repairs needed, quality of construction, remodeling/additions, etc.: THE SUBJECT IS OF AVERAGE QUALITY, AND IN AVERAGE TO GOOD CONDITION. IT IS FUNCTIONALLY DESIGNED AND LOCATED IN A RESIDENTIAL DEVELOPMENT. NEITHER FUNCTIONAL NOR EXTERNAL OBSOLESCENCE WAS NOTED AT THE TIME OF THE INSPECTION. PHYSICAL DEPRECIATION APPEARS TYPICAL FOR A HOME OF THE SUBJECT AGE. THE EFFECTIVE AGE REFLECTS THE OVERALL CONDITION AND MAINTENANCE OF THE SUBJECT. NO REPAIRS NOTED.

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property: NO ADVERSE ENVIRONMENTAL CONDITIONS WERE OBSERVED. THE APPRAISER IS NOT AN EXPERT IN THIS FIELD, AND THE REPORT IS NOT AN ENVIRONMENTAL ASSESSMENT OF THE PROPERTY BEING APPRAISED.

PAGE 1 OF 2

Fannie Mae Form 1004 6/93

Freddie Mac Form 70 6/93

727

Hartlieb Appraisal Services

## FIRREA / USPAP ADDENDUM

*Borrower  NUTT
Property Address  503 MALLARD DR.
City  SEVERANCE                County  WELD                State  CO                Zip Code  80846
Lender/Client  Countrywide Home Loans/Landsafe Appraisal Services

**Purpose**
THE PURPOSE AND INTENDED USE OF THIS APPRAISAL REPORT IS TO ESTIMATE MARKET VALUE OF THE SUBJECT PROPERTY AS DEFINED IN THE LIMITING CONDITIONS HEREIN FOR FEDERALLY RELATED MORTGAGE LOAN PURPOSES.  **THIS SUMMARY REPORT IS INTENDED FOR THE USE BY THE NOTED LENDER/CLIENT (AND/OR ASSIGNS) FOR A MORTGAGE FINANCE TRANSACTION ONLY. THIS REPORT IS NOT INTENDED FOR ANY OTHER USE.

**Scope**
THIS APPRAISAL WAS COMPLETED FOR FEDERALLY RELATED MORTGAGE LOAN PURPOSES.  IT IS A COMPLETE APPRAISAL IN SUMMARY FORM COMPLETED IN CONFORMANCE WITH TITLE XI OF THE FIERRA ACT OF 1990, STANDARDS RULE 2-2(b) OF THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE FOR A SUMMARY REPORT.  THE APPRAISER PHYSICALLY INSPECTED THE SUBJECT PROPERTY, EXTERIOR AND INTERIOR.  MULTIPLE LISTING SERVICE REPORTS AND COUNTY ASSESSOR'S DATA WERE EXAMINED AND UTILIZED.  EXTENSIVE OFFICE FILE INFORMATION WAS ALSO EXAMINED FOR COMPARISON AND VERIFICATION OF OTHER PERTINENT DATA.  AN EXTERIOR INSPECTION OF ALL COMPARABLE SALES WAS DONE, AND THE SALES DATA WAS VERIFIED THROUGH AT LEAST TWO SOURCES.

**Intended Use / Intended User**
THE INTENDED USE OF THIS REPORT IS TO ESTIMATE MARKET VALUE OF THE SUBJECT PROPERTY.

THE REPORT IS TO BE USED SOLELY BY THE CLIENT NOTED ON PAGE ONE OF THE REPORT AS A BASIS FOR A LENDING DECISION.

**History of Property**
Current listing information:   THE SUBJECT IS NOT CURRENTLY LISTED FOR SALE.  PLEASE REFER TO THE SUBJECT'S 36 MONTH LISTING HISTORY.

Prior sale:   THE SUBJECT WAS PURCHASED BY THE CURRENT OWNER IN 10/2003 FOR $134,000, AT WHICH TIME THE SUBJECT WAS A "HUD" OWNED PROPERTY.  THE "COLORADO HOUSING AND FINANCE AUTHORITY" PURCHASED THE SUBJECT FROM THE FORMER OWNER ON 4/23/2003 FOR $151,171.  THE SUBJECT WAS PURCHASED BY THE PRIOR OWNER ON 1/9/2002 FOR $144,900.  THESE ARE THE SALES OF THE SUBJECT WITHIN THE PAST 36 MONTHS.

**Exposure Time / Marketing Time**
EXPOSURE TIME: the estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective opinion based on an analysis of past events assuming a competitive and open market.
BASED ON LOCAL STATISTICAL INFORMATION AND LOCAL SALES GATHERED BY THIS OFFICE, A REASONABLE EXPOSURE TIME FOR THE SUBJECT IS 1-3 MONTHS.
TYPICAL MARKETING TIME IS ALSO 1-3 MONTHS.

**Personal (non-realty) Transfers**
N/A - THIS APPRAISAL DOES NOT INCLUDE ANY CHATTEL ITEMS.

**Additional Comments**
AS OF THE DATE OF THIS APPRAISAL, JASON S. SLATER (CR40013069), HAS COMPLETED ALL CONTINUING EDUCATION REQUIREMENTS FOR THE STATE OF COLORADO, DEPARTMENT OF REGULATORY AGENCIES, AND FOR CURRENT CERTIFICATION IN THE APPRAISAL FOUNDATION.

I CERTIFY THAT THE USE OF THIS REPORT IS SUBJECT TO THE REQUIREMENTS OF THE APPRAISAL FOUNDATION RELATING TO REVIEW BY ITS DULY AUTHORIZED REPRESENTATIVES.

I CERTIFY, TO THE BEST OF MY KNOWLEDGE AND BELIEF, THAT THE REPORTED ANALYSIS, OPINIONS, AND CONCLUSIONS WERE DEVELOPED, AND THIS REPORT PREPARED IN CONFORMITY WITH THE REQUIREMENTS OF THE CODE OF PROFESSIONAL ETHICS AND THE STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE OF THE APPRAISAL FOUNDATION.

**Certification Supplement**
1.  This appraisal assignment was not based on a requested minimum valuation, a specific valuation, or an approval of a loan.
2.  My compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result or the occurrence of a subsequent event.

Appraiser(s):  JASON S. SLATER/Certified Residential Appraiser                Supervisory Appraiser(s): _____
Effective date / Report date:            08/05/2004                Effective date / Report date: _____

 **Supplemental Addendum**      File No. 40BLASNUT503

| | |
|---|---|
| Borrower/Client | NUTT |
| Property Address | 503 MALLARD DR. |
| City SEVERANCE | County WELD     State CO     Zip Code 80546 |
| Lender | Countrywide Home Loans/Landsafe Appraisal Services |

## PURPOSE AND INTENDED USE OF THE APPRAISAL

THE PURPOSE AND INTENDED USE OF THIS APPRAISAL REPORT IS TO ESTIMATE MARKET VALUE OF THE SUBJECT PROPERTY AS DEFINED IN THE LIMITING CONDITIONS HEREIN FOR FEDERALLY RELATED MORTGAGE LOAN PURPOSES. **THIS SUMMARY REPORT IS INTENDED FOR THE USE BY THE NOTED LENDER/CLIENT (AND/OR ASSIGNS) FOR A MORTGAGE FINANCE TRANSACTION ONLY. THIS REPORT IS NOT INTENDED FOR ANY OTHER USE.

## SCOPE OF THE APPRAISAL

THIS APPRAISAL WAS COMPLETED FOR FEDERALLY RELATED MORTGAGE LOAN PURPOSES. IT IS A COMPLETE APPRAISAL REPORT COMPLETED IN SUMMARY REPORT FORMAT IN CONFORMANCE WITH TITLE XI OF THE FIERRA ACT OF 1990, STANDARDS RULE 2-2 (b) OF THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE FOR A SUMMARY REPORT. THE APPRAISER PHYSICALLY INSPECTED THE SUBJECT PROPERTY, EXTERIOR AND INTERIOR. MULTIPLE LISTING SERVICE REPORTS AND COUNTY ASSESSORS DATA WERE EXAMINED AND UTILIZED. EXTENSIVE OFFICE FILE INFORMATION WAS ALSO EXAMINED FOR COMPARISON AND VERIFICATION OF OTHER PERTINENT DATA. AN EXTERIOR INSPECTION OF ALL COMPARABLE SALES WAS DONE, AND THE SALES DATA WAS VERIFIED THROUGH AT LEAST TWO SOURCES.

## COMMENTS ON FACTORS THAT AFFECT MARKETABILITY OF PROPERTIES

THE SUBJECT IS LOCATED IN THE SMALL TOWN OF SEVERANCE, IN AN AREA WITH CONSIDERABLE NEW CONSTRUCTION. THE AREA HAS OVERALL AVERAGE TO GOOD APPEAL, DEMAND, AND MARKETABILITY, AND IS PREDOMINATED BY HOMES OF VARIOUS QUALITY AND STYLES. THERE ARE NO DETRIMENTAL MARKET FACTORS NOTED. IT HAS GOOD ACCESS TO LOCAL CONVENIENCES, INCLUDING SHOPPING, HEALTH FACILITIES, AND EMPLOYMENT IN SEVERANCE, WINDSOR, FORT. COLLINS, LOVELAND, AND GREELEY. PROXIMITY TO EMPLOYMENT AND OTHER AMENITIES IS TYPICAL, WITH NO DETRIMENTAL INFLUENCES NOTED.

MAJOR AREA EMPLOYERS INCLUDE EASTMAN KODAK, HEWLETT PACKARD, IBM, THE UNIVERSITY OF NORTHERN COLORADO, VARIOUS GOVERNMENT AGENCIES, AND MANY OTHER LARGE AND MEDIUM SIZED COMPANIES. AREA VALUES ARE CURRENTLY RAPIDLY INCREASING AS THERE IS A HIGH DEMAND FOR PROPERTIES, WITH A RELATIVELY LIMITED NUMBER OF HOMES CURRENTLY ON THE MARKET FOR SALE. CONVENTIONAL AND FHA OR VA LOANS ARE TYPICAL FOR THE SUBJECT'S MARKET. TYPICAL MARKETING TIMES AND EXPOSURE TIMES RANGE FROM 5 TO 90 DAYS. THE AREA IS PROJECTED TO EXPERIENCE REASONABLE GROWTH PATTERNS THROUGH THE YEAR 2004 AND BEYOND.

## HIGHEST AND BEST USE

THE HIGHEST AND BEST USE IS DEFINED AS "THE REASONABLY PROBABLE AND LEGAL USE OF VACANT LAND OR AN IMPROVED PROPERTY, WHICH IS PHYSICALLY POSSIBLE, APPROPRIATELY SUPPORTED, FINANCIALLY FEASIBLE, AND THAT RESULTS IN THE HIGHEST VALUE. THE FOUR CRITERIA THE HIGHEST AND BEST USE MUST MEET ARE LEGAL PERMISSIBILITY, PHYSICAL POSSIBILITY, FINANCIAL FEASIBILITY, AND MAXIMUM PROFITABILITY. " (QUOTED FROM THE DICTIONARY OF REAL ESTATE APPRAISAL, THIRD EDITION.) AFTER RESEARCH OF THE HIGHEST AND BEST OF THE SUBJECT AS IMPROVED, IT WAS DETERMINED THAT THE HIGHEST AND BEST USE IS THE PRESENT USE OR RESIDENTIAL.

## COMMENTS REGARDING THE APPRAISAL OBSERVATION PROCESS

THIS APPRAISAL IS NOT A HOME INSPECTION AND THE APPRAISER IS NOT ACTING AS A HOME INSPECTOR WHEN PREPARING THE REPORT. THE BORROWER HAS THE RIGHT TO HAVE THE HOME INSPECTED BY A PROFESSIONAL HOME INSPECTOR AND/OR BUILDING CONTRACTOR.

WHEN PERFORMING THE OBSERVATION OF THIS PROPERTY, THE APPRAISER VISUALLY OBSERVED AREAS THAT WERE READILY ACCESSIBLE. THE APPRAISER IS NOT REQUIRED TO DISTURB OR MOVE ANYTHING THAT OBSTRUCTS ACCESS OR VISIBILITY.

THE APPRAISAL OBSERVATION DOES NOT OFFER WARRANTIES OR GUARANTEES OF ANY KIND. THE APPRAISER DOES NOT OFFER WARRANTIES ON THE CONDITION OF THE FURNACE, WIRING, ROOF SHINGLES, PLUMBING, WATER HEATER, OR ANY OTHER MECHANICALS OR ITEMS HIDDEN WITHIN WALLS OR UNDER FLOORS.

## COMMENTS ON THE APPRAISAL PROCESS

IN THE APPRAISAL PROCESS, THE APPRAISER SEARCHES FOR RECENT TRANSFERS THAT ARE AS SIMILAR TO THE SUBJECT AS POSSIBLE. HOMES ARE RARELY IDENTICAL IN EVERY WAY. GENERALLY, THERE ARE DIFFERENCES AND AMENITIES THAT THE TYPICAL BUYER WOULD EITHER PAY MORE OR LESS FOR. THE APPRAISER IDENTIFIES THE DIFFERENCES BETWEEN PROPERTIES THROUGH RESEARCH AND DATA COLLECTION. THE COMPARABLES ARE ADJUSTED FOR DIFFERENTIALS THAT ARE RECOGNIZED BY THE TYPICAL BUYER FROM THIS MARKET. THE DOLLAR AMOUNT OF THE ADJUSTMENTS IS TAKEN FROM THE MARKET, AS WELL AS FROM THE APPRAISERS GENERAL KNOWLEDGE OF THE MARKET. THE DOLLAR AMOUNT OF EACH ADJUSTMENT MAY DIFFER FROM DEVELOPMENT TO DEVELOPMENT, AND IS DEPENDENT ON OVERALL HOUSE QUALITY, MARKET DEMAND, AND MARKET APPEAL OF EACH INDIVIDUAL DEVELOPMENT AND EACH INDIVIDUAL DIFFERENTIAL. THE AMOUNT OF AN ADJUSTMENT IS DETERMINED BY PAIRED DATA ANALYSIS. PER THE DICTIONARY OF REAL ESTATE APPRAISAL, THIRD EDITION, PAGE 268, THE DEFINITION OF "PAIRED DATA ANALYSIS" IS: "A QUANTITATIVE TECHNIQUE USED TO

 **Supplemental Addendum**    File No.   40BtASNUT503

| Borrower/Client   NUTT | | | |
| Property Address   503 MALLARD DR. | | | |
| City   SEVERANCE | County   WELD | State   CO | Zip Code   80646 |
| Lender   Countrywide Home Loans/Lendsafe Appraisal Services | | | |

IDENTIFY AND MEASURE ADJUSTMENTS TO THE SALE PRICES OR RENTS OF COMPARABLE PROPERTIES; TO APPLY THIS TECHNIQUE, SALES OR RENTAL DATA ON NEARLY IDENTICAL PROPERTIES ARE ANALYZED TO ISOLATE A SINGLE CHARACTERISTIC EFFECT ON VALUE OR RENT". THIS APPRAISAL OFFICE PERFORMS CONTINUOUS PAIRED DATA ANALYSIS ON NUMEROUS ADJUSTABLE ITEMS, RECOGNIZED BY SPECIFIC MARKETS, TO DETERMINE ADJUSTMENTS FOR THOSE ITEMS AS THEY RELATE TO THOSE SPECIFIC MARKETS.

**ADDITIONAL FEATURES**

THE SUBJECT IS A 1 STORY STYLE HOME WITH A 2CAR ATTACHED GARAGE.  THE PROPERTY IS IN OVERALL AVERAGE TO GOOD CONDITION, WITH NO DETRIMENTAL ITEMS NOTED AS OF THE EFFECTIVE DATE OF THIS APPRAISAL.

THE SUBJECT IS SURROUNDED ON ALL SIDES BY SIMILAR SINGLE FAMILY HOMES, WITH NO DETRIMENTAL VIEW OR EXTERNAL FACTORS NOTED.

THE IMPROVEMENTS INCLUDE VAULTED CEILINGS AND NEWLY INSTALLED WOOD FLOORING IN THE ENTRY, LIVING ROOM, DINING ROOM, AND KITCHEN, AND NEW INTERIOR PAINT IN ALL ROOMS.

**COMMENTS REGARDING APPRECIATION OF THE SUBJECT**

IT IS NOTED THAT THE SUBJECT WAS PURCHASED BY THE CURRENT OWNER IN 10/2003 FOR $134,000  WITH THE APPRAISED VALUE FOR PURPOSES OF THIS APPRAISAL BEING $150,000.  THE SUBJECT WAS A "HUD" OWNED PROPERTY THAT HAD BEEN PLACED ON THE MARKET FOR $140,000. AFTER EXTENSIVE MARKET RESEARCH, IT APPEARS THAT THE SALE PRICE OF $134,000 WAS BELOW MARKET VALUE. SINCE THE PURCHASE, THE OWNERS HAVE INSTALLED GOOD QUALITY WOOD FLOORING IN THE ENTRY, LIVING ROOM, DINING ROOM, AND KITCHEN, AND PAINTED ALL INTERIOR ROOMS.
THE APPRECIATION IS SIGNIFICANT, HOWEVER, IT IS NOT CONSIDERED EXCESSIVE AND IS SUPPORTED BY CURRENT MARKET DATA.   *IMPORTANT... 134,000 not correct.*

**COMPARABLE SALES**

AFTER A CAREFUL SEARCH OF DATA FROM THE SUBJECT MARKET AREA, THE COMPARABLE SALES USED IN THE ANALYSIS WERE FOUND TO BE THE BEST, MOST CURRENT AVAILABLE.  THE SALES ARE THE MOST RECENT TRANSFERS OF 1 STORY STYLE HOMES FROM WITHIN THE SUBJECT DEVELOPMENT.

*PLEASE NOTE: THE SALE PRICE OF SALE #3 IS SLIGHTLY HIGHER THAN THE MOST RECENT LIST PRICE. WHILE THERE MAY BE SEVERAL SCENARIOS THAT WOULD CREATE THIS CHANGE (SELLER PAID CLOSING COSTS, NUMEROUS BUYERS BIDDING, ETC)., THE SALES PRICE IS CONSIDERED TO BE MARKET VALUE.

TWO ADDITIONAL PROPERTIES CURRENTLY LISTED FOR SALE WITHIN THE SUBJECT DEVELOPMENT ARE ANALYZED AND ATTACHED TO THIS REPORT.

THE COMPARABLES ARE ADJUSTED FOR DIFFERENTIALS THAT ARE RECOGNIZED BY THE TYPICAL BUYER FROM THIS MARKET.  THE DOLLAR AMOUNT OF THE ADJUSTMENTS IS TAKEN FROM THE MARKET, AND, THE APPRAISERS GENERAL KNOWLEDGE OF THE MARKET.  THIS IS DETERMINED BY PAIRED DATA ANALYSIS. PER THE DICTIONARY OF REAL ESTATE APPRAISAL, THIRD EDITION, PAGE 258, THE DEFINITION OF "PAIRED DATA ANALYSIS" IS: "A QUANTITATIVE TECHNIQUE USED TO IDENTIFY AND MEASURE ADJUSTMENTS TO THE SALE PRICES OR RENTS OF NEARLY IDENTICAL COMPARABLE PROPERTIES; TO APPLY THIS TECHNIQUE, SALES OR RENTAL DATA ON NEARLY IDENTICAL PROPERTIES ARE ANALYZED TO ISOLATE A SINGLE CHARACTERISTICS EFFECT ON VALUE OR RENT".  THIS APPRAISAL OFFICE PERFORMS CONTINUOUS PAIRED DATA ANALYSIS ON NUMEROUS ADJUSTABLE ITEMS, RECOGNIZED BY SPECIFIC MARKETS, TO DETERMINE ADJUSTMENTS FOR THOSE ITEMS AS THEY RELATE TO THOSE SPECIFIC MARKETS.

**NOTE: ALTHOUGH "BRACKETING" WITHIN THE SALES COMPARISON ANALYSIS SECTION OF THE REPORT IS THE IDEAL, IT IS NOT ALWAYS POSSIBLE IN THE REAL WORLD.  UNLESS A NEIGHBORHOOD IS FULL OF NEWER "TRACT" STYLE HOUSING, HOMES TEND TO BECOME INDIVIDUALIZED BY THE OCCUPANTS, AS REMODELS AND ADDITIONS OCCUR OVER THE YEARS.  THE APPRAISAL PROCESS LOOKS AT EACH INDIVIDUAL HOUSE (SALE), AND ADJUSTMENTS ARE MADE FOR THE DIFFERENCES BASED ON THE MATCHED PAIR ANALYSIS, THE APPRAISER'S KNOWLEDGE OF THE AREA MARKET, AND HIS/HER EXPERTISE.

**EXTRAORDINARY ASSUMPTIONS**

1. UNDER NORMAL CIRCUMSTANCES, THE APPRAISER(S) ARE NOT ABLE TO PHYSICALLY OBSERVE THE INTERIOR OF THE COMPARABLES (UNLESS OTHERWISE STATED), AND ARE MAKING THE ASSUMPTION THAT THE INTERIOR CONDITIONS (CONDITION INCLUDES ANY INFORMATION REGARDING UPDATING AND/OR REMODELING) ARE IDENTIFIED WITH REASONABLE ACCURACY IN THE COMMENTS NOTED IN THE MLS DATA AND/OR FROM THE LISTING/SELLING REALTORS. THE APPRAISER(S) ALSO ASSUME THAT, WHERE SUCH INFORMATION MAY BE UNAVAILABLE, THE INTERIOR OF A GIVEN COMPARABLE IS SIMILAR IN CONDITION TO THE EXTERIOR, BASED ON HIS/HER EXTERIOR OBSERVATION OF THE COMPARABLES.

2. THE APPRAISER(S) ASSUME THAT THERE IS NO MOLD PRESENT IN THE SUBJECT THAT MAY ADVERSELY AFFECT THE OCCUPANTS, AND THEREBY POSSIBLY ADVERSELY AFFECT THE MARKETABILITY AND/OR VALUE OF THE PROPERTY BEING APPRAISED. THE APPRAISER(S) ARE NOT EXPERTS IN THIS FIELD, AND ARE NOT TRAINED TO IDENTIFY OR DIAGNOSE ANY MOLDS OR SIMILAR INFLUENCES THAT MAY BE PRESENT. IF THE BORROWER IS

*2007 Appraisal via Countrywide wouldn't consider the comparables in neighborhood...*

223



3214223 08/31/2004  01:31P  Weld County, CO
1 of  10  R 76.00  D 0.00  Steve Moreno Clerk & Recorder

After R
COUNT
MS SV
P.O.B
Van N     610  067577044  D2  001  001

Prepared
MICHELLE CROWDER

---

[Space Above This Line For Recording Data]

FSL 240872                    0006757704408004
[Escrow/Closing #]                [Doc ID #]

# DEED OF TRUST

MIN 1000157-0001266331-8

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3,
11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in
Section 16.

(A) "Security Instrument" means this document, which is dated  AUGUST 25, 2004            , together
with all Riders to this document.
(B) "Borrower" is
████████████ AND MEGHAN B NOTT

Borrower is the trustor under this Security Instrument.
(C) "Lender" is
COUNTRYWIDE HOME LOANS, INC.
Lender is a CORPORATION
organized and existing under the laws of NEW YORK
Lender's address is
4500 Park Granada, Calabasas, CA 91302-1613                         County,
(D) "Trustee" is the Public Trustee of WELD                                    County,
Colorado.
(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting
solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this
Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and
telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated  AUGUST 25, 2004            . The
Note states that Borrower owes Lender
ONE HUNDRED TWENTY THOUSAND and 00/100

Dollars (U.S. $ 120,000.00          ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than  SEPTEMBER 01, 2034      .
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."

COLORADO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS      Initials: MBN
                                    Page 1 of 11
  -6A(CO) (0005)     CHL (08/05)(d)    VMP MORTGAGE FORMS - (800)521-7291                Form 3006  1/01
CONVVA

NA700240872

23991        0 6757704400002006A

731

3214223 08/31/2004 01:31P Weld County, CO
2 of 15 R 76.00 D 0.00    Steve Moreno Clerk & Recorder

DOC ID #: 0006577044080004

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower, in consideration of the debt and the trust herein created, irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

COUNTY                        of                    WELD
[Type of Recording Jurisdiction]              [Name of Recording Jurisdiction]

LOT 58, LAKEVIEW ADDITION FIRST FILING, TOWN OF SEVERANCE, COUNTY OF WELD, STATE OF COLORADO.

Parcel ID Number: R0157395                           which currently has the address of

503 MALLARD DRIVE, SEVERANCE
[Street/City]

Colorado      80546      ("Property Address"):
       [Zip Code]

@-6A(CO) (0005)    CHL (08/00)         Page 2 of 11              Form 3006 1/01



3214223  08/31/2004  01:31P  Weld County, CO
11 of 15 R 76.00  D 0.00  Steve Moreno Clerk & Recorder

STATE OF COLORADO,   MBN
                     LARIMER WELD          DOC ID #: 0006757704408004
                                           County ss:

by ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
The foregoing instrument was acknowledged before me this 25th day of August 2004
& Meghan B. Nutt

Witness my hand and official seal.

My Commission Expires:
9/5/06
                              _____
                                  Notary Public

[Notary seal: MEGAN B. NUTT   NOTARY PUBLIC   STATE OF COLORADO]

MBN

▓▓▓▓▓▓

Initials:_____

VMP -6A(CO) (0005)      CHL (08/00)        Page 11 of 11           Form 3006  1/01

733

3214224 08/31/2004 01:31P Weld County, CO
5 of 5 R 26.00 D 0.00 Steve Moreno Clerk & Recorder

DOC ID #: 0006757705208004

GENERAL: You or the Trustee can waive or delay enforcing any of your rights under this Deed of Trust without losing them. Any waiver by you of any provisions of this Deed of Trust will not be a waiver of that or any other provision on any other occasion.

THIS DEED OF TRUST has been signed by each of us under seal on the date first above written.

WITNESS:

_____        _____ (SEAL)
                                 Grantor

_____        _Meghan B. Nutt_____ (SEAL)
                                 Grantor   MEGHAN B. NUTT

                                 _____ (SEAL)
                                 Grantor

                                 _____ (SEAL)
                                 Grantor

STATE OF COLORADO, _Weld_____                    County ss:

The foregoing instrument was acknowledged before me this __25th__ day of __august__ , 2004 , by _____

Witness my hand and official seal.

My Commission Expires: 9-5-06        _____
                                     Notary Public

734

*Note listed Foreclosure #1*

RECORDING REQUESTED BY:
Countrywide Home Loans Servicing LP
Attn: Home Retention Division, Mail Stop :
FWACN-HRD
4500 Amon Carter Blvd
Fort Worth, TX 76155-2202

EFILED Document – District Court
2011cv2869
CO Weld County District Court 19th JD
Filing Date: May 27 2011 6:00PM MDT
Filing ID: 37619319

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## LOAN MODIFICATION AGREEMENT
### (Fixed Interest Rate)

This Loan Modification Agreement ("Agreement"), made this 23rd day of December 2008, between ▓▓▓▓▓ Meghan B Nutt  (the "Borrower(s)") and Countrywide Home Loans Servicing LP (the "Lender"), amends and supplements (1) the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument"), dated the 25th day of August 2004 in the amount of $120,000.00, and (2) the Note bearing the same date as, and secured by, the Security Instrument, and (3)  any prior agreements or modifications in effect relative to the Note and Security Instrument which covers the real and personal property described in the Security Instrument and defined therein as the "Property", located at: 503 Mallard Drive, Severance, CO 80546.

The real property described being set forth as follows:

### SAME AS IN SAID SECURITY INSTRUMENT

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

1.  As of the 1st day of February 2009, the amount payable under the Note and Security Instrument (the "Unpaid Principal Balance") is U.S. $125,444.64, consisting of the amount(s) loaned to the Borrower by the Lender which may include, but are not limited to, any past due principal payments, interest , fees and/or costs capitalized to date.

2.  The Borrower promises to pay the Unpaid Principal Balance, plus interest, to the order of the Lender.  Interest will be charged on the Unpaid Principal Balance at the yearly rate of 6.500% from the 1st day of January 2009. The Borrower promises to make monthly payments of principal and interest of U.S. $761.05 beginning on the 1st day of February 2009, and continuing thereafter on the same day of each succeeding month until principal and interest are paid in full.  If on the 1st day of September 2034 (the "Maturity Date"), the Borrower still owes amounts under the Note and Security Instrument, as amended by this Agreement, the Borrower will pay these amounts in full on the Maturity Date.

3.  The Borrower will make such payments at P.O. BOX 650070 Dallas, TX  75265-0070 or at such other place as the Lender may require.

4.  Nothing in this agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.  Except as otherwise specifically provided in this Agreement, the Note and Security Instrument will remain unchanged, and the Borrower and Lender will be bound by, and comply with, all terms and provisions thereof, as amended by this Agreement.

5.  In consideration of this Modification, Borrower agrees that if any document related to the Security Instrument, Note and/or Modification is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the loan as modified, or is otherwise missing, Borrower(s) will comply with Lender's request to execute, acknowledge, initial and deliver to Lender any documentation Lender deems necessary. If the original promissory note is replaced the Lender hereby indemnifies the Borrower(s) against any loss associated with a demand on the original note. All documents Lender requests of Borrower(s) shall be referred to as "Documents." Borrower agrees to deliver the Documents within ten (10) days after receipt by Borrower(s) of a written request for such replacement.



WDGFIXNR  8314  03/26/2008

735

Transunion   Online Dispute Service

Credit Report and Request Details

## Credit File Details

CURRENT FILE   FILE NUMBER   328681332   NAME   MEGHAN C. BELASKI
REPORT DATE   11/04/2013   ADDRESS   1212 SOUTHRIDGE DR
FORT COLLINS, CO 80521-4433

You may see that TransUnion has enriched your credit report with additional personal and financial information not previously retained in our production database. This data can enable you and your creditors to see a more complete picture of how you have managed your credit over time.

### Personal Information

**SSN:** ▓▓▓▓▓▓▓▓▓

**Names Reported:**
MEGHAN C. BELASKI and MEGHAN B. NUTT

You have been on our files since 06/01/1997
**Date of Birth:** 02/20/1976

### Addresses Reported

| Address | Date Reported |
|---|---|
| 1212 SOUTHRIDGE DR, FORT COLLINS, CO 80521-4433 | 10/31/2009 |
| 503 MALLARD DR, SEVERANCE, CO 80550-2921 | 12/31/2006 |
| 1003 CASTLEROCK DR, FORT COLLINS, CO 80521-4317 | 07/06/2007 |
| 734 EVELYN DR, CANON CITY, CO 81212-9405 | 02/14/2005 |
| 103 WEAVER LN APT A, CANON CITY, CO 81212-3977 | |

### Telephone Numbers Reported

| (719) 429-9939 | (719) 275-9565 | (970) 223-0166 | (970) 484-9226 | (970) 218-0918 | (970) 674-8090 | (222) 429-9939 |
|---|---|---|---|---|---|---|
| (970) 227-6421 | (970) 498-9262 | | | | | |

### Employment Data Reported

| Employer Name | Location | Date Verified |
|---|---|---|
| 16TH STREET CAFE LLC | CANON CITY, CO 81212 | 02/19/2007 |
| FRONT RANGE COM COLLEGE | | 08/01/2002 |

### Adjustable Rate Mortgage Information

The following information concerning adjustable rate mortgages was obtained from public records and appears on your report. The information was obtained from the Recorder's Office in the jurisdiction and state specified. None of these items contains adverse information; they are simply a listing of the information filed in the Recorder's Office concerning your adjustable rate mortgage.

## MORTGAGE DETAILS FROM PUBLIC RECORD    *Not correct*

**Recorder's Office:**
WELD, CO

| | | | |
|---|---|---|---|
| Origination Date: | 08/2004 | Loan Amount: | $120,000 |
| Initial Rate Adjustment: | 09/2007 | Initial Interest Rate: | 5.5% |
| Next Rate Change Date: | 09/2014 | Rate Calculation Change: | 2.25% |
| Rate Change Frequency: | Monthly | Change Percent Limit: | 2% |
| Rate Change Interval: | 12 | Maximum Rate: | 11.5% |
| Index Type: | LIB | Combined Loan to Value: | 78.6% |

736

Cynthia Lowery-Graber
#34145

**STATEMENT BY ATTORNEY FOR QUALIFIED HOLDER PURSUANT TO 38-38-101, C.R.S.**

I, _____, of The Castle Law Group, LLC as attorneys for Nationstar Mortgage LLC ("Qualified Holder"), provide the below Statement to the County Public Trustee of Weld County, Colorado, that the following is true and correct, to the best of our knowledge, following reasonable inquiry:

Check applicable boxes:

☑ 1.  Nationstar Mortgage LLC ("Qualified Holder") is the holder of the evidence of debt.  A true and correct copy, except for redaction of any non-public information and personal identifying information required by applicable federal or state law of the evidence of debt is attached hereto.  The attached copy of the evidence of debt may not include post-execution endorsements as contemplated by 38-38-101(2), C.R.S.

☑ 2.  Nationstar Mortgage LLC ("Qualified Holder") is the current beneficiary of the Deed of Trust.  A true and correct copy, except for redaction of any non-public information and personal identifying information required by applicable federal or state law of the recorded Deed of Trust is attached hereto.

☐ 3.  Nationstar Mortgage LLC is a Qualified Holder pursuant to Section 38-38-100.3(20), C.R.S.  A true and correct copy(ies), except for redaction of any non-public information and personal identifying information required by applicable federal or state law of modification(s) is attached hereto.

☐ 4.  Nationstar Mortgage LLC is a Qualified Holder pursuant to Section 38-38-100.3(20), C.R.S.  A true and correct copy(ies), except for redaction of any non-public information and personal identifying information required by applicable federal or state law of the recorded partial release of the deed of trust is attached hereto.

☑ 5.  Nationstar Mortgage LLC ("Qualified Holder") is one of the following entities described in Section 38-38-100.3 (20), C.R.S.:

☐ (a).  A bank, as defined in section 11-101-401(5), C.R.S.;
☐ (b).  An industrial bank, as defined in section 11-108-101(1) C.R.S.;
☐ (c).  A federally chartered savings and loan association doing business in Colorado or a savings and loan association chartered under the "Savings and Loan Association Law", articles 40 to 46 of Title II, C.R.S.;
☐ (d).  A supervised lender, as defined in 5-1-301(46) C.R.S., that is licensed to make supervised loans pursuant to 5-2-302 C.R.S., that is either (I) a public entity, which is an entity that has issued voting securities that are listed on a national security exchange registered under the Federal "Securities Exchange Act of 1934" as amended, or (II) an entity in which all of the outstanding voting securities are held, directly or indirectly, by a public entity;
☐ (e).  An entity in which all of the outstanding voting securities are held, directly or indirectly, by a public entity that also owns, directly or indirectly, all of the voting securities of a supervised lender, as defined in Section 5-1-301(46) C.R.S., that is licensed to make supervised loans pursuant to Section 5-2-302 C.R.S.;
☐ (f).  A Federal Housing Administration approved mortgagee;
☐ (g).  A federally chartered credit union doing business in Colorado or a state chartered credit union, as defined in Section 11-30-101 C.R.S.;
☐ (h).  An agency or department of the federal government;
☐ (i).  An entity created or sponsored by the federal or state government that originates, insures, guarantees, or purchases loans or a person acting on behalf of such an entity to enforce an evidence of debt or deed of trust securing an evidence of debt; or
☐ (j).  Any entity listed in paragraphs (a) to (i) of this subsection (20) acting in the capacity of agent, nominee except as otherwise specified in subsection (10) of this section, or trustee for another person.

6.  The Qualified Holder of the evidence of debt agrees that it is obligated to indemnify and defend any person liable for repayment of any portion of the original evidence of debt in the event that the original evidence of debt is presented for payment to the extent of any amount other than the amount of a deficiency remaining under the evidence of debt after deducting the bid amount at sale, and any person who sustains a loss due to any title defect that results from reliance upon a foreclosure sale at which the original evidence of debt was not presented, subject to the limitations set forth in 38-38-101 (2) (a)-(c), C.R.S.

Nationstar Mortgage LLC
QUALIFIED HOLDER/CURRENT HOLDER OF THE EVIDENCE OF DEBT

Name and Title of Agent or Officer of Qualified Holder

350 Highland Dr.
Lewisville, TX  75067                     Cynthia Lowery-Graber
Address of Qualified Holder                    #34145

Signature
The Castle Law Group, LLC
Attorneys for Nationstar Mortgage LLC

Grantor: ████████ and Meghan B Nutt
Date of Deed of Trust:     August 25, 2004
Recording Date of Deed of Trust: August 31, 2004
Recording Information:    at Reception No. 3214223
County:  Weld

Nutt / 10-23712R

737



Consumer Financial
Protection Bureau

Welcome **Meghan Belaski** [Logout]

Case number ▓▓▓▓▓▓

11/30/13



## STATUS

Company responded

Nationstar Mortgage, Bank of NY Mellon said:
**Explanation of closure**
    PLEASE REFER TO THE ATTACHED DOCUMENT

**Response**
    PLEASE REFER TO THE ATTACHED DOCUMENT

## WHAT HAPPENED

**Describe what happened so we can understand the issue...**
    PLEASE REFER TO CURRENT CFPB CASE # ▓▓▓▓▓▓ for Meghan Belaski and ▓▓▓▓▓ in
regards to Bank of America et al., Real Time Resolutions and Castle-Law Group in Colorado. We are
submitting an additional complaint against The Bank Of NY Mellon et al., NationStar and if allowable,
the Public Trustee in Weld County, Colorado. Bank of America has serviced released this invalid debt
and mortgage to NationStar, and we dispute this transfer as of 11/30/13.

**Which part of the mortgage process is your issue related to?**
☐ Making payments

**This is about** Other

## DESIRED RESOLUTION

**What do you think would be a fair resolution to your issue?**
    Due to the nature of the case, and the continuous and purposeful misrepresentation and fraud
perpetrated in the foreclosure actions on our property in Weld County for over 3 years now, that
BANK of NY MELLON, NATIONSTAR, Bank of America, Real Time Resolutions, Castle-Law Group
and the Public Trustee of Weld County and MERS, withdraw the demand for the sale of the property
that will take place in a foreclosure action on 12/18/13 at 10 am in Weld County, and that Bank of
America and NationStar and Real Time Resolutions etc., understand and acknowledge that ▓▓▓ and I
do not recognize their company, or any companies associated with them as valid servicers or debt
holders of any loans in the name of ▓▓▓ and or Meghan Nutt aka Meghan Belaski. Bank of NY Mellon
does not have ANY RIGHT by law that would permit them to make the types of claims through a
public trustee and a law firm as the debt holders on our deed of trust(s) in Colorado considering the
due process implications and the Bank of NY Mellon et al., have no legal claim and should withdraw
the demand for the foreclosure as soon as possible due to the pending and pressing nature of this
situation and foreclosure scheduled for 12/18/13. Only clear title to ▓▓▓ and I would be appropriate
with all pertinent and acknowledged (by Land Energy Inc., on 10/15/13) mineral rights established in
the first filing (1980) of the subdivision and the special warranty deed issued to ▓▓▓ and I in 2003.
Neither NationStar or Bank of America can legally assert their ability to service a loan in Scott and I's
name at this time. There should also be a debt collection complaint filed in regards to the same issues
that have gone on for years related to BOA, RTR, Castle-Law, etc., also attached to the case #
▓▓▓▓▓▓ submitted on or around 9/2013 by Meghan Belaski and we would appreciate
providing that complaint # with a copy of this complaint as well.

738



December 3, 2013

Meghan Belaski
1212 Southridge Drive
Fort Collins, CO 80521

RE:     Nationstar Reference Number – ████1993
        Mortgagor – Meghan Belaski
        Property Address – 1212 Southridge Drive, Fort Collins, CO 80521
        CFPB Case Number – 131201-000013

Dear Meghan Belaski:

Nationstar Mortgage LLC (Nationstar) received your correspondence forwarded to us by Consumer Financial Protection Bureau (CFPB) on December 2, 2013, regarding concerns with the above referenced account.

Thank you for bringing this matter to our attention. We take all matters seriously and are in the process of reviewing your concerns. Our goal is to provide a response no later than December 17, 2013.

At Nationstar, customer concerns are important to us. Should you have any general questions other than those referenced in the correspondence, please contact:

<u>Customer Service Department</u>
Monday through Thursday, 8 a.m. to 8 p.m. CDT
Friday, 8 a.m. to 6 p.m. CDT
Toll-free number: 1.888.480.2432

Sincerely,

Cawana Collins
Customer Relations Specialist
Nationstar Mortgage LLC
350 Highland Drive
Lewisville, TX 75067
Toll-free number: 1.877.783.7480
extension: 467.0528
e-mail: cawana.collins@nationstarmail.com

Standard Mail

739





December 4, 2013


Meghan Belaski
1212 Southridge Drive
Fort Collins, CO 80521

RE:   Nationstar Reference Number – ██████-1993
      CFPB Case Number – ███████0013

Dear Meghan Belaski:

Nationstar Mortgage LLC (Nationstar) is in receipt of your correspondence submitted through the Consumer Financial Protection Bureau (CFPB) on December 2, 2013, regarding the mortgage loan reference above. We appreciate you bringing this to our attention, as we take matters such as this seriously.

We could not locate the case number in the CFPB portal for the old case number provided (           ). Furthermore, we cannot locate an account with the identifying information provided. Please provide a Nationstar account number, borrower social security number, or additional identifying information regarding the account in questions so that we can further research your concerns.

At Nationstar, customer concerns are important to us. Should you have any general questions other than those referenced in your correspondence, please contact:

<u>Customer Service Department</u>
Monday through Thursday, 8 a.m. to 8 p.m. CDT
Friday, 8 a.m. to 6 p.m. CDT
Saturday, 8 a.m. to 2 p.m. CDT
Toll-free Number: 1.888.480.2432


Sincerely,

*Cawana Collins*

Cawana Collins
Customer Relations Specialist
Nationstar Mortgage LLC
350 Highland Drive
Lewisville, TX 75067
phone: 480.467.0528
e-mail: Cawana.Collins@Nationstarmail.com

740

By CFPB Portal
cc: Consumer Financial Protection Bureau

This is an attempt to collect a debt and any information obtained will be used for that purpose. If this debt is in or has been discharged in a bankruptcy proceeding, be advised this communication is not an attempt to collect the debt against you. Please note, however, we reserve the right to exercise the legal rights only against the property securing the original obligation.



**John W. Suthers**
Attorney General

**Cynthia H. Coffman**
Chief Deputy Attorney General

**Daniel D. Domenico**
Solicitor General

# STATE OF COLORADO
## DEPARTMENT OF LAW

Consumer Protection Section
Consumer Credit Unit

**Ralph L. Carr**
**Colorado Judicial Center**
1300 Broadway, 6th Floor
Denver, Colorado 80203
Phone (720) 508-6000

December 5, 2013

Ms. Meghan Belaski & ████████
1212 Southridge Drive
Ft. Collins CO 80521

RE:     Your complaint against Real Time Resolutions Inc. (and others)

Dear Ms. Belaski & ██████

After careful review of your complaint and the collection agency's response, we have determined to take no further action at this time regarding the collection agency. Enclosed is a copy of the reply we received from the above-referenced organization. Your copy of the agency's reply does not include copies of investigative material which is considered confidential.

However, we have forwarded a copy of your complaint to the Consumer Protection-Mortgage Fraud division in our office. Additionally, we have forwarded your complaint regarding the Castle Law Firm to the Office of Attorney Regulations under the Supreme Court of the State of Colorado.

Your complaint will be retained in our files. It may be reviewed again if we receive other complaints against this collection agency which suggest a pattern of violations of the Colorado Fair Debt Collection Practices Act.

You may wish to consult an attorney concerning your rights pursuant to § 12-14-113, C.R.S. and other available legal remedies. Also enclosed is a Referral Agency List which may contain information useful to you in resolving your complaint.

Sincerely,

DARA ROCKETT BENOIT
Compliance Investigator
Consumer Credit Unit
(720)508-6101
(720)508-6033 (FAX)
Email: dara.benoit@state.co.us

741



**REAL TIME**
R E S O L U T I O N S

October 18, 2013



OCT 2 1 2013

OFFICE OF THE
ATTORNEY GENERAL

Colorado Department of Law
Consumer Credit Unit
Collection Agency Regulation
Attn: Tony Cordova
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 6th Floor
Denver, CO 80203

RE:    Consumer Complaint of Meghan Belaski

Dear Mr. Cordova:

Real Time Resolutions, Inc. ("RTR") would like to take this opportunity to respond to the complaint filed against our company by Meghan Belaski. RTR is committed to customer service and hopes this correspondence addresses Ms. Belaski's concerns. Please be advised that RTR is servicing a junior lien mortgage for customers Meghan Nutt n/k/a Meghan Belaski and ▮▮▮▮▮ regarding the property located at 503 Mallard Drive, Severance, Colorado 80546 ("Account"). Please note that RTR is unable to comment on the allegations regarding Bank of America, N.A. or Castle Law Group as they are wholly separate entities.

RTR acknowledges receipt of Ms. Belaski's inquiry on December 21, 2012, copy attached. RTR responded to Ms. Belaski on January 22, 2013 and supplied Ms. Belaski with (i) a copy of the mortgage securing the subject property, (ii) a copy of the note evidencing Ms. Belaski's promise to pay, and (iii) the loan history itemizing the Account's payment history since the Account was transferred to RTR and reflecting that RTR has not received a payment for the Account. RTR apologizes to Ms. Belaski if she believes our previous correspondence did not address her concerns and we would like to take this opportunity to clarify our previous correspondence.

RTR's records indicate that the senior lienholder for the subject property has previously initiated foreclosure proceedings. However, as RTR is servicing the junior lien, RTR did not initiate or participate in the foreclosure proceedings.

IMPORTANT NOTICE REQUIRED BY LAW:
Federal law requires us to notify you that (a) Real Time Resolutions, Inc. is considered a debt collector, (b) this is an attempt to collect a debt and (c) any information obtained will be used for that purpose. However, if you are currently in bankruptcy or have received a discharge in bankruptcy, this letter is not an attempt to collect a debt from you personally to the extent it is included in your bankruptcy or has been discharged, but is provided for informational purposes only.

1349 Empire Central, Suite 150 Dallas, TX 75247-4026
Main 877-469-7325 • Facsimile 214-599-6309
Corporate Hours of Operation: Monday-Friday 8:30am-5:30pm

742

Colorado Department of Law
Meghan Belaski

In regards to Ms. Belaski's allegations that the junior lien deed of trust is missing a notary acknowledgment for Ms. Belaski, RTR has reviewed the document and the notary acknowledges the signature of ████████ However, RTR disputes Ms. Belaski's allegations that due to the lack of notary acknowledgement the Account is invalid. The deed of trust secures the subject property, but the promissory note details Ms. Belaski's promise to repay a specific sum. As evidenced by the attached promissory note signed by Ms. Belaski, the debt remains valid.

In conclusion, it is RTR's belief that its servicing efforts are in compliance with state and federal law. Ms. Belaski may contact RTR toll free at 877-469-7325 to discuss the available payment arrangements for the Account. It is RTR's belief that no remedial action is necessary.

Sincerely,

T.J. Plichta
Chief Compliance Officer

Enclosures

IMPORTANT NOTICE REQUIRED BY LAW:
Federal law requires us to notify you that (a) Real Time Resolutions, Inc. is considered a debt collector, (b) this is an attempt to collect a debt and (c) any information obtained will be used for that purpose. However, if you are currently in bankruptcy or have received a discharge in bankruptcy, this letter is not an attempt to collect a debt from you personally to the extent it is included in your bankruptcy or has been discharged, but is provided for informational purposes only.

1349 Empire Central, Suite 150 Dallas, TX 75247-4026
Main 877-469-7325 • Facsimile 214-599-6309
Corporate Hours of Operation: Monday-Friday 8:30am-5:30pm

*From Jost & Shelton   Received 12/7/13*

## BEFORE THE OIL AND GAS CONSERVATION COMMISSION
## OF THE STATE OF COLORADO

IN THE MATTER OF THE APPLICATION OF PDC ENERGY, INC. FOR AN ORDER TO POOL ALL INTERESTS IN AN APPROXIMATE 400-ACRE DESIGNATED WELLBORE SPACING UNIT ESTABLISHED FOR PORTIONS OF SECTIONS 1, 2, 11 AND 12, TOWNSHIP 6 NORTH, RANGE 67 WEST, 6TH P.M., FOR THE CODELL FORMATION, WATTENBERG FIELD, WELD COUNTY, COLORADO

CAUSE NO.

DOCKET NO.

### APPLICATION

COMES NOW PDC Energy, Inc. ("Applicant"), by its attorneys, Jost & Shelton Energy Group, P.C., and makes this application to the Oil and Gas Conservation Commission of the State of Colorado ("Commission") for an order to pool all interests within an approximate 400-acre wellbore spacing unit for the drilling of the Simonsen 1i-421 well, (API No. 05-123-35976) ("Well") for the development of the Codell Formation on the following described lands:

Township 6 North, Range 67 West, 6th P.M.
Section 1:    W/2W/2
Section 2:    E/2E/2
Section 11:   NE/4NE/4
Section 12:   NW/4NW/4

Weld County, Colorado (hereinafter "Application Lands").

In support thereof, Applicant states and alleges as follows:

1.      Applicant is a corporation duly authorized to conduct business in the State of Colorado, and is a registered operator in good standing with the Commission.

2.      Applicant owns certain leasehold interests in the Application Lands.

3.      On April 27, 1998, the Commission adopted Rule 318A, which, among other things, allowed certain drilling locations to be utilized to drill or twin a well, deepen a well or recomplete a well and to commingle any or all of the Cretaceous Age Formations from the base of the Dakota Formation to the surface. On December 5, 2005, Rule 318A was amended to allow interior infill and boundary wells to be drilled and wellbore spacing units to be established. On August 8, 2011, Rule 318A was again amended to, among other things, address drilling of horizontal wells.

◯ — where is #4?

744

5.    Applicant designated the 400-acre wellbore spacing unit, as defined below, for the production of oil, gas, and associated hydrocarbons from the Codell Formation pursuant to Rule 318A. and notified the appropriate parties under Rule 318A.

6.    Applicant, pursuant to Commission Rule 530 and/or the provisions of C.R.S. § 34-60-116 (6) and (7), hereby requests an order to pool all interests, including but not limited to, any nonconsenting interests, in the Application Lands in the Codell Formation underlying the following approximate 400-acre designated wellbore spacing unit:

Township 6 North, Range 67 West, 6th P.M.
Section 1:    W/2W/2
Section 2:    E/2E/2
Section 11:   NE/4NE/4
Section 12:   NW/4NW/4

(hereafter "Wellbore Spacing Unit").

7.    Applicant requests that the Commission's pooling order be made effective as of the earlier of the date of this Application, or the date that the costs specified in C.R.S. § 34-60-116(7)(b) are first incurred for the drilling of the Well to the Codell Formation in the Application Lands.

8.    Applicant certifies that copies of this Application will be served on all persons owning an interest in the mineral estate of the tracts to be pooled within seven (7) days of the date hereof, as required by Rule 507.b(2), and that at least thirty (30) days prior to the hearing on this matter, each such interest owner not already leased or voluntarily pooled will be offered the opportunity to lease, or to participate in the drilling of the Well, and will be provided with the information required by Rule 530 as applicable. The list of such interested parties is attached hereto as Exhibit A.

9.    That in order to prevent waste and to protect correlative rights, all interests in the Wellbore Spacing Unit should be pooled for the orderly development of the Codell Formation, including any nonconsenting interests therein.

WHEREFORE, Applicant requests that this matter be set for hearing at the next available opportunity, that notice be given as required by law, and that upon such hearing, the Commission enter its order:

A.    Pooling all interests in the Application Lands and the Wellbore Spacing Unit for the development of the Codell Formation.

B.    Providing that the Commission's pooling order is made effective as of the earlier of the date of this Application, or the date that any of the costs specified in

C.R.S. § 34-60-116(7)(b) are first incurred for the drilling of the Well in the Wellbore Spacing Unit to the Codell Formation in the Application Lands.

C.    Providing that the interests of any owners with whom the Applicant has been unable to secure a lease or other agreement to participate in the drilling of the Well are pooled by operation of statute, pursuant to C.R.S. § 34-60-116(6) and (7), and made subject to the cost recovery provisions thereof with respect to the Well drilled to develop the Codell Formation in the Wellbore Spacing Unit comprising the Application Lands.

D.    For such other findings and orders as the Commission may deem proper or advisable in this matter.

WHEREFORE, Applicant respectfully requests that this matter be set for hearing in January 2014, that notice be given as required by law, and that upon such hearing, the Commission enter its order consistent with Applicant's request as set forth above.

Dated: November 22, 2013.

Respectfully submitted:

PDC ENERGY, INC.

By: _____
Jamie L. Jost
James Parrot
Jost & Shelton Energy Group, P.C.
Attorneys for Applicant
1675 Larimer Street, Suite 420
Denver, Colorado 80202
(720) 379-1812

Applicant's Address:
PDC Energy, Inc.
ATTN:  Marie McCord
1775 Sherman Street, Suite 3000
Denver, CO 80203-4341

746

## VERIFICATION

STATE OF COLORADO )
 ) ss.
CITY AND COUNTY OF DENVER )

John Krattenmaker, of lawful age, being first duly sworn upon oath, deposes and says that he is the Senior Regional Landman for PDC Energy, Inc., and that he has read the foregoing Application and that the matters therein contained are true to the best of his knowledge, information and belief.

John Krattenmaker
Senior Regional Landman
PDC Energy, Inc.

Subscribed and sworn to before this 27 day of November 2013.

Witness my hand and official seal.

[SEAL]

```
KRISTIE ANN MONEY
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20134031397
My Commission Expires May 16, 2017
```

My commission expires: 5/16/17

747

BEFORE THE OIL AND GAS CONSERVATION COMMISSION
OF THE STATE OF COLORADO

IN THE MATTER OF THE APPLICATION OF | CAUSE NO.
PDC ENERGY, INC. FOR AN ORDER TO |
POOL ALL INTERESTS IN AN APPROXIMATE | DOCKET NO.
400-ACRE   DESIGNATED   WELLBORE |
SPACING   UNIT   ESTABLISHED   FOR |
PORTIONS OF SECTIONS 1, 2, 11 AND 12, |
TOWNSHIP 6 NORTH, RANGE 67 WEST, 6TH |
P.M., FOR THE CODELL FORMATION, |
WATTENBERG   FIELD,   WELD   COUNTY, |
COLORADO

## AFFIDAVIT OF MAILING

STATE OF COLORADO          )
                           )ss.
CITY AND COUNTY OF DENVER  )

    I, Jamie Jost, of lawful age, and being first duly sworn upon my oath, state and declare that I am the attorney for PDC Energy, Inc. and that on or before the 4th day of ~~November~~, 2013, I caused a copy of the attached Application to be deposited in the United States Mail, postage prepaid, addressed to the parties listed on Exhibit A to the Application.

_December_

                                      Jamie L. Jost

Subscribed and sworn to before me November 27, 2013.

Witness my hand and official seal.

My commission expires: _9/18/17_

                                       Notary Public

DANIELLE E CARROLL
Notary Public
State of Colorado
Notary ID 20134059312
My Commission Expires Sep 18, 2017

748

*Nov, 2013 – reviewed 11/7/13*

### EXHIBIT A

Noble Energy
1099 18th Street, #1800
Denver, CO 80202

Mazel Group LLC
101 South Clermont
Denver, CO 80246

Timothy J. Mollohan & JoNell S. Mollohan, JT
11160 Weld County Rd 74
Severance, CO 80546

Mauricio &
Angela K. Lodwick, JT
308 Charles Avenue
Severance, CO 80546

Land Energy, Inc.
1615 California StreetDenver, CO 80202

James Lucian Anderson, II and
Barbara Jean Anderson, JT
409 3rd Street
Severance, CO 80546

Kevin P. Bach
410 Mallard Drive
Windsor, CO 80550

Fred E. Banghart &
Artis Jean Banghart &
Craig Banghart, JT
402 Broadview Drive
Severance, CO 80546

Amanda M. Banka &
Adam A. Banka, JT
1931 Mahogany Way
Severance, CO 80546

Carey Beecham &
Sharayah Beecham, JT
418 Broadview Drive
Severance, CO 80546

Bill R. Belitz & Debra Belitz, JT
1909 Mahogany Way
Severance, CO 80546

Ronald E. Bodine
417 Lakeview Drive
Severance, CO 80546

Robert A. Bowden &
Melissa D. BowdeN
240 4th Avenue
Severance, CO 80546

Christopher A. Bowers &
Kelcey D. Bowers, JT
1087 Mahogany Way
Windsor, CO 80550

Robert C. Brady & Cathy M. Brady, JT
400 Broadview Drive
Severance, CO 80550

Brandon D. Brake & Tamera I. Mather, JT
1906 Mahogany Way
Severance, CO 80546

Adam Brannon
867 Cliffrose Way
Severance, CO 80546

Robert A. Brinker and Ann L. Brinker, Joint
Tenants                           Severance, CO
305 Central Avenue
80546

Roger S. Brodzeller and Dawn R. Brodziller, JT
205 Ruth Avenue
Severance, CO 80546

Scott A. Brown
1063 Mahogany Way
Windsor, CO 80550

749

Ronald Brown and Ivy Brown, as Joint Tenants
511 2nd Street
Windsor, CO 80550
*Last address PDC has

Jason E. Brownhill and Jennifer L. Sumner-
Brownhill, as Joint Tenants
1939 Mahogany Way
Severance, CO 80546

John R. Buoniconti and Heather M. Buoniconti, as
Joint Tenants
1916 Mahogany Way
Severance, CO 80546

Aaron M. Burd and Jamie A. Burd, as Joint
Tenants
403 Mallard Drive
Severance, CO 80546

Timothy J. Carsrud and Jessica J. Carsrud, as Joint
Tenants
416 Broadview Drive
Severance, CO 80546

Scott Aaron Chapman and Pepper Michelle
Chapman, as Joint Tenants
1047 Mahogany Way
Severance, CO 80550

Cassandra J. Cheesman
422 Broadview Drive
Severance, CO 80546

Jacqueline L. Cisco and Michael S. Cisco
402 Mallard Drive
Severance, CO 80546

Michael Collins
1039 Mahogany Way
Severance, CO 80550

Bradley W. Conway and Ann F. Heiliger and
Franklin E. Heiliger and April C. Mason, as Joint
Tenants

1918 Mahogany Way
Windsor, CO 80550

Michael L. Coppola and Marie F. Turner, JT
507 2nd Street
Severance, CO 80546

Carl K. Cress
407 Vivian Street
Severance, CO 80546

Alison M. Daniel
860 Cliffrose Way
Severance, CO 80550

Lawrence P. DeMilt
202 Ruth Avenue
Severance, CO 80550

Beau Dennis and Corey Goodnight, as Joint
Tenants
1915 Mahogany Way
Severance, CO 80550

Courtney Devine and Travis Devine, JT
301 Central Avenue
Severance, CO 80546

Doke Enterprises, Inc., a delinquent Colorado
corporation
1425 WCR 32
Longmont, CO 80504

Gregory B. Driskill and Lisha A. Driskill, as Joint
Tenants
848 Cliffrose Way
Windsor, CO 80550

Josh Duran and Natasha Duran, as Joint Tenants
1900 Mahogany Way
Severance, CO 80550

Scott Dvorak
507 Vivian Street
Severance, CO 80546

Everitt Investments, Inc. and Double E & G, LLC,
as Joint Tenants
884 Cliffrose Way
Windsor, CO 80550

Federal National Mortgage Association
405 Mallard Drive
Windsor, CO 80550

Kurt M. Felker and Lacey J. Felker, as Joint
Tenants
1932 Mahogany Way
Severance, CO 80546

Joshua C. Fetzer and Amanda E. Fetzer, as Joint
Tenants
879 Cliffrose Way
Windsor, CO 80550

Lynda C. Fortier
504 Mallard Drive
Severance, CO 80546

Gregory A. Fretwell
875 Cliffrose Way
Severance, CO 80550

Bryan C. Geha
1937 Mahogany Way
Severance, CO 80546

Patrick A. Gersick and Lorri L. Gersick, as Joint
Tenants
500 Lakeview Drive
Severance, CO 80546

John Scott Gill and Jane G. Gill, as Joint Tenants
413 Broadview Drive
Severance, CO 80546

R. Paul Gleason and Sara J. Gleason, JT
307 Central Avenue
Severance, CO 80546

Gonzalo L. Gonzales and Lena J. Gonzales, as
Joint Tenants
1938 Mohogany Way
Severamce, CO 80550

William D. Goode and Susan K. Goode, JT
204 Ruth Avenue
Severance, CO 80546

Adam B. Grove and Megan Grove, as Joint
Tenants
1067 Mahogany Way
Severance, CO 80550

Derek D. Guard and Lindsay R. Guard, Joint
Tenants
863 Cliffrose Way
Severance, CO 80550

Carl Richard Gumina, Jr. and Judy A. Walton, as
Joint Tenants
408 Mallard Drive
Severance, CO 80546

Gordon Harrison and Shelby Lyons, as Joint
Tenants
872 Cliffrose Way
Severance, CO 80550

Michelle Hasbargen and Dana Hasbargen, JT
506 Vivian Street
Severance, CO 80546

Thomas K. Hatch and Sheila L. Hatch, JT
206 Ruth Avenue
Severance, CO 80546

Sarah E. Heeney and Gregory A. Heeney, as Joint
Tenants
1055 Mahogany Way
Severance, CO 80550

Justin G. Heikes and Teresa L. Heikes, JT
922 Cliffrose Way
Severance, CO 80546

Carrie A. Herrera and Kevin D. Lehman, as Joint
Tenants
1926 Mahogany Way
Windsor, CO 80550

Jessica M. Hill
904 Cliffrose Way
Severance, CO 80550

Jacob Hirsch, III
408 Broadview Drive
Severance, CO 80550

Richard D. Hoff and Sharon L. Hoff
P.O. Box 144
Severance, CO 80546-0144

Larry Howell and Donna Howell and Nathan
Howell, as Joint Tenants
502 Lakeview Drive
Severance, CO  80546

Wesley Carl Howland and Rachael Ann Howland,
as Joint Tenants
421 Lakeview Drive
Severance, CO  80550

Secretary of Housing and Urban Development of
Washington, D.C.
c/o Michaelson,
Connor and Boul, Inc.
4400 Will Rogers Parkway,
Suite 300
Oklahoma City, OK 73108

Raymond L. Hudgens, Jr. and Judith D. Hudgens,
JT
307 Jay Avenue
Severance, CO 80546

Steven D. Hulen
1924 Mahogany Way
Windsor, CO 80550

Daniel Dean Hull
901 Cliffrose Way
Windsor, CO 80580

Philip S. Hunter and Jessa P. Groves, Tenants in
Common
519 Broadview Drive
Windsor, CO 80546

Jeffrey S. Hutchinson and Jody L. Hutchinson, as
Joint Tenants
412 Mallard Drive
Severance, CO 80550

Ann Marie Jackson and Robert P. Jackson, as
Joint Tenants
1943 Mahogany Way
Severance, CO 80546

Eric W. Jackson and Elizabeth J. Jackson, as Joint
Tenants
912 Cliffrose Way
Severance, CO 80550

Derek S. Jackson and Joan E. Jackson, JT
210 Ruth Avenue
Severance, CO 80550

Corey John Jaskolski and Ann Jaskolski, JT
508 Vivian Street
Severance, CO 80546

Rebecca R. Johnson
411 Broadview Drive
Severance, CO 80550

JWP Properties, Ltd
4816 West Parkview
Ft. Collins, CO 80526

Zachary Kaplan and Bonnie E. Skolnik
514 Vivian Street
Severance, CO 80546

William T. Kellogg
503 Lakeview Drive
Severance, CO 80550

Michael E. Kelly
1940 Mahogany Way
Severance, CO 80550

Jeremy R. Kirby
420 Broadview Drive
Severance, CO 80550

Jonathan Noel Korban
412 Mallard Drive
Severance, CO 80550

Robert Lambrecht and Jane Lambrecht, JT
501 Vivian Street
Severance, CO 80550

Lazy JJD Family, Ltd., a delinquent Colorado
corporation
1425 WCR 32
Longmont, CO 80504

Stephanie Nicole Schleiger and Jesse Schleiger, as
Joint Tenants
888 Cliffrose Way
Severance, CO 80550

Jeremy Schlotthauer
404 Mallard Drive
Severance, CO 80550

Kyle Uwe C. Schnellmann and Christina M.
Schnellmann, as Joint Tenants
910 Mahogany Way
Severance, CO 80546

Corey Schwartzkopf
523 Vivian Street
Severance, CO 80546

Thomas W. Seaberg
501 Lakeview Drive
Severance, CO 80546

Louis Gage Shiers
415 Lakeview Drive
Severance, CO 80550

James N. Shreck and Annette M. Shreck, Joint
Tenants
311 Central Avenue
Severance, CO 80550

John James Sifford
513 Broadview Drive
Severance, CO 80546

Pamela Ann Skidmore
105 Ruth Avenue
Severance, CO 80546

Andrew H. Sloan and Sherri E. Sloan, as Joint
Tenants
900 Cliffrose Way
Severance, CO 80546

Michael D. Sturdy
1075 Mahogany Way
Severance, CO 80550

Sean Allen Swanson

920 Cliffrose Way
Severance, CO 80550

Cheri Dee Tatro
510 Broadview Drive
Severance, CO 80546

Cheryl L. Thompson
508 Broadview Drive
Severance, CO 80550

Timber Ridge - Severance II, LLC, A Colorado
Limited Liability Company
330 South College Avenue
Ft. Collins, CO 80525

Donna M. Wagner
415 Broadview Drive
Severance, CO 80546

Ryan Walker and Cassandra Bullard, as Joint
Tenants
1912 Mahogany Way
Severance, CO 80546

Wallygriff Revocable Living Trust
302 Central Avenue
Severance, CO 80546

Ian R. Webb and Samantha J. Webb, as Joint
Tenants
413 Lakeview Drive
Severance, CO 80550

Sharon Wieczorek
418 Lakeview Drive
Severance, CO 80550

Marcus A. White and Rachael K. Mattson-White
fka Rachael K. Mattson
1923 Mahogany Way
Severance, CO 80550

David E. Whiting
934 Cliffrose Way
Severance, CO 80546

Lloyd L. Winder and Lucille E. Winder, as Joint
Tenants
505 Broadview Drive

753

Severance, CO 80546

Wingland Holdings, LLC, a Colorado Limited
Liability Company
928 Cliffrose Way
Severance, CO 80546

Becky A. Worman and Zachary H. Worman, as
Joint Tenants
409 Broadview Drive
Severance, CO 80546

Philip J. Yearous and Rachel G. Perez, as Joint
Tenants
1094 Mahogany Way
Severance, CO 80550

Royalty Owners:

Carol Aguero

P.O. Box 152
Severance, CO 80546

Herman Altergott
2117 44th Avenue
Greeley, CO 80634

Adam S. Bagley
35900 WCR 23
Windsor, CO 80550

Heidi Baughman
5622 South Yank Ct.
Littleton, CO 80127

Herbert & Vivian Becker

P.O. Box 14
207 Charles Avenue
Severance, CO 80546

Jay B. & Deborah L. Becker
P.O. Box 190
310 Charles Avenue
Severance, CO 80546

Bruce L. Steinbrecher
3405 West 18th Street
Greeley, CO 80634

Douglas M. Burman
205 Ruth Avenue
Severance, CO 80546

Bruce C. & Cherie Carron
P.O. Box 9
446 1st Street
Severance, CO 80546

Mark E. Casseday
409 Vivian Street
P.O. Box 37
Severance, CO 80546

Ronald H. Connors
201 Ruth Avenue
Severance, CO 80546

Darrin C. & Pamela K. Cook
P.O. Box 5
301 Jay Avenue
Severance, CO 80546

Frances E. Cordell
P.O. Box 246
Severance, CO 80546

Harold G. & Cynthia G. Cox
411 Vivian Street
P.O. Box 181
Severance, CO 80546

Darren Welch & Ashley Henk, JT
303 Central Avenue
Severance, CO 80546-0303

Benjamin L. Dewitt
P.O. Box 65
Severance, CO 80546

Jason D. & Vandee M. Dittmar

504 Vivian Street
Severance, CO 80546

Delmar L. & Cynthia E.
Eikenberg
P.O. Box 249
Severance, CO 80546

Brian & Jodi Entgelmier
P.O. Box 274
203 Ruth Avenue
Severance, CO 80546



Lauren J.& Debroah K. Felte

35316 WCR 23
Severance, CO 80546

Philip N. & Rebecca L. Graff
203 Charles Avenue
Severance, CO 80546

Roberta A. Hass
P.O. Box 213
Severance, CO 80546

Timothy Harris & Kelly Harris
309 Central Avenue
Severance, CO 80546

Roger B. & Theresa A. Hartshorn
P.O. Box 304
510 Vivian Avenue
Severance, CO 80546

Keith & Aryn Henneke
505 Vivian Street
P.O. Box 337
Severance, CO 80546

Jay and Karen Hessler, JT
405 3rd Street
Severance, CO 80546

Daryl C. Hill
136 4th Avenue
P.O. Box 94
Severance, CO 80546

Gregory J & Sherry P. Hoffman

P.O. Box 133
Severance, CO 80546

John Robert Hutchinson

P.O. Box 117
Severance, CO 80546

Jerod A. & Megan D. Hawa

P.O. Box 321
303 3rd Street
Severance, CO 80546

Daniel J. & Dianne Judge
P.O. Box 272
Severance, CO 80546

Eric James Kos
306 Charles Avenue
Severance, CO 80546

Steve R. Martin
7794 S. Brentwood Street
Littleton, CO 80128-8278

Judith Ann Michal
302 3rd Street
P.O. Box 265
Severance, CO 80546

William C. & Linda A. Miller

P.O. Box 204
Severance, CO 80546

Paul L. Mista
P.O. Box 261
505 Vivian Street
Severance, CO 80546

Neige Enterprises LTD
Anthony Chris Snow, President

1017 East 6th Circle
Broomfield, CO 80020

Randy A. Proctor
1009 Van Buren Avenue

Severance, CO 80546

503 Mallard Drive
Severance, CO 80550

Brett Richard Oestreich and Anjanette Lee Quinn,
as Joint Tenants
1903 Mahogany Way
Windsor, CO 80550

Michael C. Olson and Julianna E. Olson, as Joint
Tenants
1090 Mahogany Way
Severance, CO 80550

Jeffrey Dean Orsburn and Kathryn Jean Orsburn,
as Joint Tenants
1091 Mahagany Way
Severance, CO 80550

Jason A. Owens
1927 Mahagany Way
Severance, CO 80546

Christine Pagan and Shawn M. Pagan, as Joint
Tenants
509 Mallard Drive
Severance, CO 80550

Shawna M. Pehrson and Corey R. Pehrson, as
Joint Tenants
419 Lakeview Drive
Severance, CO 80546

Christopher A. Philipp
505 Lakeview Drive
Severance, CO 80546

Judtih Ann Poland
856 Cliffrose Way
Severance, CO 80546

Steve D. Rains and Laura A. Rains, as Joint
Tenants
1083 Mahogany Way
Windsor, CO 80550

Chad E. Reiss and Autumn R. Reiss, as Joint
Tenants

1901 Mahogany Way
Windsor, CO 80550

Jon M. Ridout and Paula J. Ridout, Joint Tenants
407 3rd Street
Severance, CO 80546

Ryan K. Roark
908 Cliffrose Way
Severance, CO 80546

Justin E. Robert and Stefany Robert, as Joint
Tenants
1079 Mahogany Way
Severance, CO 80546

Jeff S. Rokosz
515 Broadview Drive
Severance, CO 80546

Benjamin E. Romero and Holly M. Dillmann, as
Joint Tenants
1934 Mahogany Way
Windsor, CO 80550

Steven B. Ruth
#7 Adelaid Road
Walton on Thames
Surrey, England KT12 1NB

Sean Vincent Ryan and Rhiannon Ryan, JT
517 Vivian Street
Severance, CO 80546

Jose Luis Saenz
516 Broadview Drive
Windsor, CO 80550

Nicholas Garcia and Amy Garcia, as Joint Tenants
424 Broadview Drive
Severance, CO 80546

Nathan Cody Sanders
517 Broadview Drive
Severance, CO 80550

Tyler J. Scheer and Brittany N. Scheer, as Joint
Tenants
506 Broadview Drive
Severance, CO 80550

Estate of Willie Lind
Letters sent to heirs below

Bruce Lind
11409 3rd Street SW
Killdeer, ND 85640

Alan Lind
59 115th Avenue SW
Killdeer, ND 85640

Mona K. Lind-Norton
310 7th Street
New Salem, ND 58563

Cameron W. Louie and Alicia K. Louie, as Joint
Tenants
1935 Mahogany Way
Severance, CO 80546

Loup Reservoir Company
39828 Hillton Circle
Ault, CO 80610

Kelly J. Lujan
1059 Mahogany Way
Severance, CO 80546

Clyde W. Lutton
885 Cliffrose Way
Severance, CO 80550

Mahogany Land Trust
1930 Mahogany Way
Severance, CO 80546

Larry Martinez
409 Lakeview Drive
Severance, CO 80550

Cole J. McDonald
1902 Mahogany Way
Severance, CO 80550

Scott A. Metcalf and Kimberly J Metcalf, as Joint
Tenants
1929 Mahogany Way
Severance, CO 80550

*See "Panama Papers" in 2016 via John Defrance Loup Holdings*

Jacob Meyer and Vanessa Lucero-Meyer, as Joint
Tenants
914 Cliffrose Way
Windsor, CO 80550

Jamie L. Meyer and Sandie K. Erbe-Meyer, as
Joint Tenants
864 Cliffrose Way
Severance, CO 80550
and
12340 N Eagle Road
Flagstaff, AZ 86001

Anthony Michael Mill
868 Cliffrose Way
Windsor, CO 80590

Shannon K. Miller and Jason M. Miller
420 Lakeview Drive
Severance, CO 80550

Robert A. Money, Sr. and Heather A. Money, JT
209 Charles Avenue
Severance, CO 80546

Jay Murrell
411 Lakeview Drive
Severance, CO 80550

Maureen K. Myers and Lyndell Myers, Joint
Tenants
300 3rd Street
Severance, CO 80546

Robert Edward Nauta and Brandi Dawn Nauta, as
Joint Tenants
1904 Mahogany Way
Severance, CO 80546

Rebecca K. Navarro and Daniel Navarro, as Joint
Tenants
1051 Mahogany Way
Severance, CO 80550

Kirk C. Nichols and Johnna M. Nichols
304 Central Avenue
Severance, CO 80546

James N. Niswender and Grace E. Niswender, JT
312 Charles Avenue

**757**

Loveland, CO 80537

Steven J. & Julie A. Roberts
302 Charles Avenue
P.O. Box 216
Severance, CO 80546

Natlie R. Schaffer
301 South 3rd Street
Severance, CO 80546

James & Annette M. Shreck
541 Goose Island Drive
North Platte, NE 69101

Jennifer L. Shreck
311 Central Avenue
Severance, CO 80546

Simcad Resources, LLC
Harlan Simonsen,
Registered Agent
35540 County Road 25
Eaton, CO 80615

Kimberly A. Sloan
3221 West 5th Street Road
Greeley, CO 80634

Denise R. Smith &
Krystal A. Santiago
505 Second Street
P.O. Box 234
Severance, CO 80546

Keith Allen Smith
4861 Highway 60
Johnstown, CO 80534

Susan K. Smith
9003 West Arbor Ave
Littleton, CO 80123-3289

Michael & Kathleen Spiegel, JT
308 Central Avenue
Severance, CO 80546

Duane G. Steinbrecher
618 42nd Avenue
Greeley, CO 80634

Jeremy A. Steinbrecher
410 30th Avenue
Greeley, CO 80634

Marc L. Steinbrecher
785 West Aviary Way
Gilbert, AZ 85233

Donald Tormey
216 E. 4th Avenue
P.O. Box 8
Severance, CO 80546

Town of Severance
P.O. Box 339
231 W. 4th Avenue
Severance, CO 80546

Ridiey E. & Laura J. Ullom

P.O. Box 28
205 Charles Avenue
Severance, CO 80546

Frank J. Wassenberg
403 Vivian Street
Severance, CO 80546

Eileen Kay White
107 Ruth Avenue
Severance, CO 80546

# COGIS - WELL Information

Scout Card    🖳⦿ Related   🔍 Insp.   🔍 Insp.   🔍 MIT   🜨 GIS   🗋 Doc   ᚛ Wellbore   🗁 Orders

## Surface Location Data for API # 05-123-35976     Status: PR

| | | | |
|---|---|---|---|
| Well Name/No: | Simonsen #1I-421 (click well name for production) | | |
| Operator: | PDC ENERGY INC - 69175 | | |
| Status Date: | 3/31/2013 | Federal or State Lease #: | |
| County: | WELD #123 | Location: | NWNW  12 6N  67W  6 PM |
| Field: | SEVERANCE  - #77030 | Elevation: | 4,848 ft. |
| Planned Location | 206 FNL  380 FWL | Lat/Long: 40.50839/-104.84984 | Lat/Long Source: Field Measured |

**FracFocus**
Chemical Disclosure Registry    Job Date: 3/1/2013    Reported: 3/8/2013     Days to report: 7

## Wellbore Data for Sidetrack #00      Status:
### PR    3/31/2013

| | | | |
|---|---|---|---|
| Spud Date: | 12/4/2012 | Spud Date is: | ACTUAL |
| **Wellbore Permit** | | **HORIZONTAL** | |
| Permit #: | | Expiration Date: | 8/16/2014 8:33:30 AM |
| Prop Depth/Form: | 12310 | Surface Mineral Owner Same: | Y |
| Mineral Owner: | FEE | Surface Owner: | FEE |
| Unit: | | Unit Number: | |
| Formation and Spacing: | Code: CODL , Formation: CODELL , Order: , Unit Acreage: 400, Drill Unit: GWA | | |
| Casing: | String Type: SURF , Hole Size: 12.25, Size: 9.625, Top: 0, Depth: 875, Weight: 36 | | |
| Cement: | Sacks: 730, Top: 0, Bottom: 875, Method Grade: | | |
| Casing: | String Type: 1ST , Hole Size: 8.75, Size: 7, Top: 0, Depth: 7830, Weight: 26 | | |
| Cement: | Sacks: 650, Top: 600, Bottom: 7830, Method Grade: | | |
| Casing: | String Type: 1ST LINER , Hole Size: 6.125, Size: 4.5, Top: 6514, Depth: 12310, Weight: 11.6 | | |
| Cement: | Sacks: , Top: , Bottom: , Method Grade: | | |

### Wellbore Completed

| | | | | |
|---|---|---|---|---|
| Completion Date: | N/A | | | |
| Measured TD: | | Measured PB depth: | | |
| True Vertical TD: | | True Vertical PB depth: | | |
| Top PZ Location: | Sec: 1 Twp: 6N 67W | Footage: 500 FFSLL  200 FFWLL | Depth | |
| Bottom Hole Location: | Sec: 1 Twp: 6N 67W | Footages: 500 FFNLL  200 FFWLL | Depth | |

| Formation | Log Top | Log Bottom | Cored | DSTs |
|---|---|---|---|---|

## Completed information for formation N-COM

| | | | | |
|---|---|---|---|---|
| 1st Production Date: | N/A | Choke Size: | | |
| Status Date: | 4/1/2013 | Open Hole Completion: | | |
| Commingled: | | Production Method: | | |
| Formation Name: | NOT COMPLETED | Status: | PR | |
| Tubing Size: | | Tubing Setting Depth: | | |
| Tubing Packer Depth: | | Tubing Multiple Packer | | |
| Open Hole Top: | | Open Hole Bottom: | | |

**No Initial Test Data was found for formation N-COM .**

**No Perforation Data was found for formation N-COM .**

759



761



2013 — Severance, Colorado

Regulation Counsel
James C. Coyle

Chief Deputy Regulation Counsel
James S. Sudler

Chief Deputy Regulation Counsel
Matthew A. Samuelson

Deputy Regulation Counsel
Charles E. Mortimer, Jr.

Deputy Regulation Counsel
Margaret B. Funk

**COLORADO SUPREME COURT
ATTORNEY REGULATION COUNSEL**



Attorneys' Fund for Client Protection
Unauthorized Practice of Law

Assistant Regulation Counsel
Louise Culberson-Smith
Amy C. DeVan
Adam J. Espinosa
Stephen R. Fatzinger
Jill Perry Fernandez
Lisa E. Frankel
Kim E. Ikeler
Erin Robson Kristofco
Brooke H. Meyer
Geanne R. Moroye
Timothy J. O'Neill
Katrin Miller Rothgery
Catherine S. Shea

Staff Attorneys
Marie E. Nakagawa
Alan C. Obye

December 30, 2013

Meghan Belaski
1212 Southridge Dr.
Fort Collins, CO 80521

Re:    Your request for investigation of Lawrence Edward Castle, 13-7214

Dear Ms. Belaski:

We reviewed the information that was forwarded to this office by the Colorado Attorney General's office.    Specifically, on or about September 27, 2013 you filed a request with the Attorney General's Office seeking review of collection and/or foreclosure practices implemented by the Castle Law Group related to mortgage debt you allegedly owe.    Because this office has regulatory jurisdiction over lawyers, the Attorney General's Office forwarded the information for review.

The Office of Attorney Regulation Counsel ("OARC") investigates allegations of professional misconduct and, in appropriate cases, prosecutes attorneys for violations of the Colorado Rules of Professional Conduct (the 'Rules").    These Rules govern the ethical conduct of attorneys licensed to practice law in Colorado.    If a tribunal finds, or the attorney acknowledges, that the attorney violated the Rules, an appropriate sanction will be imposed by the Presiding Disciplinary Judge or the Colorado Supreme Court pursuant to the Colorado Rules of Procedure Regarding Attorney Discipline and Disability Proceedings. The OARC has authority to enter into an alternative to discipline if the facts and circumstances indicate that such a resolution is appropriate, but we do not have authority to impose discipline upon an attorney.

In order to pursue discipline against an attorney, the OARC must be able to prove that the attorney violated the Rules by clear and convincing evidence. The information you provided does not prove by clear and convincing evidence that Mr. Castle has violated the Rules.

You are concerned about foreclosure activities related to property owned by you and your ex-husband.    You assert that Mr. Castle's firm has continuously violated your rights regarding state and federal Fair Debt Collection Practices

1300 Broadway • Suite 500 • Denver, Colorado 80203 • (303) 457-5800 • Toll free (877) 888-1370 • Website ·· www.coloradosupremecourt.com

763

Meghan Belaski
Re: Request for investigation of Lawrence Edward Castle, 13-7214
December 30, 2013
Page 2

on multiple occasions by attempting to collect on an invalid mortgage debt allegedly serviced by Bank of America.   You assert that the debt collection against you and your ex-husband is illegitimate.   You assert Mr. Castle's firm is engaging in fraud and illegal activity.

Disputes and disagreements such as those described in your request for investigation may be more appropriately described as civil legal disputes.   We do not have jurisdiction to decide whether the underlying mortgage debt is a valid and viable debt that is subject to collection.

Civil legal disputes are usually resolved by settlement negotiations between the parties, by arbitration or by a civil law suit and cannot be addressed by this office.   The jurisdiction of this office is limited to questions of professional misconduct.

Similarly, we do not have jurisdiction to decide whether any foreclosure proceedings initiated against you were proper.   If you wish to challenge any foreclosure sale or a foreclosure itself, you may look into what legal options you may have in the civil court that handled the foreclosure.

If a court specifically finds that Mr. Castle engaged in fraud, or otherwise acted illegally or improperly, you may resubmit your request for investigation by providing me with a copy of the court's findings against Mr. Castle.   Absent such a finding by a court, there is not clear and convincing evidence of a violation of the Rules by Mr. Castle. Therefore, we are closing this matter and will take no further action on your request.

Thank you for taking the time to report your concerns.   Your involvement in the attorney disciplinary process is a vital part of the Colorado Supreme Court's efforts to ensure that attorneys comply with the Rules.

Sincerely,

Lisa E. Frankel
Assistant Regulation Counsel

LEF/rsl

cc:   Lawrence Edward Castle, Esq.

764

# STATE OF COLORADO

DEPARTMENT OF NATURAL RESOURCES
Oil & Gas Conservation Commission
1120 Lincoln Street, Suite 801
Denver, Colorado 80203-2136

34100526

503 Mallard Drive
Severance, CO 80550

1401-UP-31

765

Received
1/7/14

Frm Shdc

## BEFORE THE OIL AND GAS CONSERVATION COMMISSION
## OF THE STATE OF COLORADO

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF PDC ENERGY, INC FOR AN ORDER TO POOL ALL INTERESTS WITHIN AN APPROXIMATE 400-ACRE DESIGNATED WELLBORE SPACING UNIT FOR SECTIONS 1, 2, 11 AND 12, TOWNSHIP 6 NORTH, RANGE 67 WEST, 6TH P.M. FOR THE CODELL FORMATION, WATTENBERG FIELD, WELD COUNTY, COLORADO | ) CAUSE NO. 407<br>)<br>) DOCKET NO. 1401-UP-31<br>)<br>)<br>)<br>)<br>)<br>) |

### NOTICE OF HEARING

TO ALL INTERESTED PARTIES AND TO WHOM IT MAY CONCERN:

On February 19, 1992 (Amended August 20, 1993), the Commission entered Order No. 407-87 which, among other things, established 80-acre drilling and spacing units for the production of oil and/or gas from the Codell-Niobrara Formation underlying certain lands, with the permitted well locations in accordance with the provisions of Order No. 407-1. Sections 1, 2, 11 and 12, Township 6 North, Range 67 West, 6th P.M. are subject to this Order for the Codell-Niobrara Formation.

On April 27, 1998, the Commission adopted Rule 318A which, among other things, allowed certain drilling locations to be utilized to drill or twin a well, deepen a well or recomplete a well and to commingle any or all of the Cretaceous Age Formations from the base of the Dakota Formation to the surface. Rule 318A supersedes all prior Commission drilling and spacing orders affecting well location and density requirements of Greater Wattenberg Area wells. On December 5, 2005, Rule 318A was amended, among other things, to allow interior infill and boundary wells to be drilled and wellbore spacing units to be established. On August 8, 2011, Rule 318A was again amended, among other things, to address drilling of horizontal wells. Sections 1, 2, 11 and 12, Township 6 North, Range 67 West, 6th P.M. are subject to this Order for the Codell Formation.

On November 27, 2013, PDC, by its attorneys, filed with the Commission pursuant to §34-60-116, C.R.S., a verified application ("Application") for an order to pool all interests within an approximate 400-acre designated wellbore spacing unit established for the below-described lands ("Application Lands") pursuant to §34-60-116(6), C.R.S., for the development and operation of the Codell Formation, effective as of the date that any of the costs specified in §34-60-116(7)(b)(II), C.R.S. were first incurred for the drilling of the Simonsen 1I-421 well, (API No. 05-123-35976) ("Well"), and to subject any nonconsenting interests to the cost recovery provisions of §34-60-116(7), C.R.S.:

Township 6 North, Range 67 West, 6th P.M.
Section 1:    W½W½
Section 2:    E½E½
Section 11:   NE¼NE¼
Section 12:   NW¼NW¼

NOTICE IS HEREBY GIVEN, pursuant to: 1) the general jurisdiction granted to the Oil and Gas Conservation Commission of the State of Colorado under §34-60-105 C.R.S.; 2)

Act at §24-4-105 C.R.S.; and 4) the Commission's Series 500 Rules at 2 CCR 404-1, that the Commission has scheduled the above-entitled matter for hearing on:

Date:       Monday, January 27, 2014
            Tuesday, January 28, 2014

Time:       9:00 a.m.

Place:      Centennial Building
            1313 Sherman Street, Room 318
            Denver, CO 80203

In accordance with the Americans with Disabilities Act, if any party requires special accommodations as a result of a disability for this hearing, please contact Margaret Humecki at (303) 894-2100 ext. 5139, prior to the hearing and arrangements will be made.

Pursuant to said hearing in the above-entitled matter at the time and place aforesaid, or at any adjourned meeting, the Commission will enter such orders as it deems appropriate to protect the health, safety and welfare of the public and to prevent the waste of oil and gas, either or both, in the operations of said field, and to carry out the purposes of the statute.

**In accordance with Rule 509., any interested party desiring to protest the granting of the application or to intervene on the application should file with the Commission a written protest or intervention no later than January 10, 2014, briefly stating the basis of the protest or intervention.** Such interested party shall, at the same time, serve a copy of the protest or intervention to the person filing the application. One electronic (cogcc.hearings_unit@state.co.us), one original and two copies shall be filed with the Commission. **Anyone who files a protest or intervention must be able to participate in a prehearing conference during the week of January 13, 2014.** Pursuant to Rule 503.g., if a party who has received notice under Rule 503.b. wishes to receive further pleadings in the above-referenced matter, that party must file a protest or intervention in accordance with these rules. In accordance with the practices of the Commission, should no protests or interventions be filed in this matter by **January 10, 2014, the Applicant may request that an administrative hearing be scheduled beginning January 10, 2014.** In the alternative, pursuant to Rule 511., if the matter is uncontested, the applicant may request, and the Director may recommend approval on the basis of the merits of the verified application and the supporting exhibits.

OIL AND GAS CONSERVATION COMMISSION
OF THE STATE OF COLORADO

By_____
        Robert J. Frick, Secretary

Dated: December 21, 2013

Colorado Oil and Gas Conservation Commission
1120 Lincoln Street, Suite 801
Denver, Colorado 80203
Website: http://cogcc.state.co.us
Phone: (303) 894-2100
Fax: (303) 894-2109

Attorneys for PDC
James L. Jost
James P. Parrot
Jost & Shelton Energy Group, P.C.
1675 Larimer Street, Suite 420
Denver, Colorado, 80202
Phone: (720) 379-1812
jost@jsenergygroup.com
jparrot@jsenergygroup.com

5139

\* James Parrot \*
pooling

Note stamped
\* Jany 3, 2014/
received
by Meghan
Belaski on
1/7/14

Page 3 of 3

(1401-UP-31)

To Whom it May Concern:  *CFPB*                                    1/21/14

This is a Freedom of Information Request to the Consumer Financial Protection Bureau in regards to case numbers ▓▓▓1126 and ▓▓▓0013 (both complaints refer to the loan number in question serviced by Bank Of America until Dec., 1, 2013) filed by Meghan Belaski on behalf of ▓▓▓ and Meghan Belaski f/k/a Meghan Nutt to the CFPB in May and November 2013.

My full name is Meghan Belaski.

My address is 1212 Southridge Dr. Fort Collins, Colorado 80521.

My phone number is 719-429-9939.

My email address is Meghan.belaski@gmail.com

The details I seek regarding both case numbers ideally would include documentation of actions taken or communications by the CFPB with/to outside agencies, both federal and state, regarding the 2 case numbers above,  as well as the entities in question, any response/communication from state or federal agencies to the CFPB, written (and current status) of the investigation, copies of documents and record of communications provided to the CFPB by Bank of America, Real Time Resolutions, MERS, Castle Law Group, Dignified Transition Solutions, Countrywide, The Attorney General for the State of Colorado, Nationstar, The Bank of NY Mellon et al., the Weld County Public Trustee and any other entity that may have been left from this list. Please include any record of communication or documentation that the CFPB may have provided to any of these entities on our behalf as well. Lastly, please include logs of phone calls to the CFPB by Meghan Belaski from May 2013-present day and any additional phone logs of communications between the CFPB and any entity as it pertains to these 2 case numbers. Also include any information associated with the debt collection complaint Meghan Belaski made in the fall of 2013 to the CFPB with this case(s) number as well and any responses to those complaints from any of the above listed entities.

This information is for personal use and not intended for commercial use. Please waive any associated fees as we are unable to incur much more impact financially, and because we seek the information as it concerns the property owned by ▓▓▓ and myself.

Thank you kindly,

Meghan Belaski

*[signature] N Belaski*
*1/21/14*



769

Fax to:  855-329-3642



```
PDC DENVER                        0.0 LBS    LTR        1 OF 1
3038605800 5800
PDC ENERGY-DENVER
1775 SHERMAN STREET
DENVER CO 80203
```

SHIP TO:

503 MALLARD DRIVE
**SEVERANCE  CO 80550-2921**



**CO 805 0-02**

**UPS NEXT DAY AIR**                                **1**
TRACKING #: 1Z X92 101 01 9121 4153

BILLING: P/P

Department Code: 150G

CS 16.0.38.      WNTIE90 48.0A 01/2014

*received appox, 1/31/14*



503 MALLARD DR
SEVERANCE CO 80550-2921                    I:
P:RED   S:GRAY                             1030
**NEL·1064**
1ZX92101019121 4153

https://www.campusship.ups.com/cship/create?ActionOriginPair=default__PrintWindow....   1/29/2014

FOLD HERE

This envelope is for use with the following services:

PULL TAB TO OPEN





Growing E&P Value                    January 29, 2014

**VIA OVERNIGHT MAIL**



503 Mallard Drive
Severance, CO 80550

         RE: PDC Energy Inc. – COGCC Docket No. 1401-UP-31

Dear ▬▬▬▬▬

This letter is to confirm and document the agreement made between you and PDC Energy, Inc., by and through Jamie L. Jost of Jost & Shelton Energy Group, P.C., at the January 27, 2014 Colorado Oil and Gas Conservation Commission ("COGCC") hearing regarding Docket No. 1401-UP-31.

Pursuant to the agreement made of record at the hearing, you shall have up to and through February 11, 2014 to either lease your interests in the 400-acre unit, or elect to participate in the Simonsen 1i-421 well.  If you have not leased or elected to participate in the Simonsen 1i-421 well by such date, then your interests in the 400-acre wellbore spacing unit shall be considered non-consenting and will be subject to the cost recovery penalties allowed in C.R.S. 34-60-116(7).  Pursuant to the discussion at the hearing, your ex-wife also confirmed this agreement and agreed to the above-stated fifteen (15) day period.

PDC appreciates your interest in the development of the Simonsen 1i-421 well and looks forward to hearing from you regarding your interests.  Please contact me at 303-860-5831 or via email at marie.mccord@pdce.com at anytime to discuss your interests in the 400-acre wellbore spacing unit for the Simonsen 1i-421 well.  Thank you.

                     Sincerely,

                     *Marie McCord*

                     Marie McCord
                     Consulting Landman
                     PDC Energy, Inc.



## PDC ENERGY

## ORDER FOR PAYMENT

### Invoice No: SIM-134

On approval of the Lease Agreement associated herewith and on approval of title to same, PDC Energy, Inc., will make payment as indicated herein, by check, within 45 business days of receipt of the __original__ fully executed **Order of Payment and the Agreement (Oil and Gas Lease)**. Payment is deemed complete upon mailing or dispatch. No default shall be declared for failure to make payment until 10 days after receipt of written notice from payee of intention to declare such default.

If the Oil and Gas Lease referenced herein covers less than the entire undivided interest in the oil and gas or other rights in such land, then the dollar amount listed herein shall be paid to the Lessor (Payee) only in the proportion which the interest in said lands covered by the Agreement bears to the entire undivided interest therein. Further, should Lessor own more or less than the net interest defined here, Lessee (PDC) shall increase or reduce the dollar amount payable hereunder proportionately.

Lessor and Lessee agree that, when Lessor executed the Oil and Gas Lease, Lessor and Lessee entered into a binding contract that, among other things, leases the lands listed in the Oil and Gas Lease to Lessee. Lessee agrees to pay Lessor the bonus consideration for the Lease subject to Lessee verifying Lessor's net mineral acre ownership, as determined solely by Lessee.

PAYEE: ▓▓▓▓▓▓▓

AMOUNT: $100.00

ADDRESS: 503 Mallard Drive
Severance, CO 80550

This payment constitutes bonus consideration for the three (3) year Paid-Up Oil and Gas Lease dated July 15, 2013, covering the following described lands in Weld County, Colorado:

__Township 6 North, Range 67 West, 6th PM__
Section 2: Lot, Lakeview Addition First Filing, a subdivision of the Town of Severance, Colorado

Gross Acres: 0.175
Net Acres: 0.088

Lessor(s)

PDC Energy, LLC
*Donna N. Keistler*

Donna N. Keistler, as Agent

*Same as "PDC"
non-dev/non-payment
does on any lifted
in 2013*



CORPORATE OFFICE:
PDC Energy
1775 Sherman Street, Suite 3000
Denver, Colorado 80203
(303) 860-5800

772

EASTERN REGIONAL HEADQUARTERS:
PDC Energy
120 Genesis Boulevard ● P.O. Box 26
Bridgeport, West Virginia 26330
(304) 842-3597

# ELECTION OPTIONS

[redacted]

503 Mallard Drive
Severance, CO 80550

✗ Well Proposal:  Simonsen 1i-421 (W/2W/2, Section 1; E/2E/2 Section 2-6N-67W)   *does not match illegal location on AF Expenditure*

Dated:  July 15, 2013

Please choose **one (1)** of the following options:

_____   The undersigned is enclosing a fully executed Oil and Gas Lease and Order for Payment.   *✗ lease was a paid up lease - not fully executed*

_____   The undersigned elects to participate in the drilling of the referenced well. Enclosed is
an executed Authorization for Expenditure (AFE). Please send me a Joint Operating
Agreement (JOA).

_____   The undersigned elects **NOT** to execute the Oil and Gas Lease and **NOT** to participate in
the referenced well.

**Mineral Owner(s):**

_____
[redacted]

THIS IS A COLLECTION ITEM
NOT A CASH ITEM

CUSTOMER'S DRAFT
With Privilege of Re-Draft

COLLECT DIRECTLY THROUGH _____ Bank of Denver
                                P.O. Box 5081 TA
                                Denver, CO  80217-5081 TA
                                ATTN:  Collection Dept.         DATE          October 15, 2013

_____ Forty-Five (45) _____ Banking Days After Sight and Subject to the Approval of Title

Pay to the
Order of ████████████████                                          $  750.00

Seven Hundred Fifty and 00/100—                              With Exchange      DOLLARS

Full & Final

Consideration for     Execution of Paid-Up OGL covering lands in Weld County, Colorado

To:     Land Energy, Inc.
        1615 California St., Ste. 702
        Denver, CO  80202              Alicia Beal, Land Assistant

                                      *Alicia Beal*

                                      No Sale!

DETACH BEFORE PRESENTING FOR PAYMENT

Description:
Township 6 North, Range 67 West, 6th P.M.
Section 2:   Lot 58, Lakeview Addition First Filing, according to the Plat recorded December 23,
             1980 at Reception No. 1845021
             County of Weld, State of Colorado

| | |
|---|---|
| County | Weld |
| State | Colorado |
| Net Acres | 0.069000 |
| Gross Acres | 0.138000 |
| Bonus $ Per Acre | N/A |
| Total Bonus | $750.00 |

**CONFIDENTIAL**

**PDC ENERGY**

## Authorization For Expenditure

Print Date: 7/22/2013

| AFE Number: | DR001402 | County/State: | Weld, Colorado |
|---|---|---|---|
| Well Name: | Simonsen 1I-421 | Budgeted: | Yes |
| API#: | 105.100 769 | Project Type: | Drilling |
| AFE Type: | Drilling - (DR) | Well Status: | |
| Asset: | DJ | Legal Location: | NWNW S12, T6N, R67W |
| Area: | Wattenberg | Depth: | 12310' md td, 7268' tvd |
| Operator: | PDC Energy | Target Formation: | Codell |
| AFE Description: | | Proposed Start: | 12/4/2012 |

**Justification For Expenditure:**

| Participants | W.I.% | Original $ | Supplement $ | TOTAL $ |
|---|---|---|---|---|
| PDC Energy | 51.827406 | $2,215,592.24 | $0 | $2,215,592.24 |
| Anadarko E&P Onshore LLC | 7.389201 | $315,518.88 | $0 | $315,518.88 |
| Land Energy, Inc. | 7.389201 | $315,518.88 | $0 | $315,518.88 |
| Grizzly Petroleum Company, LLC | 1.421913 | $60,715.69 | $0 | $60,715.69 |
| Timothy J & JoNeil Mollohan JT | 0.313059 | $13,387.62 | $0 | $13,387.62 |
| Mazel Group LLLP | 0.205366 | $8,769.13 | $0 | $8,769.13 |
| Mauricio C. Lodwick and Angela K. Lodwick, JT | 0.071064 | $3,034.43 | $0 | $3,034.43 |
| Unleased Mineral Interest | 31.322790 | $1,337,483.13 | | $1,337,483.13 |
| **TOTALS:** | 100 | $4,270,000.00 | $0.00 | $4,270,000.00 |

| Originator: | Paul Sanchez | | Partner: | Scott Nutt |
|---|---|---|---|---|

| PDC Approval | | Date | Per: |
|---|---|---|---|
| Asset Dir DJ | Steve Trippett | 11/13/2012 | |
| VP Western Ops. | Scott Reasoner | 11/14/2012 | |
| | | | Name: Scott Nutt |
| | | | |
| | | | Name: |
| | | | Date: |



**PDC ENERGY**

## Cost Estimate

AFE Date: 7/22/2013

| AFE Number : | DR001402 | County/State: | Weld, Colorado |
| --- | --- | --- | --- |
| Well Name: | Simonsen 1i-421 | Budgeted: | Yes |
| API#: | 105.100769 | Project Type: | Drilling |
| AFE Type: | Drilling - (DR) | Well Status: | |
| Asset: | DJ | Legal Location: | NWNW S12, T6N, R67W |
| Area: | Wattenberg | Depth: | 12310' md td, 7268' tvd |
| Operator: | PDC Energy | Target Formation: | Codell |
| AFE Description: | | Proposed Start: | 12/4/2012 |

| Group/ Account | Description | Gross Estimate |
| --- | --- | --- |
| **Completion Intangibles** | | |
| 8200.100 | ICC Acidizing & Fracturing | $1,761,000.00 |
| 8200.115 | ICC Completion Fluids | $42,000.00 |
| 8200.116 | ICC Contract Labor & Service | $167,000.00 |
| 8200.120 | ICC Daywork Contract Fee | $191,000.00 |
| 8200.124 | ICC Environmental, Health & Safety | $3,000.00 |
| 8200.130 | ICC Fencing | $2,000.00 |
| 8200.135 | ICC Gas Sales Connection | $55,000.00 |
| 8200.150 | ICC Miscellaneous Services & Contingency | $29,900.00 |
| 8200.168 | ICC Pump Truck Services | $10,000.00 |
| 8200.170 | ICC Rental Tools | $84,000.00 |
| 8200.175 | ICC Site Preparation & Clean Up | $75,000.00 |
| 8200.177 | ICC Subsurface Casing Equipment | $200,000.00 |
| 8200.185 | ICC Transportation - Company and Contract | $20,000.00 |
| 8200.250 | ICC Overhead | $48,400.00 |
| **Subtotal:** | | $2,688,300.00 |
| | | |
| **Completion Tangibles** | | |
| 8210.100 | TCC Artificial Lift Equipment | $5,000.00 |
| 8210.115 | TCC Casing - Production and/or Liner | $70,000.00 |
| 8210.131 | TCC Emission Control Device | $60,000.00 |
| 8210.135 | TCC Fittings | $50,000.00 |
| 8210.140 | TCC Instrumentation Equipment | $34,000.00 |
| 8210.155 | TCC Line Pipe | $16,000.00 |
| 8210.160 | TCC Metering Equipment | $2,500.00 |
| 8210.172 | TCC Production Tree | $3,200.00 |
| 8210.173 | TCC Pumps | $3,000.00 |
| 8210.180 | TCC Separating Equipment | $32,000.00 |
| 8210.181 | TCC Storage Tanks | $75,000.00 |
| 8210.185 | TCC Treating Equipment | $36,000.00 |
| 8210.186 | TCC Tubing | $25,000.00 |

Generated by AFE Navigator®

| 0.187 | TCC Tubinghead Equipment | $18,000.00 |
| **Subtotal:** | | $429,700.00 |

**Drilling Intangibles**

| 8100.105 | IDC Bits & Reamers | $45,000.00 |
| 8100.111 | IDC Casing Running Tools & Services | $18,000.00 |
| 8100.112 | IDC Cement & Cement Services | $50,000.00 |
| 8100.116 | IDC Contract Labor & Services | $15,000.00 |
| 8100.120 | IDC Daywork Contract Fee | $249,000.00 |
| 8100.121 | IDC Directional Equipment & Services | $120,000.00 |
| 8100.123 | IDC Drilling Tool & Equipment Rental | $76,000.00 |
| 8100.124 | IDC Environmental, Health & Safety | $5,000.00 |
| 8100.140 | IDC Insurance | $2,100.00 |
| 8100.150 | IDC Miscellaneous Services & Contingency | $2,500.00 |
| 8100.151 | IDC Mud & Chemicals | $55,000.00 |
| 8100.152 | IDC Mud Logging Equipment & Services | $11,000.00 |
| 8100.166 | IDC Power & Fuel | $40,000.00 |
| 8100.167 | IDC Prospect Generation | $15,000.00 |
| 8100.171 | IDC Rig Mobilization & Demobilization | $30,000.00 |
| 8100.173 | IDC Road and Site Preparation | $50,000.00 |
| 8100.176 | IDC Solids Control Equipment Rental | $55,000.00 |
| 8100.177 | IDC Subsurface Casing Equipment | $5,000.00 |
| 8100.178 | IDC Supervision Company & Contract | $21,500.00 |
| 8100.185 | IDC Transportation - Company & Contract | $2,000.00 |
| 8100.190 | IDC Water | $30,000.00 |
| 8100.250 | IDC Overhead | $4,900.00 |
| **Subtotal:** | | $902,000.00 |

**Drilling Tangibles**

| 8110.118 | TDC Surface Casing | $24,000.00 |
| 8110.119 | TDC Casinghead | $13,500.00 |
| 8110.141 | TDC Intermediate Casing | $212,500.00 |
| **Subtotal:** | | $250,000.00 |

| **Grand Total:** | | $4,270,000.00 |

*Producers 88*
*Rocky Mountain 1989*
*(Paid-Up Rev. 1996)*

# PAID-UP OIL AND GAS LEASE
## NON SURFACE OCCUPANCY

THIS AGREEMENT, made and entered into this 15 day of July, 2013, but effective November 1, 2012, by and between ███████ whose address is 503 Mallard Drive, Severance, CO 80550 hereinafter called lessor (whether one or more), and PDC Energy, Inc. whose address is 1775 Sherman Street Suite 3000 Denver, Colorado 80203, hereinafter called lessee:

WITNESSETH:

1. That lessor, for and in consideration of ***TEN AND MORE*** dollars ($10.00+) in hand paid, receipt of which is hereby acknowledged, and of the agreements of lessee hereinafter set forth, hereby grants, demises, leases and lets exclusively unto lessee the lands described below for the purpose of investigating, prospecting, exploring (by geophysical and other methods), drilling, operating for and producing oil or gas, or both (as defined below), together with the right to construct and maintain pipelines, telephone and electric lines, tanks, ponds, roadways, plants, equipment, and structures thereon to produce, save and take care of said oil and gas (which right shall include specifically a right-of-way and easement for ingress to and egress from said lands by lessee, or its assignees, agents or permittees, necessary to or convenient for the construction and maintenance of such pipelines, telephone and electric lines, tanks, ponds, roadways, plants, equipment, and structures on said lands to produce, save and take care of the oil and gas), and the exclusive right to inject air, gas, water, brine and other fluids from any source into the subsurface strata, and any and all other rights and privileges necessary, incident to, or convenient for the economical operation of said land, alone or conjointly with neighboring land, for the production, saving and taking care of oil and gas and the injection of air, gas, water, brine, and other fluids into the subsurface strata, said lands being situated in the County of Weld, State of Colorado described as follows, to-wit:

Township 6 North, Range 67 West of the 6th PM
Section 2: Lot 58, Lakeview Addition First Filing, a subdivision of the Town of Severance, Colorado

Containing 0.175 Acres More or Less and subject to all existing easements and rights of way of record.

Also Known As: 503 Mallard Drive, Severance, CO 80550

In addition to the land described above, lessor hereby grants, leases and lets exclusively unto lessee, to the same extent as if specifically described, lands which are owned or claimed by lessor by one of the following reasons: (1) all lands and rights acquired or retained by lessor by avulsion, accretion, reliction or otherwise as the result of a change in the boundaries or centerline of any river or stream traversing or adjoining the lands described above; (2) all riparian lands and rights which are or may be incident, appurtenant, related or attributed to lessor in any lake, stream or river traversing or adjoining the lands described above by virtue of lessor's ownership of the land described above; (3) all lands included in any road, easement or right-of-way traversing or adjoining the lands described above which are or may be incident, appurtenant, related or attributed to lessor by virtue of lessor's ownership of the land described above; and (4) all strips or tracts of land adjacent or contiguous to the lands described above owned or acquired by lessor through adverse possession or other similar statutes of the state in which the lands are located.

The term oil as used in this lease shall be interpreted to include any liquid hydrocarbon substances which occur naturally in the earth, including dip gasoline or other natural condensate recovered from gas without resort to manufacturing process. The term gas as used in this lease shall be interpreted to include any substance, either combustible or noncombustible, which is produced in a natural state from the earth and which maintains a gaseous or rarified state at ordinary temperature and pressure conditions, including but not limited to helium, nitrogen, carbon dioxide, hydrogen sulphide, coal bed methane gas, casinghead gas and sulphur.

Subject to the other provisions herein contained, this lease shall remain in force for a term of three (3) years (herein called "primary term") and as long thereafter as oil and gas, or either of them, is produced from the leased premises or drilling operations are continuously prosecuted. For purposes of this lease, a well completed for the production of coalbed methane gas shall be deemed to be producing gas under this lease at all times when dewatering of the coal seams from which the coalbed methane gas will be produced is occurring. For purposes of this lease, "drilling operations" shall include operations for the drilling of a new well and operations for the reworking, deepening or plugging back of a well or hole or other operations conducted in an effort to establish, resume or re-establish production of oil and gas; drilling operations shall be considered to be "continuously prosecuted" if not more than one hundred twenty (120) days shall elapse between the completion and abandonment of one well or hole and the commencement of drilling operations on another well or hole; drilling operations shall be deemed to be commenced for a new well at such time as lessee has begun the construction of the wellsite location or the road which provides access to the wellsite location; and drilling operations shall be deemed to be commenced with respect to reworking, deepening, plugging back or other operations conducted in an effort to resume or re-establish production of oil and gas at such time as lessee has the requisite equipment for such operations at the wellsite.

2. The lessee shall deliver to the credit of the lessor as royalty, free of cost, into the tanks or in the pipeline on the leased premises to which lessee may connect its wells the equal 18.75% part of all oil produced and saved from the leased premises, or lessee may from time to time at its option purchase any royalty oil in its possession, paying the market price thereof prevailing for oil of like grade and gravity in the field where produced on the date of purchase.

The lessee shall pay lessor, as royalty, on gas, including casinghead gas or other gaseous substances, produced from the leased premises and sold or used off the premises or used in the manufacture of gasoline or other products, the market value at the well of 18.75% of the gas sold or used, provided that on gas sold the royalty shall be 18.75% of the amount realized from such sale. The amount realized from the sale of gas shall be the price established by the gas sales contract entered into in good faith by lessee and a gas purchaser for such term and under such conditions as are customary in the industry. Price shall mean the net amount received by lessee after giving effect to applicable regulatory orders and after application of any applicable price adjustments specified in such contract or regulatory orders. In the event lessee compresses, treats, purifies or dehydrates such gas (whether on or off the leased premises) or transports gas off the leased premises, lessee in computing royalty hereunder may not deduct from such price the actual charge incurred by lessee for each of such functions performed. However, if gas is processed or gathered, transported, or treated by an unaffiliated third party before sale, then lessee shall pay lessor a 18.75% royalty on the net proceeds received by lessee after such third party gathering, treating and transportation charges.

3. This is a paid-up lease and all cash consideration first recited above and annual rentals have been paid to lessor in advance to keep this lease in full force and effect throughout the primary term. In consideration of the payment of such cash consideration and advance annual rentals, lessor agrees that lessee shall not be obligated, except as otherwise provided herein, to commence or continue any operations during the primary term. Lessee may at any time or times during or after the primary term surrender this lease as to all or any portion of the land described above, and as to any strata or stratum, by delivering to lessor or by filing of record a release or releases, and be relieved of all obligations thereafter accruing as to the acreage surrendered.

4. All payments required to be made to lessor pursuant to this lease, other than the payment of royalties, may be paid by lessee to the lessor or to lessor's credit in the _____"Direct to Lessor"_____ Bank, at ___Address stated above___ (or its successor or successors, or any bank with which it may be merged or consolidated, or which succeeds to its business assets or any part thereof, by purchase or otherwise) which shall continue as the depository regardless of changes in the ownership of said land or the oil and gas. All such payments may be made by cash, check or draft, mailed or delivered on or before the due date for that payment. Any payments so made shall be binding on the heirs, devisees, executors, administrators, and personal representatives of lessor and on lessor's successors in interest or on lessor's assigns.

5. If, at the expiration of the primary term of this lease, oil or gas is not being produced from the leased premises but lessee is then engaged in drilling operations, this lease shall continue in force so long as drilling operations are continuously prosecuted; and if production of oil or gas results from any such drilling operations, this lease shall continue in force so long as oil or gas shall be produced from the leased premises. If, after the expiration of the primary term of this lease, production on the leased premises should cease for any cause, this lease shall not terminate if lessee is then engaged in drilling operations, or within one hundred twenty (120) days after each such cessation of production commences or resumes drilling operations, and this lease shall remain in force so long as drilling operations are continuously prosecuted, and if production results therefrom, then as long thereafter as oil or gas is produced from the leased premises.

6. If at any time, either before or after the expiration of the primary term of this lease, there is a well capable of producing oil or gas on lands covered by this lease, or on other lands with which lands covered by this lease are pooled or unitized, but the well is shut-in, whether before or after production therefrom, and this lease is not being maintained otherwise as provided herein, this lease shall not terminate (unless released by lessee) and it shall nevertheless be considered that oil or gas is being produced from lands covered by this lease during all times while the well is so shut-in. Lessee shall use reasonable diligence to market the oil or gas capable of being produced from such shut-in well, but shall be under no obligation to market the oil or gas under terms, conditions or circumstances which, in lessee's judgment exercised in good faith, are unsatisfactory. When the lease is continued in force in this manner, lessee shall pay or tender to the lessor or lessor's successors or assigns, an amount equal to $1.00 per year per net mineral acre covered by the lease. Such payments shall be made on or before the shut-in royalty payment date, as defined below, next occurring after the expiration of one hundred twenty (120) days from the date the well was shut-in, unless prior to such date oil or gas is sold or used or this lease is otherwise maintained as provided herein. In like manner, on or before each succeeding shut-in royalty payment date while such well remains shut-in, lessee shall make payment of shut-in royalty in the same amount each year. The term "shut-in royalty payment date" shall mean the anniversary date of this lease. Any shut-in royalty payment may be made by cash, draft or check, mailed or tendered on or before the shut-in royalty date. Lessee's failure to pay or tender, or properly pay or tender, any such sum shall render lessee liable for the amount due but it shall not operate to terminate this lease.

7. If lessor owns a lesser interest in the above described land than the entire and undivided fee simple estate therein, then the royalties, including shut-in royalty, herein provided shall be paid to lessor only in the proportion which lessor's interest bears to the whole and undivided fee. Any interest in production from the lands described herein to which the interest of lessor may be subject shall be deducted from the royalty herein reserved.

8. Lessee shall have the right to use, free of cost, gas, oil and water produced on said land for its operation thereon, except water from wells and reservoirs of lessor. Lessee shall have the right at any time to remove all machinery and fixtures placed on said premises, including the right to draw and remove casing.

9. Lessee shall pay to lessor reasonable amounts for damages caused by its operations to growing crops and pasture on said land. When requested by lessor,

lessee shall bury its pipelines which traverse cultivated lands below plow depth. No well shall be drilled nearer than two hundred (200) feet to a house or barn now on said premises, without written consent of lessor. Lessee shall have the right at any time (but not the obligation), to remove all improvements, machinery, and fixtures placed or erected by lessee on said premises, including the right to pull and remove casings.

10. Lessee is hereby given the right and power at any time and from time to time as a recurring right, either before or after production, as to all or any part of the land described above or any one or more of the formations hereunder, to pool or utilize the leasehold estate and the mineral estate covered by this lease with other land, lease or leases in the immediate vicinity for the production of oil and gas, or separately for the production of either, when in lessee's judgment it is necessary or advisable to do so, and irrespective of whether authority similar to this exists with respect to such other land, lease or leases. Likewise, units previously formed to include formations not producing oil or gas may be reformed to exclude such non-producing formations. The forming or reforming of any unit shall be accomplished by lessee executing and filing of record a declaration of such unitization or reformation, which declaration shall describe the unit. Any unit may include land upon which a well has heretofore been completed or upon which operations have been commenced. Production, drilling or reworking operations or a well shut-in for any reason anywhere on a unit which includes all or a part of this lease shall be treated as if it were production, drilling or reworking operations or a well shut-in under this lease. In lieu of the royalties elsewhere herein specified, lessor shall receive on production from the unit so pooled royalties only on the portion of such production allocated to this lease; such allocation shall be that proportion of the unit production that the total number of surface acres covered by this lease and included in the unit bears to the total number of surface acres in such unit.

11. Lessee shall have the right to utilize, pool, or combine all or any part of the land described above as to one or more of the formations thereunder with other lands in the same general area by entering into a cooperative or unit plan of development or operation approved by any governmental authority and, from time to time, with like approval, to modify, change or terminate any such plan or agreement and, in such event, the terms, conditions, and provisions of this lease shall be deemed modified to conform to the terms, conditions, and provisions of such approved cooperative or unit plan of development or operation and particularly, all drilling and development requirements of this lease, express or implied, shall be satisfied by compliance with the drilling and development requirements of such plan or agreement, and this lease shall not terminate or expire during the life of such plan or agreement. In the event that the land described above or any part thereof shall hereafter be operated under any such cooperative or unit plan of development or operation whereby the production therefrom is allocated to different portions of the land covered by said plan, then the production allocated to any particular tract of land shall, for the purpose of computing the royalties to be paid hereunder to lessor, be regarded as having been produced from the particular tract of land to which it is allocated and not to any other tract of land; and the royalty payments to be made hereunder to lessor shall be based upon production only as so allocated.

12. If the estate of either party hereto is assigned or sublet, and the privilege of assigning or subletting in whole or in part is expressly allowed, the express and implied covenants hereof shall extend to the sublessees, successors and assigns of the parties; and in the event of an assignment or subletting by lessee, lessee shall be relieved and discharged as to the leasehold rights so assigned or sublet from any liability to lessor thereafter accruing upon any of the covenants or conditions of this lease, either express or implied. No change in ownership of the land, royalties, or other payments, however accomplished, shall operate to enlarge the obligations or diminish the rights of lessee or require separate measuring or installation of separate tanks by lessee. Notwithstanding any actual or constructive knowledge of or notice to lessee, no change in ownership of said land or of the right to receive royalties or other payments hereunder, or of any interest therein, whether by reason of death, conveyance or any other matter, shall be binding on lessee (except at lessee's option in any particular case) until one hundred twenty (120) days after lessee has been furnished written notice thereof, and the supporting information hereinafter referred to, by the party claiming as a result of such change in ownership or interest. Such notice shall be supported by original and certified copies of all documents and other instruments or proceedings necessary in lessee's opinion to establish the ownership of the claiming party.

13. In the interest of conservation, the protection of reservoir pressures and recovery of the greatest ultimate yield of oil and/or gas, lessee shall have the right to combine the leased premises with other premises in the same general area for the purpose of operating and maintaining repressuring and recycling facilities, and for such purpose may locate such facilities, including input wells, upon leased premises, and no royalties shall be payable hereunder upon any gas used for repressuring and recycling operations benefiting the leased premises.

14. In the event lessor considers that lessee has not complied with all its obligations hereunder, either express or implied, lessor shall notify lessee in writing, setting out specifically in what respects lessee has breached this lease. Lessee shall then have sixty (60) days after receipt of said notice within which to meet or commence to meet all or any part of the breaches alleged by lessor. The service of said notice shall be precedent to the bringing of any action by lessor on said lease for any cause, and no such action shall be brought until the lapse of sixty (60) days after service of such notice on lessee. Neither the service of said notice nor the doing of any acts by lessee aimed to meet all or any of the alleged breaches shall be deemed an admission or presumption that lessee has failed to perform all its obligations hereunder.

15. All express and implied covenants of this lease shall be subject to all federal and state, county or municipal laws, executive orders, rules and regulations, and lessee's obligations and covenants hereunder, whether express or implied, shall be suspended at the time or from time to time as compliance with such obligations and covenants is prevented or hindered by or is in conflict with federal, state, county, or municipal laws, rules, regulations or executive orders asserted as official by or under public authority claiming jurisdiction, or Act of God, adverse field, weather, or market conditions, inability to obtain materials in the open market or transportation thereof, wars, strikes, lockouts, riots, or other conditions or circumstances not wholly controlled by lessee, and this lease shall not be terminated in whole or in part, nor lessee held liable in damages for failure to comply with any such obligations or covenants if compliance therewith is prevented or hindered by or is in conflict with any of the foregoing eventualities. The time during which lessee shall be prevented from conducting drilling or reworking operations during the primary term of this lease, under the contingencies above stated, shall be added to the primary term of the lease.

16. Lessor agrees that lessee, at its option, shall have the right at any time to pay for lessor, any mortgage, taxes or other liens existing, levied or assessed on or against the above described lands in the event of default of payment by lessor and be subrogated to the rights of the holder thereof, and lessor hereby agrees that any such payments made by lessee may be deducted from any amounts of money which may become due the lessor under the terms of this lease.

17. This lease and all its terms, conditions, and stipulations shall extend to and be binding on all successors in interest, in whole or in part, of said lessor or lessee.

18. With respect to and for the purpose of this lease, lessor, and each of them if there be more than one, hereby release and waive the right of homestead.

WHEREOF witness our hands as of the day and year last above written.

<del>_____</del>

### INDIVIDUAL ACKNOWLEDGEMENT

STATE OF _____ COLORADO _____ ]
                                      ] ss.
COUNTY OF _____ WELD _____ ]

On this _____ of _____, 2013, before me personally appeared _____ to me known to be the person(s) described in, and who executed the foregoing instrument, and who acknowledged to me that he executed the same as there free act and deed.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal the day and year last above written.

My commission expires:

_____                    _____

                                                Notary Public for the State of _____

779



**Form SC 13G/A**
**Amended Statement of**
**Beneficial Ownership**

**Filed Feb 14, 1995**

February 14, 1995

**Date**

*/s/ William F. Strome*

Signature - PNC Bank Corp.

**William F. Strome, Senior Vice President**

**Name/Title**

February 14, 1995

**Date**

*/s/ Paul L. Audet*

Signature - PNC Bancorp, Inc.

**Paul L. Audet, Vice President**

**Name/Title**

February 14, 1995

**Date**

*/s/ William F. Strome*

Signature - PNC Bank, National Association

**William F. Strome, Senior Vice President**

**Name/Title**

**See Agreement Attached as Exhibit A**

**AGREEMENT EXHIBIT A**

February 9, 1995

The undersigned hereby agree to file a joint
statement on Schedule 13G under the Securities
Exchange Act of 1934 (the "Act") in connection

- Document Search
- Shopping Cart
  - My Cart
  - Purchase History
  - Buy Subscription
- My Profile
- Search Help
- About
- Weld County
- Logout meghanashe

*PDC in Jan. 2014 docs*

AFFIDAVIT OF NON DEVELOPMENT & NON PAYME - 3967712

**General Data**

| | | |
|---|---|---|
| Document Number | | **Return Address** |
| 3967712 | | PNC ENERGY INC |
| Recording Date | Number Pages | Address1 |
| 10/01/2013 02:32:12 PM | 4 | 1775 SHERMAN ST |
| Recording Fee | Documentary Fee | Address2 |
| $26.00 | | STE 3000 |
| Total Fee | | City        State  Zip |
| $26.00 | | DENVER  CO   80203 |

Mailback Date
10/07/2013 03:07:12 PM

**Names**

| SIGNATURE | LESSOR/LESSEE |
|---|---|
| KEISTLER DONNA N | SIMTH GEORGE J |
| | SIMTH RUTH |
| | GEORGE ROBERT F |
| | LOUP RESERVOIR COMPANY |
| | DOWNING H S |
| | FELTE HENRY |
| | FELTE RUTH FRANCES |
| | COLTON COLTON |
| | STEINBRECHER ALEXANDER |
| | STEINBRECHER ESTHER |
| | NOFFSINGER MANUFACTURING CO INC |
| | SULPHUR RIVER EXPLORATION INC |
| | CODY NORDELL EXPLORATION INC |
| | MARJO INC |
| | GEROGE L ALLARD COMPANY |
| | LIND LELA L |
| | LIND BRUCE E |
| | LIND RACHELLE L |
| | LIND ALAN W |
| | NORTON MONA K |
| | NORTON BRAD |
| | GREAT WESTERN RAILWAY COMPANY |
| | OILCOM CORPORATION |
| | MISSION OIL CORPORATION |
| | ELK EXPLORATION INC |

*"Smith" on titled docs in 2012*

*– and many of these names also found on 2013/2014 "Royalty Owners" docs used from oil & gas co's.*

**Related**

781

**Document Number**
1165297
1165297

**Notes**

**Legal Data**

Section: 1 Township: 6 Range: 67 W2 W2
Section: 2 Township: 6 Range: 67 E2 E2

782



3967712     Pages: 1 of 4
10/01/2013 02:32 PM  R Fee:$26.00
Steve Moreno, Clerk and Recorder, Weld County, CO

# AFFIDAVIT OF NONDEVELOPMENT AND NONPRODUCTION

*see "PDC"*
*docs signed*
*by*
*Donna*
*Keistle*
*Jan, 2*

| | | |
|---|---|---|
| **State:** | **Colorado** | |
| **County:** | **Weld** | |
| **Affiant:** | **Name** | **Donna N. Keistler** |
| | **Address:** | **545 Estes Street** |
| | | **Lakewood, CO 80226** |

Affiant on oath swears that the following statements are true:

My name is Donna N. Keistler.  I am over the age of 21.  I am familiar with the following lands (the "Lands") in Weld County, Colorado:

Township 6 North, Range 67 West, 6th PM
Section 1:  W/2W/2
Section 2:  E/2E/2

A search of the online database records maintained by the Oil and Gas Conservation Commission of the State of Colorado show that no production of oil and/or gas has been reported during the primary terms of the oil and gas leases described as follows:

1. Dated:       July 28, 1953
   Lessor:      George J. Smith and Ruth Smith    *← named on 2012*
   Lessee:      Robert F. George                                *Title docs for*
   Recorded:    August 7, 1953, at Reception 1165297    *Short sale(s)*
   Term:        Ten years
   Legal:       Township 6 North, Range 67 West, 6th P.M.
                Section 2: Portions of the E/2

2. Dated:       August 1, 1953
   Lessor:      Loup Reservoir Company
   Lessee:      H. S. Downing                          *"Royalty"*
   Recorded:    August 14, 1953, at Reception 1165597    *owners*
   Term:        Ten years                                        *2013*
   Legal:       Township 6 North, Range 67 West, 6th P.M.    *COGCC*
                Section 2: a 28.5 Acre tract described in metes and bounds    *docs*

Simonsen 1i-421 - DDOTO dated 6/17/2013: Requirement 11                    Page 1 of 4

3. Dated:      November 9, 1970
   Lessor:     Henry Felte and Ruth Frances Felte
   Lessee:     Colton & Colton
   Recorded:   December 23, 1970, at Reception 1559357
   Term:       Five years, extended two (2) additional years
   Legal:      Township 6 North, Range 67 West, 6th P.M.
               Section 1:  Part of the SW/4 described in metes and bounds, containing 77
                           acres m/l;
               Section 2:  All that part of the SE/4 lying East of GWRR R/W and South of
               John Law Reservoir, containing 36.5 Acres m/l.

4. Dated:      May 21, 1971
   Lessor:     Alexander Steinbrecher and Esther Steinbrecher
   Lessee:     Colton & Colton
   Recorded:   July 1, 1971, at Reception 1570887
   Term:       Five years
   Legal:      Township 6 North, Range 67 West, 6th P.M.
               Section 2:  All that part of the SE/4 lying East of GRRR R/W and South of
                           John Law Reservoir.

*names 2012 on Title docs*
*½ Royalty owners in 2013*

5. Dated:      July 2, 1981
   Lessor:     Noffsinger Manufacturing Co., Inc.
   Lessee:     Sulphur River Exploration, Inc.
   Recorded:   August 4, 1981, at Reception 1865316
   Term:       Five years
   Legal:      Township 6 North, Range 67 West, 6th P.M.
               Section 2:  Lots A and B of RE 0807-02-1-RE440, recorded in Book 894 at
               Reception 1815572, said land being a part of the E/2

6. Dated:      July 30, 1981
   Lessor:     Alexander Steinbrecher and Esther Steinbrecher
   Lessee:     Sulphur River Exploration, Inc.
   Recorded:   October 13, 1981, at Reception 1871623
   Term:       Five years
   Legal:      Township 6 North, Range 67 West, 6th P.M.
               Section 2:  A parcel of land in the SE/4 lying East of the Great Western
               Railroad and South of the Reservoir

*Same*

3967712      Pages: 2 of 4
10/01/2013 02:32 PM  R Fee:$26.00
Steve Moreno, Clerk and Recorder, Weld County, CO

784

3967712      Pages: 3 of 4
10/01/2013 02:32 PM  R Fee:$26.00
Steve Moreno, Clerk and Recorder, Weld County, CO

7. Dated:        April 13, 1982
   Lessor:       George J. Smith and Ruth B. Smith         *2012*
   Lessee:       Cody Nordell Exploration, Inc.            *Title*
   Recorded:     April 14, 1982, at Reception 1888685      *Docs*
   Term:         Five years
   Legal:        Township 6 North, Range 67 West, 6th P.M.
                 Section 2:  A part of the E/2E/2, lying East of the GW RR R/W except John
                 Law Reservoir high water line.

8. Dated:        July 7, 1982
   Lessor:       MarJo, Inc., formerly known as Geroge L. Allard & Company
   Lessee:       Sulphur River Exploration, Inc.
   Recorded:     August 4, 1982, at Reception 1899531
   Term:         Three years
   Legal:        Township 6 North, Range 67 West, 6th P.M.
                 Section 2:  Lots A and B of RE 0807-02-1-RE440, recorded in Book 894 at
                 Reception 1815572, said land being a part of the E/2

9. Dated:        March 1, 1984
   Lessor:       Lela L. Lind, Bruce E. Lind and Rachelle L. Lind, Alan W. Lind, Mona K.
                 Norton and Brad Norton                     *2013*
   Lessee:       Mission Oil Corporation                    *"Royalty Owners"*
   Recorded:     March 14, 1984, at Reception 1959172
   Term:         Three years
   Legal:        Township 6 North, Range 67 West, 6th P.M.
                 Section 2:  Lots A and B of RE 0807-02-1-RE440, recorded in Book 894 at
                 Reception 1815572, said land being a part of the E/2

10. Dated:       November 25, 1983
    Lessor:      The Great Western Railway Company
    Lessee:      Oilcom Corporation
    Recorded:    March 16, 1984, at Reception 1959544
    Term:        Two years
    Legal:       Township 6 North, Range 67 West, 6th P.M.
                 Section 2:  A strip of land 80 feet in width through the E/2 of Section
                 2-T6N-R67W, being 40 feet on each side of the centerline of the track of the
                 Railroad of said Company as the same is now located and surveyed by the
                 engineer of said Corporation and other lands.

11. Dated:       July 22, 1985
    Lessor:      MarJo, Inc., formerly known as Geroge L. Allard & Company
    Lessee:      Mission Oil Corporation
    Recorded:    July 23, 1985, at Reception 2018096
    Term:        One year
    Legal:       Township 6 North, Range 67 West, 6th P.M.
                 Section 2:  Lots A and B of RE 0807-02-1-RE440, recorded in Book 894 at
                 Reception 1815572, said land being a part of the E/2

*Wayne Allard?*
*If Wayne Allard's name does appear on a water or well document somewhere in this section*

*2012 Title Docs*

12. Dated:        August 13, 1987
    Lessor:       George J. Smith and Ruth B. Smith
    Lessee:       Elk Exploration, Inc.
    Recorded:     October 26, 1987, at Reception 2118931
    Term:         Two years
    Legal:        Township 6 North, Range 67 West, 6th P.M.
                  Section 2:  Part of the E/2E/2, lying East of the Great Western Railroad right
                  of way except John Law Reservoir high water line, all as more particularly
                  described in Deed recorded in Book 1276 at Reception 1077406

**Affiant**

*Donna N Keistler*

Print Name:  Donna N. Keistler

Date: _9-11-2013_

ACKNOWLEDGEMENT

STATE OF COLORADO          )
                           ) §
COUNTY OF WELD             )

Subscribed and acknowledged before me on this _11th_ day of _September_, 2011, by
_Donna W. Keistler_

_Tracie Owens Yates_
Notary Public
Print Name _Tracie Owens Yates_

My Commission Expires

TRACIE OWENS YATES
NOTARY PUBLIC
STATE OF COLORADO
COMMISSION EXPIRES 01/05/2014

Pages: 4 of 4
3967712   R Fee:$26.00
10/01/2013 02:32 PM   Weld County, CO
Steve Moreno, Clerk and Recorder, Weld County, CO

*Just day after foreclosure*
*#1 vs Sept 1 - Not filed and executed until 10/1/13*

Simonsen 1i-421 - DDOTO dated 6/17/2013: Requirement 11                    Page 4 of 4

#1



5586 West 19th Street #1000,
Greeley, CO 80634
Phone: (970) 330-4522
Fax: (866) 828-0844

**DATE:** September 24, 2012
**FILE NUMBER:** 598-H0350734-084-MG4, Amendment No. 1
**PROPERTY ADDRESS:** 503 Mallard Drive, Severance, CO 80550-2921
**BUYER/BORROWER:** ███████████████
**OWNER(S):** ███████
**YOUR REFERENCE NUMBER:**
**ASSESSOR PARCEL NUMBER:** R0157395

PLEASE TAKE NOTE OF THE FOLLOWING REVISED TERMS CONTAINED HEREIN:

Amended sales price and premium

### WIRED FUNDS ARE REQUIRED ON ALL CASH PURCHASE TRANSACTIONS, SEE WIRING INSTRUCTIONS INCLUDED HEREIN.

| TO: | Heritage Title Company, Inc.<br>5586 West 19th Street #1000<br><br>Greeley, CO 80634 | ATTN:<br>PHONE:<br>FAX:<br>E-MAIL: | Melinda Gualandri<br>(970) 330-4522<br>(866) 828-0844<br>mgualandri@heritagetco.com |
|---|---|---|---|
| TO: | Pro Realty, Inc.<br>1110 38th Avenue<br>Suite 1000<br>Greeley, CO 80631 | ATTN:<br>PHONE:<br>FAX:<br>E-MAIL: | Mark Ferguson<br>(970) 353-1117<br>(970) 535-1328<br>simplyreo@simplyreo.com |
| TO: | Re/Max Alliance<br>5586 W. 19th Street<br>Suite 2000<br>Greeley, CO 80634 | ATTN:<br>PHONE:<br>FAX:<br>E-MAIL: | Jason Mahoney<br>(970) 330-5000<br>(970) 330-5100<br>thesuperteam@hotmail.com |
| TO: | Greeley Escrow<br>5586 West 19th Street #1000<br>Greeley, CO 80634 | ATTN:<br>PHONE:<br>FAX:<br>E-MAIL: | Melinda Gualandri<br>(970) 330-4522<br>(866) 828-0844<br>mgualandri@heritagetco.com |

### END OF TRANSMITTAL



Date:  September 24, 2012

Property Address:  503 Mallard Drive, Severance, CO 80550-2921

We would like to thank you for choosing Heritage Title Company, Inc. for your title insurance needs.

For all of your closing needs, including Tax Certificate, Settlement Statement, HUD and/or Insured Closing
Letters, your Escrow Officer is:  Melinda Gualandri,
Phone:      (970) 330-4522
Fax:        (866) 828-0844
Email:      mgualandri@heritagetco.com
Location of Closing:  5586 West 19th Street #1000  Greeley, CO 80634

## WIRING INSTRUCTIONS

| | |
|---|---|
| Bank: | Wells Fargo Bank West, NA |
| Bank Address: | 550 California St., 10th Floor |
| | San Francisco, CA  94104 |
| Account Name: | Heritage Title Company, Inc. |
| Account Number: | ██████7025 |
| ABA Number: | 121000248 |
| Reference: | 598-H0350734-084-MG4 |
| Property Address: | 503 Mallard Drive |
| | Severance, CO 80550-2921 |

Visit our website www.heritagetco.com for a demonstration of our Online Transaction Management Service,
TitleVault.  This amazing program allows you to manage your transactions 24/7!  Contact your Business
Development Representative for a login and password.

Sincerely,

Heritage Title Company, Inc.

09/24/2012 2:53:22 PM

Commitment No.:  598-H0350734-084-MG4, **Amendment No. 1**

# Attached Legal Description

Lot 58,
Lakeview Addition First Filing, Town of Severence,
County of Weld,
State of Colorado.

**Copyright American Land Title Association. All rights reserved.**  The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



789

09/24/2012 2:53:22 PM                    Commitment No.: **598-H0350734-084-MG4, Amendment No. 1**

## SCHEDULE B – Section 1
### Requirements

**The following requirements must be met:**

a.   Pay the agreed amounts for the interest in the land and/or for the mortgage to be insured.

b.   Pay us the premiums, fees and charges for the policy.

c.   Obtain a certificate of taxes due from the county treasurer or the county treasurer's authorized agent.

d.   Evidence that any and all assessments for common expenses, if any, have been paid.

e.   The Company will require that an Affidavit and Indemnity Agreement be completed by the party(s) named below before the issuance of any policy of title insurance.

   Party(s):       ████████████

   The Company reserves the right to add additional items or make further requirements after review of the requested Affidavit.

f.   Deed sufficient to convey the fee simple estate or interest in the Land described or referred to herein, to the Proposed Insured Purchaser. .

g.   Furnish for recordation a deed as set forth below:

   Grantor(s):     ███████████████ and Meghan B. Nutt
   Grantee(s):     █████████ and Meghan Belaski

   Reason:         The name of the grantor appears as Meghan Belaski-Nutt in the Quitclaim Deed to ████████ recorded April 12, 2011 at Reception No. 3761856, whereas title was vested in ██████████ and Meghan B. Nutt.

h.   Furnish for recordation a full release of deed of trust:

   Amount:          $120,000.00
   Trustor/Grantor: ██████████ and Meghan B. Nutt
   Trustee:         Public Trustee of Weld County
   Loan No.:        Unknown
   Beneficiary:     Countrywide Home Loans, Inc.   — MERS was/is beneficiary
   Recording Date:  August 31, 2004
   Recording No:    3214223

**Copyright American Land Title Association. All rights reserved.** The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

AMERICAN LAND TITLE ASSOCIATION

09/24/2012 2:53:22 PM                           Commitment No.: 598-H0350734-084-MG4, **Amendment No. 1**

### SCHEDULE B – Section 2

### Exceptions

**Any policy we issue will have the following exceptions unless they are taken care of to our satisfaction:**

*will not apply*

1.  Any facts, rights, interests or claims that are not shown by the Public Records but which could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.

2.  *Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.*

3.  Any encroachments, encumbrances, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by Public Records.

4.  Any lien or right to a lien, for services, labor or material heretofore or hereafter furnished, imposed by law and not shown by the Public Records.

*to be deleted 11/29/13*

5.  Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the Public Records or attaching subsequent to the effective date hereof but prior to the date the proposed Insured acquires of record for the value the estate or interest or mortgage thereon covered by this Commitment.

6.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof, (c) water rights, claims of title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.

7.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the *records of such agency or by the Public Records.*

8.  All taxes and assessments, now or heretofore assessed, due or payable.

9.  The right of proprietor of a vein or lode to extract or remove his ore should the same be found to penetrate or intersect the premises thereby granted as reserved in United States patent recorded March 31, 1891 in Book 11 at Page 134; and any and all assignments thereof or interest therein.

10. An easement for telephone and telegraph lines and incidental purposes granted to Mountain States Telephone and Telegraph Company by the instrument recorded on March 12, 1915 in Book 276 at Page 195.

11. Oil, gas and other minerals as conveyed to George J. Smith and Ruth Smith by deed recorded on August 10, 1950 in Book 1376 at Page 602, and any and all assignments thereof or interests therein.

12. Oil, gas and other minerals as reserved by Alex Steinbrecher in deed recorded on June 12, 1958 in Book 1457 at Page 623, and any and all assignments thereof or interests therein.

**Copyright American Land Title Association. All rights reserved.** The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



791

*find*
*Reception # 1845021*

09/24/2012 2:53:22 PM            Commitment No.: **598-H0350734-084-MG4, Amendment No. 1**

13.     Terms, conditions, provisions, agreements and obligations contained in the Dedication Agreement recorded on December 23, 1980 in Book 923 at _____.

14.     Terms, conditions, restrictions, provisions, notes and easements but omitting any covenants or restrictions, if any, including but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law, as set forth on the Plat(s) of said subdivision.

15.     Covenants, conditions, restrictions and easements but omitting any covenants or restrictions, if any, including but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, source of income, gender, gender identity, gender expression, medical condition or genetic information, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law, as set forth in the document recorded December 23, 1980 in Book 923 at _____ and any and all amendments and supplements thereto.

16.     Terms, conditions, provisions, agreements and obligations specified under the Subdivision Improvement Agreement by and between the Town of Severance and <u>Severance Development Company</u> recorded December 23, 1980 in Book 923 at _____.

17.     An easement for utility lines and incidental purposes granted to Public Service Company of Colorado by the instrument recorded December 1, 1994 in Book 1469 at _____.

18.     Order of Inclusion in the North Weld County Water District recorded April 8, 1996 in Book 1541 at _____.

*refers to a "mineral estate"*

NOTE: <u>Item(s)</u> above refer to recorded evidence that a mineral estate has been severed, leased, or otherwise conveyed from the surface estate.

19.     Ordinance No. 62CV15311 re The North Weld County Water District as set forth below:
         Recording Date:       March 3, 1997
         Recording No.:       _____

*KEY*
*removed from mineral estate*

END OF EXCEPTIONS

*Look @*
*2004*
*appraisal*
*by Landsafe*
*& PUD*
*attached to*
*2003 Deed*

*what is the*
*Severance Development*
*Company?*
*11/29/13*

Copyright American Land Title Association. All rights reserved. The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

*#1   Sept., 2012 version*

792

09/24/2012 2:53:22 PM

Commitment No.: 598-H0350734-084-MG4, Amendment No. 1



# Commonwealth Land Title Insurance Company
## COMMITMENT
### SCHEDULE A

Commitment No:      598-H0350734-084-MG4, Amendment No. 1

1.  **Effective Date:**      **September 11, 2012 at 7:00 A.M.**

2.  **Policy or policies to be issued:**

| Proposed Insured | Policy Amount |
|---|---|
| (a) ALTA Owners Policy 6-17-06 | $110,000.00 |
| (b) None | $0.00 |
| | $ |

3.  **The estate or interest in the land described or referred to in this Commitment is:**

    A Fee Simple

4.  **Title to the estate or interest in the land is at the Effective Date vested in:**

5.  **The land referred to in this Commitment is described as follows:**

    See Attached Legal Description

    (for informational purposes only) _____

    *80550*
    *not*
    *80546*

**PREMIUMS:**

Owners Coverage: $743.00
Tax Cert: $10.00
Deletion of 1-4: $60.00

*- what does deletion of 1-4 mean?*

**Copyright American Land Title Association. All rights reserved.** The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



09/24/2012 2:53:22 PM                    Commitment No.: 598-H0350734-084-MG4, **Amendment No. 1**

## AFFIDAVIT AND INDEMNITY AGREEMENT

**TO Heritage Title Company, Inc.** a Colorado Corporation and Commonwealth Land Title Insurance Company, a Nebraska Corporation.

1.  This is written evidence to you that there are no unpaid bills, and to the extent there may be unpaid bills, that the undersigned undertakes and agrees to cause the same to be paid such that there shall be no mechanics or materialmen's liens affecting the property for materials or labor furnished for construction and erection, repairs or improvements contracted by or on behalf of the undersigned on property:

    legally described as:
    **See Attached Affidavit and Indemnity Agreement Legal Description**

    Property Address:   **503 Mallard Drive, Severance, CO 80550-2921**

2.  We further represent that to the actual knowledge and belief of the undersigned there are no public improvements affecting the property prior to the date of closing that would give rise to a special property tax assessment against the property after the date of closing.

3.  We further represent that to the actual knowledge and belief of the undersigned there are no pending proceedings or unsatisfied judgments of record, in any Court, State, or Federal, nor any tax liens filed or taxes assessed against us which may result in liens, and that if there are judgments, bankruptcies, probate proceedings, state or federal tax liens of record against parties with same or similar names, that they are not against us.

4.  We further represent that there are no unrecorded contracts, leases, easements, or other agreements or interests relating to said premises of which we have knowledge.

5.  We further represent that to the actual knowledge and belief of the undersigned we are in sole possession of the real property described herein other than leasehold estates reflected as recorded items under the subject commitment for title insurance.

6.  We further represent that there are no unpaid charges and assessments that could result in a lien in favor of any association of homeowners which are provided for in any document referred to in Schedule B of Commitment referenced above.

7.  We further understand that any payoff figures shown on the settlement statement have been supplied to Heritage Title Company, Inc. as settlement agent by the seller's/borrower's lender and are subject to confirmation upon tender of the payoff to the lender.  If the payoff figures are inaccurate, we hereby agree to immediately pay any shortage(s) that may exist. If applicable as disclosed or referred to on Schedule A of Commitment referenced above.

The undersigned affiant(s) know the matters herein stated are true and indemnifies **Heritage Title Company, Inc.**, a Colorado Corporation and Commonwealth Land Title Insurance Company, a Nebraska Corporation against loss, costs, damages and expenses of every kind incurred by it by reason of its reliance on the statements made herein.

This agreement is executed with and forms a part of the sale and/or financing of the above described premises, and is given in addition to the conveyance and/or financing of the premises in consideration for the conveyance and/or financing, and forms a complete agreement by itself for any action thereon.

**SELLER:**                              **SELLER:**

_____                  _____

State of Colorado                        }ss:
County of **Weld**

The foregoing instrument was acknowledged, subscribed, and sworn to before me on _____ by

(SEAL)                                   _____
                                         Notary Public
                                         My Commission Expires:

79/4





Date:  October 25, 2012

Property Address:  503 Mallard Dr, Severance, CO 80550-2921

We would like to thank you for choosing Heritage Title Company, Inc. for your title insurance needs.

For all of your closing needs, including Tax Certificate, Settlement Statement, HUD and/or Insured Closing
Letters, your Escrow Officer is:  Melinda Gualandri,
Phone:      (970) 330-4522
Fax:         (866) 828-0844
Email:      mgualandri@heritagetco.com
Location of Closing: 5586 West 19th Street #1000  Greeley, CO 80634

### WIRING INSTRUCTIONS

| | |
|---|---|
| Bank: | Wells Fargo Bank West, NA |
| Bank Address: | 550 California St., 10th Floor |
| | San Francisco, CA  94104 |
| Account Name: | Heritage Title Company, Inc. |
| Account Number: | ██████7025 |
| ABA Number: | 121000248 |
| Reference: | 459-H0353905-084-MG4 |
| Property Address: | 503 Mallard Dr |
| | Severance, CO 80550-2921 |

Visit our website www.heritagetco.com for a demonstration of our Online Transaction Management Service,
TitleVault.  This amazing program allows you to manage your transactions 24/7!  Contact your Business
Development Representative for a login and password.

Sincerely,

Heritage Title Company, Inc.

10/25/2012 3:42:49 PM

Commitment No.: **459-H0353905-084-MG4**

# Attached Legal Description

Lot 58,
Lakeview Addition First Filing, Town of Severence,
County of Weld,
State of Colorado.

**Copyright American Land Title Association. All rights reserved.** The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



796

Commitment No.: **459-H0353905-084-MG4**

**SCHEDULE B – Section 1**

**Requirements**

**The following requirements must be met:**

a.   Pay the agreed amounts for the interest in the land and/or for the mortgage to be insured.

b.   Pay us the premiums, fees and charges for the policy.

c.   Obtain a <u>certificate of taxes</u> due from the county treasurer or the county treasurer's authorized agent.

d.   Evidence that any and all assessments for common expenses, if any, have been paid.

e.   The Company will require that an Affidavit and Indemnity Agreement be completed by the party(s) named below before the issuance of any policy of title insurance.

     Party(s):   ▮▮▮▮▮▮▮

     The Company reserves the right to add additional items or make further requirements after review of the requested Affidavit.

f.   Deed sufficient to convey the fee simple estate or interest in the Land described or referred to herein, to the Proposed Insured Purchaser.

g.   Furnish for recordation a deed as set forth below:

     Grantor(s):     Meghan B. Nutt
     Grantee(s):    ▮▮▮▮▮▮

     Reason:     The name of the grantor appears as Meghan Belaski-Nutt in the Quitclaim Deed to ▮▮▮▮▮ recorded April 12, 2011 at <u>Reception No. 3761856</u>, whereas title was vested in ▮▮▮▮▮▮▮ and Meghan B. Nutt and the notary acknowledgement is missing the county.

h.   Furnish for recordation a full release of deed of trust:

     Amount:     $120,000.00
     Trustor/Grantor:    ▮▮▮▮▮▮ and Meghan B. Nutt
     Trustee:     Public Trustee of Weld County
     Loan No.:     Unknown
     Beneficiary:     Countrywide Home Loans, Inc.
     Recording Date:    August 31, 2004
     Recording No:    <u>3214223</u>

**Copyright American Land Title Association. All rights reserved.** The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



10/25/2012 3:48:10 PM                                          Commitment No.: **459-H0353905-084-MG4**

An assignment of the beneficial interest under said deed of trust which names:

| | |
|---|---|
| Assignee: | The Bank of New York Mellon, fka The Bank of New York as Successor to JPMorgan Chase Bank, N.A., |
| Loan No.: | Unknown |
| Recording Date: | July 11, 2011 |
| Recording No: | 3778863 |

Note:  Rescission of Public Trustee Sale No. 10-2468 recorded September 20, 2011 at Reception No. 3793497, given in connection with the above Deed of Trust.

i.       Furnish for recordation a full release of deed of trust:

| | |
|---|---|
| Amount: | $22,500.00 |
| Trustor/Grantor: | ▮▮▮▮▮▮▮▮ and Meghan B. Nutt |
| Trustee: | Public Trustee of Weld County |
| Loan No.: | Unknown |
| Beneficiary: | Countrywide Home Loans, Inc. |
| Recording Date: | August 31, 2004 |
| Recording No: | 3214224 |

The Deed of Trust set forth above is purported to be a "Credit Line" Deed of Trust.  It is a requirement that the Trustor/Grantor of said Deed of Trust provide written authorization to close said credit line account to the Lender when the Deed of Trust is being paid off through the Company or other Settlement/Escrow Agent.

Click to view Tax Info

NOTE: Exception(s) number(ed) 1-4 will not appear on the Owner's Policy.  Exception number 5 will be removed from the policy provided the company conducts the closing.

**24 MONTH CHAIN OF TITLE, FOR INFORMATIONAL PURPOSES ONLY:**

The following vesting deeds relating to the subject property have been recorded in the Clerk and Recorder's office of the County in which the property is located:

Quit Claim Deed recorded April 12, 2011 at Reception No. 3761856.

NOTE: Exception(s) number(ed) 1 – 4  will not appear on the Owner's Policy.  Exception number 5 will be removed from the policy provided the company conducts the closing.

END OF REQUIREMENTS

**Copyright American Land Title Association. All rights reserved.** The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

AMERICAN
LAND TITLE
ASSOCIATION

## CONDITIONS

1. The term mortgage, when used herein, shall include deed of trust, trust deed, or other security instrument.

2. If the proposed Insured has or acquired actual knowledge of any defect, lien, encumbrance, adverse claim or other matter affecting the estate or interest or mortgage thereon covered by this Commitment other than those shown in Schedule B hereof, and shall fail to disclose such knowledge to the Company in writing, the Company shall be relieved from liability for any loss or damage resulting from any act of reliance hereon to the extent the Company is prejudiced by failure to so disclose such knowledge. If the proposed insured shall disclose such knowledge to the Company, or if the Company otherwise acquires actual knowledge of any such defect, lien, encumbrance, adverse claim or other matter, the Company at its option may amend Schedule B of this Commitment accordingly, but such amendment shall not relieve the Company from liability previously incurred pursuant to paragraph 3 of these Conditions.

3. Liability of the Company under this Commitment shall be only to the named proposed insured and such parties included under the definition of Insured in the form of policy or policies committed for and only for actual loss incurred in reliance hereon in undertaking in good faith (a) to comply with the requirements hereof, or (b) to eliminate exceptions shown in Schedule B, or (c) to acquire or create the estate or interest or mortgage thereon covered by this Commitment. In no event shall such liability exceed the amount stated in Schedule A for the policies or policies committed for and such liability is subject to the insuring provisions and Conditions and the Exclusions from Coverage of the form of policy or policies committed for in favor of the proposed Insured which are hereby incorporated by reference and are made a part of this Commitment except as expressly modified herein.

4. This Commitment is a contract to issue one or more title insurance policies and is not an abstract of title or a report of the condition of title. Any action or actions or rights of action that the proposed Insured may have or may bring against the Company arising out of the status of the title to the estate or interest or the status of the mortgage thereon covered by this Commitment must be based on and are subject to the provisions of this Commitment.

5. The policy to be issued contains an arbitration clause. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. You may review a copy of the arbitration rules at http://www.alta.org.

**Copyright American Land Title Association. All rights reserved.** The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

799

Commitment No.: **459-H0353905-084-MG4**



## COMMITMENT FOR TITLE INSURANCE

Issued by

### Heritage Title Company, Inc.

#### AS AGENT FOR

#### Commonwealth Land Title Insurance Company

Commonwealth Land Title Insurance Company, a Nebraska corporation ("Company"), for a valuable consideration, commits to issue its policy or policies of title insurance, as identified in Schedule A, in favor of the Proposed Insured named in Schedule A, as owner or mortgagee of the estate or interest in the land described or referred to in Schedule A, upon payment of the premiums and charges and compliance with the Requirements; all subject to the provisions of Schedule A and B and to the Conditions of this Commitment.

The Commitment shall be effective only when the identity of the Proposed Insured and the amount of the policy or policies committed for have been inserted in Schedule A by the Company.

All liability and obligation under this Commitment shall cease and terminate 6 months after the Effective Date or when the policy or policies committed for shall issue, whichever first occurs, provided that the failure to issue the policy or policies is not fault of the Company.

The Company will **provide** a sample of the policy form upon request.

IN WITNESS WHEREOF, Commonwealth Land Title Insurance Company has caused its corporate name and seal to be affixed by its duly authorized officers on the date shown in Schedule A.

Attest:

Secretary

SEAL

By:

President

**Copyright American Land Title Association. All rights reserved.** The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

AMERICAN
LAND TITLE
ASSOCIATION

10/25/2012 3:48:10 PM

Commitment No.: **459-H0353905-084-MG4**

### SCHEDULE B – Section 2
### Exceptions

**Any policy we issue will have the following exceptions unless they are taken care of to our satisfaction:**

1.    *Any facts, rights, interests or claims that are not shown by the Public Records but which could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.*

2.    Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

3.    Any encroachments, encumbrances, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by Public Records.

4.    Any lien or right to a lien, for services, labor or material heretofore or hereafter furnished, imposed by law and not shown by the Public Records.

5.    Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the Public Records or attaching subsequent to the effective date hereof but prior to the date the proposed Insured acquires of record for the value the estate or interest or mortgage thereon covered by this Commitment.

6.    (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof, (c) water rights, claims of title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.

7.    (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

8.    All taxes and assessments, now or heretofore assessed, due or payable.

9.    The right of proprietor of a vein or lode to extract or remove his ore should the same be found to penetrate or intersect the premises thereby granted as reserved in United States patent recorded March 31, 1891 in Book 57 at Page 134; and any and all assignments thereof or interest therein.

10.   An easement for telephone and telegraph lines and incidental purposes granted to Mountain States Telephone and Telegraph Company by the instrument recorded on March 12, 1915 in Book 376 at Page 395.

11.   Oil, gas and other minerals as conveyed to George J. Smith and Ruth Smith by deed recorded on August 10, 1950 in Book 1276 at Page 602, and any and all assignments thereof or interests therein.

12.   Oil, gas and other minerals as reserved by Alex Steinbrecher in deed recorded on June 12, 1958 in Book 1452 at Page 623, and any and all assignments thereof or interests therein.

**Copyright American Land Title Association. All rights reserved.**  The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



10/25/2012 3:48:10 PM                                    Commitment No.: **459-H0353905-084-MG4**

13.     Terms, conditions, provisions, agreements and obligations contained in the Dedication Agreement recorded on December 23, 1980 in Book 923 at Reception No. 1845022.

14.     Terms, conditions, restrictions, provisions, notes and easements but omitting any covenants or restrictions, if any, including but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law, as set forth on the Plat(s) of said subdivision recorded December 23, 1980 at Reception Number 1845021.

15.     Covenants, conditions, restrictions and easements but omitting any covenants or restrictions, if any, including but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, source of income, gender, gender identity, gender expression, medical condition or genetic information, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law, as set forth in the document recorded December 23, 1980 in Book 923 at Reception No. 1845023 and any and all amendments and supplements thereto.

        Modification(s) of said covenants, conditions and restrictions

        Recording Date:        August 12, 1994
        Recording No:          2402183.

16.     Terms, conditions, provisions, agreements and obligations specified under the Subdivision Improvement Agreement by and between the Town of Severance and Severance Development Company recorded December 23, 1980 in Book 923 at Reception No. 1845024.

17.     An easement for utility lines and incidental purposes granted to Public Service Company of Colorado by the instrument recorded December 1, 1994 in Book 1469 at Reception No. 2417354.

18.     Order of Inclusion in the North Weld County Water District recorded April 8, 1996 in Book 1541 at Reception No. 2484761.

19.     Ordinance No. 62CV15311 re The North Weld County Water District as set forth below:
        Recording Date:        March 3, 1997
        Recording No.:         2535848

NOTE: Item(s) above refer to recorded evidence that a mineral estate has been severed, leased, or otherwise conveyed from the surface estate.

END OF EXCEPTIONS

*#19 unduded un mineral estate this time - 1 month later with different buyer*

Copyright American Land Title Association. All rights reserved. The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.


AMERICAN
LAND TITLE
ASSOCIATION

*#2 version Oct., 2012*                                    802



10/25/2012 3:48:30 PM                                    Commitment No.: **459-H0353905-084-MG4**

## AFFIDAVIT AND INDEMNITY AGREEMENT

**TO Heritage Title Company, Inc.** a Colorado Corporation and Commonwealth Land Title Insurance Company, a Nebraska Corporation.

1. This is written evidence to you that there are no unpaid bills, and to the extent there may be unpaid bills, that the undersigned undertakes and agrees to cause the same to be paid such that there shall be no mechanics or materialmen's liens affecting the property for materials or labor furnished for construction and erection, repairs or improvements contracted by or on behalf of the undersigned on property:

   legally described as:
   **See Attached Affidavit and Indemnity Agreement Legal Description**

   Property Address: **503 Mallard Dr, Severance, CO 80550-2921**

2. We further represent that to the actual knowledge and belief of the undersigned there are no public improvements affecting the property prior to the date of closing that would give rise to a special property tax assessment against the property after the date of closing.

3. We further represent that to the actual knowledge and belief of the undersigned there are no pending proceedings or unsatisfied judgments of record, in any Court, State, or Federal, nor any tax liens filed or taxes assessed against us which may result in liens, and that if there are judgments, bankruptcies, probate proceedings, state or federal tax liens of record against parties with same or similar names, that they are not against us.

4. We further represent that there are no unrecorded contracts, leases, easements, or other agreements or interests relating to said premises of which we have knowledge.

5. We further represent that to the actual knowledge and belief of the undersigned we are in sole possession of the real property described herein other than leasehold estates reflected as recorded items under the subject commitment for title insurance.

6. We further represent that there are no unpaid charges and assessments that could result in a lien in favor of any association of homeowners which are provided for in any document referred to in Schedule B of Commitment referenced above.

7. We further understand that any payoff figures shown on the settlement statement have been supplied to Heritage Title Company, Inc. as settlement agent by the seller's/borrower's lender and are subject to confirmation upon tender of the payoff to the lender.   If the payoff figures are inaccurate, we hereby agree to immediately pay any shortage(s) that may exist. If applicable as disclosed or referred to on Schedule A of Commitment referenced above.

The undersigned affiant(s) know the matters herein stated are true and indemnifies **Heritage Title Company, Inc.**, a Colorado Corporation and Commonwealth Land Title Insurance Company, a Nebraska Corporation against loss, costs, damages and expenses of every kind incurred by it by reason of its reliance on the statements made herein.

This agreement is executed with and forms a part of the sale and/or financing of the above described premises, and is given in addition to the conveyance and/or financing of the premises in consideration for the conveyance and/or financing, and forms a complete agreement by itself for any action thereon.

**SELLER:**                                              **SELLER:**


_____                _____

State of Colorado                          }ss:
County of **Weld**

The foregoing instrument was acknowledged, subscribed, and sworn to before me on _____ by

(SEAL)                                                  _____
                                                        Notary Public
                                                        My Commission Expires:

10/25/2012 3:42:49 PM                              Commitment No.: **459-H0353905-084-MG4**

# Commonwealth Land Title Insurance Company
# COMMITMENT
### SCHEDULE A

Commitment No:        279-H0353905-084-MG4

1.  **Effective Date:**        October 12, 2012 at 7:00 A.M.

2.  **Policy or policies to be issued:**

    | Proposed Insured | Policy Amount |
    | --- | --- |
    | (a) ALTA Owners Policy 6-17-06 | $115,000.00 |
    |  Vernon | |
    | (b) None | $0.00 |

3.  **The estate or interest in the land described or referred to in this Commitment is:**

    **A Fee Simple**

4.  **Title to the estate or interest in the land is at the Effective Date vested in:**

    

5.  **The land referred to in this Commitment is described as follows:**

    See Attached Legal Description

(for informational purposes only)  503 Mallard Dr, Severance, CO 80550-2921

**PREMIUMS:**

**Owners Coverage: $752.00**
**Tax Cert: $10.00**
**Del #1-4: $60.00**

**Copyright American Land Title Association. All rights reserved.**  The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.





## Leadership Committee



**Gege Ellzey, Weld County Farm Bureau President**

*Contact Information*

*printed on 2/17/2014*

Office:
Fax:
Cell:



**Bob Winter, District 1 Director**

I am a retired farmer and very active in Weld County Farm Bureau. My wife Janet and I have farmed for over 35 years in the Eaton and Windsor areas of northern Colorado; we grew shell corn, silage corn, sugar beets, malt barley for Coors, pinto beans, alfalfa, onions, and seed wheat. We also finished about 2500 head of hogs per year for slaughter.

I have served as the President, Vice-President, and Secretary/Treasurer of the Colorado Pork Producers Council and Northern Colorado Pork Producers Coop. For the past 30 years, I have held the position of President of Loup Reservoir Company. I have been an active participant in the Weld County Farm Bureau and have held various positions within the organization, including President for 10 years. Currently, I am serving as the District I State Director for Colorado Farm Bureau representing Weld, Larimer, Boulder, and Adams counties, and consider representing the District 1 Farm Bureau membership an Honor and Privilege--YOUR VOICE IN AGRICULTURE.

*Contact Information*

Office:
Fax:
Cell: 970-686-2037

*President of the LOUP Reservoir CO last 30 years?*

**Lauren Felte, Weld County Farm Bureau Vice President**

I began my life farming in the same area I was born and raised, Severance, Colorado. Although I am currently retired from farming, I still do custom combining in the fall harvesting wheat, barley, beans, and corn with a Challenger combine. In addition to custom combining, I work in the summer and spring as a salesperson for Arial Sprayers Inc. in Platteville; Arial Sprayers does rig spraying and air dusting.

I am a member of the Windsor Lions Club Chapter where I am one of the active Charter representatives for my youngest grandson Presten's Cub Scout Pack 57 in Windsor. In addition to my Lion's Club responsibilities, I also serve as the Economic Development Planning Commissioner for the Town of Severance. I have been an active member of Weld County Farm Bureau for many years, and currently serve as the Weld County Farm Bureau Vice President. I believe in Farm Bureau and think it is a great grass roots organization!

*Contact Information*

Office:
Fax:
Cell:

*Economic Development Planning Commissioner for Severance...*



**Dana Thompson, Colorado Farm Bureau Regional Manager and Young Farmer and Rancher Program Coordinator**

*Contact Information*

Office:
Fax:
Cell: 970-227-1783

email

805

CAREN JACOBS CASTLE                                    (303) 865-1400

FORECLOSURE REFERRAL #3

January 31, 2014

Susie Velasquez
Public Trustee of Weld County
1701 23rd Avenue, Suite 250
Greeley, CO  80634-0000

Re:      Notice of Election and Demand to Foreclose
         Deed of Trust recorded August 31, 2004 at Reception No. 3214223
         in the County of Weld
         State of Colorado
         Property Address: 503 Mallard Drive, Severance, CO  80546

         Our File No.: 10-23712R

Dear Susie Velasquez:

        We enclose/transmit herewith the original "Notice of Election and Demand for Sale by Public Trustee" for the property described in the above-referenced Deed of Trust, and request that you record the same.  Please record the Notice of Election and Demand for Sale in compliance with C.R.S. 38-38-102, within ten business days.  Also enclosed is the original Combined Notice pursuant to C.R.S. 38-38-103 (unless your office has previously agreed to supply the Combined Notice).  When you have established a sale date, we request that you transmit a copy of the Combined Notice with sale date, and first and last publication dates noted thereon to our law firm via GTS or e-mail to salenotices@cmsatty.com.

        We enclose the following items to facilitate this foreclosure:

    1.  The Original Notice of Election and Demand as described above;
    2.  Original Deed of Trust; a certified copy of the recorded Deed of Trust, or a copy of the recorded Deed of Trust and certification by the Qualified Holder of the Evidence of Debt or its attorney pursuant to C.R.S. 38-38-100.3 (20) and C.R.S. 38-38-101 (2) together with recorded modifications of the Deed of Trust or recorded partial releases of the Deed of Trust, if any;
    3.  Original Evidence of Debt secured by said Deed of Trust or a corporate surety bond equal to one and one-half times the face amount thereof or copy of the Evidence of Debt and Certification by the Qualified Holder of the Evidence of Debt or its attorney pursuant to C.R.S. 38-38-100.3 (20) and C.R.S. 38-38-101 (2);
    4.  A list in compliance with C.R.S. 38-38-100.3(14) of names and addresses of parties to receive notice ("Appendix A");
    5.  Combined Notice pursuant to C.R.S. 38-38-103 (unless your office has previously agreed to supply the Combined Notice);
    6.  Copies of C.R.S. 38-37-108, 38-38-104, 38-38-301, 38-38-302, 38-38-304, 38-38-305, 38-38-306;
    7.  A Statement of Current Owner pursuant to C.R.S. 38-38-101(1)(g);
    8.  A Statement of Servicer pursuant to C.R.S. 38-38-101(1)(f.5)
    9.  An Affidavit pursuant to 38-35-109(5), if applicable;
    10. A Notice to Public Trustee Regarding Foreclosure Deferment Eligibility, if applicable;
    11. A deposit check or authorization to draw that amount from an ACH or draw account as an advance against the cost of this foreclosure in conformity with C.R.S. 38-38-101(10);
    12. One set of envelopes, if applicable;
    13. Other: _____

        _____

806

Public Trustee
Page Two

    Within twenty calendar days from the date that the enclosed "Notice of Election and Demand for Sale" is recorded by you, please mail notices to the parties whose names appear on the enclosed Appendix A at their respective addresses provided thereon informing them of the date, time and place of sale; their curative rights, if any, and their redemptive rights, if any, under applicable Colorado law.

    In the event you do not receive a separate amended mailing list from our office at least 60 days prior to the first scheduled sale date, you are instructed to use the names and addresses contained in the enclosed list ("Appendix A") as the amended mailing list under C.R.S. 38-38-100.3(1.5).

    We ask that you acknowledge receipt of the transmitted or enclosed documents via GTS or email to salenotices@cmsatty.com.

### STATEMENT OF NAME AND ADDRESS OF CURRENT OWNER(S)

    To the best of the knowledge of the undersigned as the Attorney for the Holder of the Evidence of Debt, the name and address of the current owner(s) of the property described in the Notice of Election and Demand are:

    █████ and Meghan B Nutt
503 Mallard Drive
Severance, CO 80550

### STATEMENT OF LOAN SERVICER, IF DIFFERENT FROM THE HOLDER OF THE EVIDENCE OF DEBT

**TO THE BEST OF THE KNOWLEDGE OF THE UNDERSIGNED AS THE ATTORNEY FOR THE HOLDER OF THE EVIDENCE OF DEBT, THE NAME OF THE LOAN SERVICER IS: Nationstar Mortgage LLC**

Sincerely,

Nationstar Mortgage LLC
Holder of the Evidence of Debt, as the term "Holder" is defined in C.R.S. 38-38-101(2)

By:    The Castle Law Group, LLC
        Attorneys for Holder of Evidence of Debt

By:    _____
        Cynthia Lowery-Graber
        #34145

enc.

Nutt / 10-23712R
CONV

807



# Weld County Public Trustee
## Susie Velasquez - Public Trustee



## PROPERTY DETAILS
ID: 13-0587

*+ Foreclosure #2*

Return to foreclosure search

Address
Bankruptcy
Basics
Cure
Deed
Law Firm
Mailings
Owner Redemption
Publication
Redemption
Sale Information
Withdrawal
Deferments
View Documents

### BASICS

| | |
|---|---|
| NED Date: | 8/19/2013 |
| NED Reception #: | 3957292 |
| Originally Scheduled Sale Date: | 12/18/2013 |
| Currently Scheduled Sale Date: | 2/12/2014 |
| Date File Received: | 8/6/2013 |
| Date File Created: | 8/16/2013 |

*last sale date was 1/29/14 Nationstar "referral" on 1/31/14 yet...*

### NED RERECORDING

| | |
|---|---|
| Date: | |
| Reception #: | |

### DEED OF TRUST

| | |
|---|---|
| Date: | 8/25/2004 |
| Recorded: | 8/31/2004 |
| Reception #: | 3214223 |

### LOAN INFORMATION

| | |
|---|---|
| Loan Type: | CONV |
| Original Principal Balance: | $120,000.00 |
| Principal Balance As Of Date: | 8/6/2013 |
| Outstanding Principal Balance: | $122,362.53 |
| Interest Rate: | 5.5 |
| Interest Type: | Adjustable |
| Current Holder: | THE BANK OF N |

*"LIBOR" NOTE*   *still Bank of NY*

808

February 10, 2014

PDC Energy-Denver
1775 Sherman Street
Denver, Colorado 80203

This letter is in response to the January 27, 2014, hearing before the Colorado Oil and Gas Conservation Commission, Cause NO. 407, Docket NO. 1401-UP-31, in order to pool all interests in a 400-acre wellbore spacing unit for the Simonsen 1i-421 well (API No. 05-123-35976) for development of the Codell Formation in Township 6 North, Range 67 West, 6th PM covering certain land in sections 1, 2, 11 and 12 naming ███████ as a Royalty Owner in Exhibit A of the initial application dated (in various forms), both November 27, 2013 and December 4, 2013, by Jost and Shelton, Energy Group, P.C., and submitted as an application to the Colorado Oil and Gas Conservation Commission requesting a date for a future hearing in January 2014 to pool all interests in the 400-acre unit.

It is likely that the information presented to the Commission on January 27, 2014, conveyed that ██████ ████ was a named royalty owner falling under the Category C description of the initial application as an unleased mineral interest the applicant had been unable to secure due to the fact that an offer to lease the mineral interest was submitted to ████████ by Land and Energy Inc. (LEI) on October 15, 2013, went unsigned and the check for title verification was not deposited.

The above named actions were not taken by ████████ due to the fact that the property in question is under federal investigation, that some the parties acting against our property interest were aware or made aware of the investigation by Meghan Belaski, and that certain aspects of the lease offer from LEI dated October 15, 2013, conflicted with the investigation, would affect title, and could not be signed in the manner that it was presented, but that ██████ (and I) were willing to work with LEI to move forward pending changes to the lease agreement.

Due to the failure to follow up with Meghan Belaski, an equal, but unacknowledged royalty owner on the same property with ████████ who did in fact reach out to LEI within a week or so of receiving the first offer dated October 15, 2013, talked at length with an individual at LEI about the situation, and was told they (LEI) would talk to their attorneys and get back to us as soon as possible. That never happened.

Instead, we were informed in December 2013 of an application for a hearing in January 2014, with no set date, to pool all interests in the 400-acre unit, and the next thing we know, we've received a letter from the State of Colorado date stamped January 3, 2014, (received on January 7, 2014) letting us know we had until January 10, 2014, to protest this pool. However, the hearing date was set and signed and acknowledged by the State of Colorado and the attorneys for PDC Energy on December 21, 2013 but not received by ████ and I until January 7, 2014.

That's more than 2 weeks of time that we lost to protest this pool (on record) due to the fact that the agents of the courts are following the letter of the law according to their interpretations, but abusing the process of what the law allows according to ours. Which is why ████████ appeared on January 27, 2014, in person to explain to the parties involved that we needed more time to try and figure out what has happened and how to best move forward considering the circumstances.

Because there was a public statement period at the hearing on January 27, 2014, as indicated on the documents sent by the state on January 3, 2014, and because Meghan Belaski had left a message with the Commission, and subsequently received a call back from the Commission, Meghan was made aware that the website for the Oil and Gas Commission had information she was seeking but the individual could not offer legal advice and told Meghan she should seek legal representation if she felt it was necessary.

It should be noted that the person who identified herself as an attorney with the state, and sought permission to discuss the situation with█████ after the hearing on January 27, 2014, seemed puzzled by our awareness of certain forms and terms and our goals with this situation, and wanted to know who I had talked with at the Commission. Maybe the lawyer should consider the following and then revisit how we could know the things we know as it pertains to our property rights.

It should also be noted that the federal investigation, ongoing since May 1, 2013, stems from an Independent Foreclosure Review (IFR) payment of 500.00 we received in April 2013 after submitting **10 pounds** of documents for the IFR on December 31, 2012 alleging years of fraud and purposeful misrepresentation, as well as numerous due process violations in the State of Colorado levied by actions of the public trustee and statements made in public records by agents of the courts to the 19th District Court in Weld County in our mortgage and foreclosure fraud situation. Almost everything we have in documentation is of public record with multiple attorney generals in several states, including the State of Colorado, the Consumer Financial Protection Bureau and the judicial 2 foreclosure actions of record with the Clerk and Recorder, the 19th District and the Public Trustee in Weld County from 2010-present day as well as complaints filed on our behalf from agency to agency.

What has concerned us the most recently is the fact that PDC Energy sent documents that were backdated to both July 15, 2013 and November 1, 2012, with no explanation as to why, and these documents were sent as a result of the acknowledged agreement on record from the January 27, 2014 hearing in order to allow additional time to decide how our royalty would be pooled. There was never any mention of backdating agreements, especially since it was acknowledged that LEI was a PDC company and their terms differ.

In light of the fact that the law firm and the energy companies didn't seem to care much as to inquire at all the conditions that caused our property to be under federal investigation as long as it has, in effect, required us to escalate our complaints to other law enforcement entities at this time and we would respectfully ask that the Jost And Shelton Energy Group P.C., and PDC Energy, as well as the Oil and Gas Conservation Commission for the State of Colorado, allow PDC and Jost and Shelton to proceed in the same manner they would have on January 27, 2014 if █████████ had **NOT** appeared that day.

We assume that means█████ royalty was considered an unleased mineral right that would be pooled with the other entities listed in Exhibit A under the named royalty owners on the initial application (November 2013). We are not so sure of what would have happened next however which is why we are going to let the proper law enforcement agencies conduct their investigations and decide what is proper in this case. We refuse to sign any documents at this time, especially backdated documents that affect title to our property, putting the onus on the entities that have pooled our interests in this manner.